JOHNSTON V. MITCHELL
ATTACHMENT TO HABEAS PETITION

9(f) Issues raised on direct appeal:

I.      The jurors were instructed that if they found Johnston not guilty by reason of insanity (NGRI), he could be released in 60 days or shortly thereafter. In fairness, and especially given persistent prejudices against the insanity defense, if the jury are to be instructed regarding the minimum possible consequence of an NGRI verdict then they should also have been instructed such commitments could continue for the rest of the defendant's life.

II.     The instruction on the burden of proof at commitment proceedings pushed jurors to reject an NGRI verdict. Jurors were told that if they returned an NGRI verdict, Johnston would be released unless the Commonwealth proved beyond a reasonable doubt that he remained mentally ill.  But the Commonwealth's evidence was that Johnston was not mentally ill. Jurors would conclude that if they found Johnston NGRI, the Commonwealth would not be able to prove mental illness beyond a reasonable doubt and Johnston would inevitably be released.

III.    The judge failed to instruct jurors that if Johnston lacked criminal responsibility while sober, his voluntary intoxication did not defeat that defense even if he knew that intoxication worsened his symptoms. The failure of the instructions to address that circumstance created a substantial likelihood of a miscarriage of justice.

IV.  Trial counsel did not object to admission of evidence that Johnston refused sobriety tests twenty minutes after the shooting. The defense was insanity and the evidence bore directly on  Johnston's mental functioning close to the time of the shooting. Counsel's failure constituted a significant failing in performance and seriously rejuiced the defendant.

V.      Johnston repeatedly and clearly invoked his right to counsel when questioned at the jail and at Bridgewater State Hospital. Nevertheless, Johnston was reapproached and questioned numerous times. All his responses should have been suppressed.

VI.     Trial counsel failed to move to exclude inadmissible evidence that Johnson invoked his right to counsel and refused to answer questions from staff at the House of Correction and at Bridgewater State Hospital.

VII.    Trial counsel failed to object to the prosecutor's insinuation that Johnston's early consultation with counsel indicated a false "constructed" insanity defense.

VIII.The Commonwealth elicited from its expert, Dr. Welner, that he had requested and been refused access to evidence that was plainly in Johnston's control. But Johnston had the constitutional right to refuse Welner's requests. Welner's testimony impinged upon Johnston's right to remain silent.

IX.     The judge should not have admitted evidence that Johnston had the textbook "Sociology of Deviant Behavior" in his trunk. The evidence was irrelevant, more prejudicial than probative, and the prosecutor used it to argue a false inference to the jury.

X.      Trial counsel elicited that Dr. Welner characterized Johnston as "moon-faced" – a fact not elicited on direct testimony - in an attempt to show that Welner personally denigrated Johnston. Dr. Welner responded that a moon face is a medical term describing a symptom of long-term anabolic steroid abuse. That was false. Counsel's failure to impeach Welner's response introduced damaging evidence and left Welner's credibility on psychopharmacology unchallenged.

XI.     Exclusion of Johnston's descriptions to Dr. Kelly of his hallucinations violated Johnston's right to present a defense.

XII.    Dr. Welner gave inadmissible hearsay summary testimony. Trial counsel's failure to object was ineffective.

XIII.The judge gave an unfairly one-sided instruction regarding state of mind.

XIV.    Fundamentally unfair conduct by the prosecutor.

Ground One
(d)(1) Decision on Motion for New Trial (attached)
(d)(6) Decision on Direct Appeal Consolidated with Motion for New Trial

05  023  132.

## COMMONWEALTH OF MASSACHUSETTS
### TRIAL COURT

HAMPSHIRE, ss.

**SUPERIOR COURT**
**CRIMINAL NO. 05-025-028**

A TRUE COPY
ATTEST

CLERK MAGISTRATE

**COMMONWEALTH**

**vs.**

**BRYAN R. JOHNSTON**

## MEMORANDUM OF DECISION ON
## DEFENDANT'S MOTION FOR NEW TRIAL
## AND EVIDENTIARY HEARING

On April 28, 2006, a Hampshire County jury convicted the defendant, Bryan R. Johnston

("Johnston"), of murder in the first degree, armed burglary, possession of a large capacity firearm

without a license, and possession of a large capacity firearm in the commission of a felony.

Johnston appealed the conviction to the Supreme Judicial Court. The case was sent to this court

for consideration of Johnston's motion for a new trial. Johnston has also moved for an

evidentiary hearing. For the reasons that follow, Johnston's motions for a new trial and an

evidentiary hearing are **DENIED**.

### BACKGROUND

There was no dispute in this case that Johnston shot and killed the victim, David Sullivan.

The issue at trial was whether Johnston was criminally responsible for his actions. The defense's

theory was that Johnston was not criminally responsible due to a mental disorder involving

hallucinations and delusions. The Commonwealth's theory was that even if the defendant

suffered from a mental illness, he was sane at the time of the killing. The Commonwealth

presented evidence that the defendant only exhibited symptoms long before the time of the

killings and while under the influence of drugs and alcohol. The facts of this case are sufficiently

set forth in detail in the memoranda of the parties, most reliably in the Commonwealth's Memorandum and will not be repeated here.  Instead, for the sake of brevity, each section will address those facts which are relevant to the nine asserted claims of error.

The defendant asserts nine grounds for his claims of error, arguing that trial counsel was ineffective for failing to anticipate or remedy errors allegedly committed during trial: (1) trial counsel was ineffective for failing to object to evidence that Johnston "refused" sobriety tests twenty minutes after the shooting; (2) trial counsel was ineffective for failing to move to exclude evidence that Johnston refused to speak, on advice of counsel, to correctional officers, doctors and nurses at the House of Correction, and at Bridgewater State Hospital; (3) the Commonwealth improperly used Johnston's understanding of the *Lamb* warnings as evidence of his sanity and trial counsel was ineffective for permitting the defense psychiatrist to administer these warnings; (4) the Commonwealth improperly elicited testimony from the Commonwealth's expert that he had requested and been refused access to evidence that was plainly in Johnston's control; (5) the Court improperly excluded testimony from the defense psychiatrist that Johnston's description of his hallucinations was consistent with mental illness and trial counsel was ineffective for failing to object to contrasting testimony from the Commonwealth's psychiatrist; (6) the Court erroneously excluded Johnston's statements to the defense psychiatrist describing his delusions; (7) trial counsel was ineffective for failing to object to hearsay testimony from the Commonwealth's psychiatrist; (8) trial counsel was ineffective for eliciting testimony from the Commonwealth's psychiatrist relating to Johnston's steroid use; and (9) the Commonwealth impermissibly used Johnston's decision to plead provocation in a disciplinary hearing as evidence of sanity.

2

## DISCUSSION

### I.     Standard of Review

The Commonwealth and Johnston dispute the standard of review the Court should apply

to a claim of ineffective assistance of counsel after a motion for new trial filed in the Supreme

Judicial Court is remitted to the trial court.  Under G. L. c. 278, § 33E, the court has a broad

review power over capital cases on direct appeal.  "If satisfied that the verdict was against the law

or the weight of the evidence, or because of newly discovered evidence, or for any other reason

that justice may require," the court is empowered to either order a new trial or direct the entry of

a verdict of a lesser degree of guilt.  G. L. c. 278, § 33E.  The statute provides that "motions for a

new trial shall be presented to that court and shall be dealt with by the full court, which may itself

hear and determine such motions *or remit the same to the trial judge for hearing and*

*determination.  Id.* (emphasis added).  The issue here is whether the trial court may apply the

same broad standard of review when a motion for a new trial is remitted as provided in the

statute.

Johnston asserts, without support, that when the case is referred back to the trial court, the

higher court delegates its authority under § 33E to the trial court.  However, the court has

repeatedly held that "§ 33E gives us a power on appeal *broader than that of a trial judge on a*

*motion for a new trial*."  Commonwealth v. Mazza, 366 Mass. 30, 33 (1974); see also

Commonwealth v. Grace, 381 Mass. 753, 758 (1980); Commonwealth v. Pisa, 372 Mass. 590,

597 (1977).  The court has further explained that its broad power under § 33E must be "used with

restraint."  Grace, 381 Mass. at 758; *Mazza*, 366 Mass. at 33.  Additionally, the court has stated

that the power under § 33E "imposes on us an obligation of the most serious *deliberation*."  Pisa,

3

372 Mass. at 597 (emphasis added), quoting from Commonwealth v. Williams, 364 Mass. 145, 151 (1973).

The court's repeated emphasis on exercising its statutory power with restraint and serious deliberation suggests that the decision to remit a new trial motion is not meant to constitute a delegation of the court's statutory authority to the trial court. See Id. at 682 n.1 (referring to § 33E as "our special powers of review"). The court's exercise of power with restraint is inapposite to freely delegating those powers to trial courts. The court has refused to extend the scope of § 33E review in other contexts. See, e.g., Commonwealth v. Smith, 427 Mass. 245, 256 (1998); Commonwealth v. Haley, 413 Mass. 770, 775 (1992).

That the court is unwilling to allow a single justice of the SJC to apply the § 33E standard of review on subsequent appeals, after the full court has already fulfilled its statutory obligations, further suggests that a trial court should not apply that standard of review when a new trial motion is remitted. The cases reflect an effort and intention to keep the § 33E power carefully contained within a particular and limited domain: the full court's review of the direct appeal. Thus, the Court must apply its ordinary standard of review for ineffective assistance of counsel. See G. L. c. 278, § 33E, Saferian, 366 Mass. at 96.

For each of Johnston's claims of ineffective assistance if counsel, the inquiry is 1) whether the performance of counsel falls below the standard of an "ordinarily fallible lawyer", and 2) whether any misstep deprived the defendant of "an otherwise available, substantial ground of defense." Commonwealth v. Baran, 74 Mass. App. Ct. 256, 271-272 (2009), quoting Saferian, 366 Mass. at 96. Accordingly, the Court considers whether there is "some showing that better work might have accomplished something material for the defense." Id. at 272.

4

## II.   <u>Request for Evidentiary Hearing</u>[1]

A judge has broad discretion to deny a motion for a new trial upon review of the motion and affidavits without conducting an evidentiary hearing.  Mass. R. Crim. P. 30 (c) (3).  See also <u>Commonwealth</u> v. <u>Rice</u>, 427 Mass. 203, 207 (1998).  "In determining whether a 'substantial issue' meriting an evidentiary hearing under rule 30 has been raised, [the Court] look[s] not only at the seriousness of the issue asserted, but also to the adequacy of the defendant's showing on the issue raised."  <u>Commonwealth</u> v. <u>Stewart</u>, 383 Mass. 253, 257–258 (1981).  "If the theory of the motion, as presented by the papers, is not credible or not persuasive, holding an evidentiary hearing to have the witnesses repeat the same evidence . . . will accomplish nothing." <u>Commonwealth</u> v. <u>Goodreau</u>, 442 Mass. 341, 348–349 (2004).

The claims here center on the defendant's position now that trial counsel's failure to object to or confront the admission of allegedly inadmissible evidence rendered his assistance ineffective.  There is arguably a tension between trial counsel's assertions in his affidavit and what the record and conduct at trial suggest the defense strategy was.  See <u>Commonwealth</u> v. <u>Epsom</u>, 422 Mass. 1002 (1996); <u>Commonwealth</u> v. <u>Licata</u>, 412 Mass. 654, 660-661 (1992). Unlike the cases where evidentiary hearings were deemed necessary, the claims in the affidavits in this case contain contradictions with the record and conduct of counsel at trial.  See <u>Epsom</u>, 422 Mass. at 1003; <u>Licata</u>, 412 Mass. at 660-661.[2]

At numerous times throughout the trial, counsel was called sidebar and asserted that a

---

[1] Specific areas concerning the claims of counsel are discussed in other sections.

[2] Additionally, the affidavits in those cases were from the defendants themselves, not from trial counsel.

5

strategic decision was made not to challenge objectionable evidence.  For example, on the first

day of testimony, the Court called counsel sidebar and inquired whether the defense team was

objecting to aspects of the testimony that was being given.  Defense counsel stated he was not.

The Court stated, "I just wanted to make it clear for the record that there's no objection based on

a strategic decision that's been made by the defense, correct?"  Defense counsel answered,

"That's right, your Honor." Later in the trial, at a sidebar conference, defense counsel was asked

to confirm that another area to which he was not objecting was "a matter of his strategy."

Counsel answered, "Yes." The next day at sidebar, the Court asked defense counsel if the failure

to object during other objectionable testimony was a "strategic decision" made by the defense.

Defense counsel confirmed that it was because he believed he could use the objectionable

material to his "advantage."

It is reasonable to conclude, as the trial judge who observed the conduct of counsel

throughout the trial, that strategic defense decisions were made at trial, in part, to present to the

jury a defense image of frankness and openness in an effort to establish trust that the defense was

not trying keep anything from the jury.  Here, the record contradicts the averments concerning

defense attorney's internal processes.  Notably, the defendant was represented by two

experienced defense attorneys. The second trial attorney, a senior criminal defense attorney, did

not file an affidavit.  Further, as discussed below, the conduct of counsel at trial anticipating

areas of evidence the defense now claims were a surprise undermines the post hoc defense

position now advanced.

For the reasons stated, the averments contained in the affidavit are not credited and no

evidentiary hearing is necessary to have them repeated. Commonwealth v. Pina, 1 Mass. App. Ct.

6

853 (1973). No substantial issue that necessitates an evidentiary hearing is raised. See

Commonwealth v. Wallis, 440 Mass. 589, 596 (2003). Accordingly, the claims of error are

examined based on the record, notwithstanding the claims in the affidavit.

**III.    Analysis of Claims**

**A)     Johnston's Interaction with Police regarding Field Sobriety Test**

Twenty minutes after the murder, Johnston's car got stuck on a log in a snow covered

parking lot on Route 9 in Hadley. The police came to the scene. When first asked to perform a

field sobriety test, Johnston "started to say that he was in college and that his professor told him

it was illegal, and he wasn't willing to do it at that point. The defendant [continued speaking] for

a little while." After the police told him that he would not be arrested, Johnston agreed and

submitted to a horizontal nystagmus gaze test. Evidence of this interaction was admitted at trial

as part of the Commonwealth's case-in-chief without objection from the defense.

Johnston asserts that his trial counsel was ineffective for failing to object to the admission

of evidence of his "refusal" to submit to field sobriety tests. This argument is without merit

because 1) Johnston's statements did not constitute refusal evidence, and 2) even if Johnston's

statements constituted refusal evidence, they were not admitted as consciousness of guilt in the

context of an OUI charge and therefore did not violate Johnston's right against self-incrimination.

See Commonwealth v. Healy, 452 Mass. 510, 513-514 (2008); Opinion of the Justices to the

Senate, 412 Mass. 1201, 1208-1209 (1992).

Article 12 of the Declaration of Rights of the Massachusetts Constitution provides in part

that no person shall "be compelled to accuse, or furnish evidence against himself." Opinion of

the Justices, 412 Mass. at 1206. Evidence of a defendant's refusal to furnish evidence violates

the defendant's right against self-incrimination if the refusal establishes the defendant's

consciousness of guilt for the particular crime charged. See Commonwealth v. Hinckley, 422

Mass. 261, 266-267 (1996); Commonwealth v. McGrail, 419 Mass. 774, 779-780 (1995);

Commonwealth v. Lydon, 413 Mass. 309, 314-315 (1992).

Even viewing Johnston's conversation with the police officers as reflecting an initial

hesitance on his part to participate in field sobriety tests, the testimony elicited at trial on this

matter cannot be fairly characterized as refusal evidence. When the police first asked him to

perform a test, Johnston volunteered that he was in college studying criminal justice and

suggested that because his professor told him the test was illegal, he wasn't willing to perform it.

However, after engaging in further discussion, Johnston agreed and performed a horizontal

nystagmus gaze test. This was not the type of explicit refusal that has been held to violate the

right against self-incrimination in other cases. Cf. McGrail, 419 Mass. at 776; Lydon, 413 Mass.

at 311. The evidence was not presented as a refusal, but rather as indicating the discussion

Johnston willing engaged in and the actions he took in performing the test. No suggestion was

made to the jury at any time to draw any inference based on Johnston's "refusal" to perform field

sobriety tests. Rather, the evidence was presented to show the defendant's actions and

statements concerning his mental processes.

Even if Johnston's statements to the police could properly be characterized as constituting

refusal evidence, trial counsel was not ineffective in failing to object to the statements because

they were not admitted to show consciousness of guilt or evidence of intoxication in a

prosecution for operating under the influence and thus did not violate Johnston's right against

self-incrimination. See Healy, 452 Mass. at 513-514; Opinion of the Justices, 412 Mass. at 1208-

8

1209. His remarks concerning the field sobriety tests were not introduced as a substitute for the statement "I had too much to drink and I know or at least suspect that I am unable to pass the test." See Opinion of the Justices, 412 Mass. at 1208-1209. Instead, Johnston's statements were introduced to show that his mental functioning was not impaired to such an extent that he could not make decisions, control his conduct, or form specific intent on the night of the murder. The significance of the evidence was not to support a conclusion that he was intoxicated or impaired; just the opposite. It was to support an inference that he was **not** impaired. This was a permissible use of the evidence that did not offend Article 12. See Healy, 452 Mass. at 513-514; McGrail, 419 Mass. at 776.

Further, Johnston's reliance on Commonwealth v. Mahdi, 388 Mass. 679, 694-696 (1983) and Wainwright v. Greenfield, 474 U.S. 284 (1986) to support his contention that the evidence was not admissible for the purpose of demonstrating his mental functioning is misplaced. In Mahdi, the court held that a defendant's exercise of the right to remain silent after being arrested and receiving Miranda warnings could not be used to infer sanity. Mahdi, 388 Mass. at 695-696. In Wainwright, the same conclusion was reached on federal due process grounds. Wainwright, 474 U.S. at 294-295. However, in his interaction with the police regarding the field sobriety test, Johnston did not exercise his right to remain silent or any other applicable right. See, Commonwealth v. Blais, 428 Mass. 294, 299-300 (1998). Instead, he merely had a conversation with the police regarding field sobriety tests, gratuitously mentioning that he was studying criminal justice, expressing hesitance concerning the tests and stating his reasons, but ultimately agreeing to participate. There is neither a concern regarding the "inherent ambiguity of silence" nor a need to consider the "implicit assurance of Miranda warnings" that the defendant's exercise

9

of the announced right will carry no penalty. See <u>Mahdi</u>, 388 Mass. at 695-696.

Accordingly, Johnston's conversation with the police was properly introduced as evidence of his mental condition. As the evidence of Johnston's statements to the police was admissible, trial counsel's decision not to object cannot be deemed as performance falling measurably below what be expected from an ordinarily fallible lawyer, nor did it deprive Johnston of an otherwise available substantial ground of defense. See <u>Satterfield</u>, 373 Mass. at 115; <u>Saferian</u>, 366 Mass. at 96-97.

**B)    Admissibility of the Evidence of Johnston's Silence on Advice of Counsel**

There were approximately ten instances mentioned at trial of Johnston's election not to discuss certain topics with mental health providers on advice of counsel. Some exhibits introduced into evidence contained notations that Johnston, on advice of counsel, would not discuss certain topics, including in a report from Dr. Leonard Peebles, who was assigned to conduct a forensic evaluation of Johnston at Bridgewater State Hospital ("Bridgewater") during Johnston's commitment pursuant to G.L. c. 123, section 18. Johnston's decision not to answer was in response to certain specific questions from psychiatrists, jail staff, and medical staff at Bridgewater.

Before any "refusals" had been admitted in evidence, defense counsel submitted a draft instruction and asked the Court to instruct the jury concerning the refusal on advice of counsel, "when that becomes an issue." The request was presented prior to the defense calling its expert, Dr. Martin Kelly. At same time, defense counsel brought to the Court's attention that the Commonwealth's expert had referred to the matter in his report. The same area was also contained in Dr. Kelly's report. Dr. Kelly then testified on direct by defense counsel regarding

10

the records he reviewed, including that on advice on counsel Johnston did not discuss any

matters with hospital staff during the first few weeks of his stay and later that interviews were

conducted of Johnston by Dr. Peebles with defense counsel present.

The defense then moved to admit Dr. Peebles report; the very report that contained

numerous references to the defendant's decision not to answer certain questions on advice of

counsel, subject to unspecified "sanitization".[3]  The defense further moved to admit the

Bridgewater records which also contained references to the "refusals".  The first the defense

asked that the Court give the limiting instruction was during the cross-examination of Dr. Kelly,

which the Court did, explaining that the jury was not to draw any adverse inferences because the

defendant had not provided certain information on advice of counsel.  The defense indicated it

was satisfied with the instruction.  At no time during either the direct examination or the cross-

examination of Dr. Kelly did the defense voice any dissatisfaction, surprise or concern with the

"refusal" evidence, aside from to ask that the jury be instructed not to hold it against the

defendant.

The only objection regarding the defendant's statements of denial was made when the

prosecution elicited testimony concerning a notation in the records that Johnston "den[ied]

symptoms of psychosis", arguing that the same limiting instruction as had been given before

should be given again.  The Court refused as the denial did not refer to a declination to answer on

advice of counsel, but rather was a response by the defendant that he did not suffer from

symptoms of psychosis.  Counsel objected after some of the instances and also requested curative

---

[3]Counsel did not request redaction of entries of "refusals".

11

instructions, which were given.[4] In closing argument, defense counsel reminded the jury that Johnston's refusal to answer certain questions was on advice of counsel and that this could not be used to support any adverse inference against Johnston. The defendant now claims ineffective assistance of counsel for failure to exclude the evidence.

Johnston's election not to answer certain questions included reference to the fact that his action was taken on advice of counsel or that he would not answer a particular question until he had a chance to speak to counsel. The defendant did not invoke his right to remain silent; rather, he set limits as to the subjects upon which he would speak, based on his understanding of his attorney's advice. For example, in Dr. Peebles' report, Johnston "refused to discuss anything related to his mental status or history. He continued to request to speak with his attorney." The report further stated that Johnston "responded to his attorney's request to selectively answer some questions." The unobjected to testimony from witnesses regarding Johnston's refusal to answer questions also consistently emphasized that Johnston was acting on advice of counsel. Johnston declined to answer some specific areas of questioning from jail staff, Dr. Peebles, and medical staff at Bridgewater based on the advice of counsel. Johnston answered certain questions during the time he was in Bridgewater and declined to answer others without first consulting with counsel.

A willingness to discuss certain subjects interspersed with an unwillingness to discuss others is not an assertion of the right to remain silent. Commonwealth v. Robidoux, 450 Mass. 141 (2007). This is in keeping with the long-standing prohibition against using a defendant's

---

[4]Trial counsel has submitted an affidavit asserting that he was surprised when this evidence was introduced and never wanted it put before the jury. For reasons discussed in further detail below, as this affidavit contradicts the record the Court does not credit the claims.

exercise of his right to remain silent to prove sanity. Doyle v. Ohio, 426 U.S. 610 (1976). Unless the right to remain silent is invoked, the right against self-incrimination does not include the right to exclude from evidence the refusal to respond to particular questions. See, Commonwealth v. Womack, 457 Mass. 268 (2010). As indicated in the Bridgewater records that comprise the main source of evidence of "refusals", Johnston answered questions that he apparently did not believe would involve legal concerns, such as improvement in his mood, some anxiety and chronic sleep problems and trouble with concentration, and was unwilling to discuss others such as, aspects of his history due to legal concerns. Because there was no invocation of his right to remain silent, the admission of Johnston's refusal to answer certain questions was not in error.

Other statements Johnston made were simply denials of symptoms of psychosis, not unequivocal denials of accusations of a crime. See, Commonwealth v. Ruffin, 399 Mass. 811 (1987). Moreover, the statements the defense seeks to characterize as "denials" were elicited on the cross-examination of the defense expert, not in the Commonwealth's case-in-chief. Cf. Womack, supra. There was no error in admitting the statements and counsel's representation in this regard did not constitute ineffective assistance of counsel.

**C)    Reasonableness of Trial Strategy Regarding Johnston's Silence on Advice of Counsel**

Assuming, *arguendo*, that the admission of the challenged evidence was in error, the decision by counsel not to seek exclusion of them was a strategically sound decision. The claim now that the defense was surprised by the Commonwealth's elicitation of evidence of the defendant's refusal to answer certain questions on advice of counsel is contrary to his conduct at trial. As at other times during the trial when the defense stated it was making a strategic decision

13

not to object to certain evidence, on this issue the defense appeared to be aware of the potentially objectionable material.

The introduction of otherwise inadmissible evidence of a defendant's invocations of his rights to silence and counsel is not erroneous where defense counsel initially introduces the evidence as part of an apparent trial strategy and there is substantial other evidence of the defendant's sanity. Commonwealth v. Adams, 434 Mass. 805, 813-814 (2001). As the introduction of the evidence is not erroneous in these circumstances, its introduction does not support the conclusion that defense counsel's performance fell below the standard of an "ordinarily fallible lawyer." See *Baran*, 74 Mass. App. Ct. at 271-272, quoting Saferian, 366 Mass. at 96.

The jury first heard evidence of Johnston's silence on advice of counsel from Dr. Kelly, the defendant's expert, on direct examination. Then, immediately after Dr. Kelly testified that Johnston was silent on advice of counsel at Bridgewater, defense counsel moved to introduce the report of Dr. Peebles, which contained many more references to Johnston's silence of advice of counsel. It was only after the defense introduced this evidence that the prosecution elicited any testimony about Johnston's refusal to speak on counsel's advice (e.g., in cross examination of Dr. Kelly, cross examination of Kim Johnston, and direct examination of Dr. Peebles).

A review of the whole record strongly indicates that defense counsel introduced the evidence as part of his trial strategy, notwithstanding his conflicting statements in his affidavit. See Commonwealth v. Bell, 460 Mass. 294, 305-306 (2011); citing Commonwealth v. Goodreau, 442 Mass. 341, 351 (2004). This is not a case in which the defense was unaware of the evidence and sat idly by as it was introduced. Instead the record shows that the defense took an active role

14

both in eliciting the testimony and in focusing in on it before it was introduced, at the time it was introduced and later when it was referred to by the prosecution.

There was a sound strategic reason to introduce the evidence, namely to provide some explanation for the absence of psychotic statements or behavior from Johnston while he was detained at Bridgewater during the thirty-day observation period. As Commonwealth expert forensic psychiatrist Michael Welner testified, consistent with his written report, the Bridgewater records contained nothing indicative of bizarre behavior, irrational ideas, hallucinations, emotional instability, disorganized communications, disorientation, or cognitive confusion. Dr. Peebles testified that despite not receiving anti-psychotic medication at Bridgewater, Johnston did not express active irrational thought and did not appear to be actively mentally ill. A reasonable conclusion by counsel could be drawn that it would be harmful to the defense if the jury were not informed that his influence and advice had a significant impact on Johnston's conduct at Bridgewater. In the absence of such an explanation, the jury would potentially be far more likely to conclude that Johnston did not suffer from any psychotic or delusional disorder. It would also be a reasonable tactical decision to avoid the harmful jury speculation that could result from redacting the Bridgewater records to conceal the numerous references therein to Johnston's silence on advice of counsel. See, Commonwealth v. McCaster, 46 Mass. App. Ct. 752, 753 (1999), and cases cited.

Despite clear indications in the record that trial counsel anticipated the evidence coming in, he asserted in his affidavit that he was surprised when it was introduced.[5] This undermines

---

[5] In total, the affidavit contains six assertions of surprise, with a separate assertion of surprise corresponding to nearly every piece of contested evidence.

15

the credibility of trial counsel's further averments in the affidavit that he "never wanted this evidence put before the jury" and had no intention of eliciting the testimony from Dr. Kelly. See Goodreau, 442 Mass at 351. The conclusion that trial counsel made a strategic decision to not exclude the evidence is bolstered by his conduct at trial and the fact that he conceded that he was making a strategic decision not to object to otherwise inadmissible evidence at other junctures in the trial.

Moreover, there was substantial independent evidence of Johnston's sanity. See Adams, 434 Mass. at 812. There was testimony from many witnesses that Johnston appeared normal most of the time, including but not limited to the following: 1) testimony from Johnston's work supervisor at Baystate Medical Center that Johnston was polite and had very good job performance, 2) testimony from Johnston's friend Justin Bond that they engaged in regular "everyday activities", 3) testimony from Johnston's co-worker that Johnston was reliable and able to handle stressful situations at work, 4) testimony from Johnston's friends that he was normal when sober, 5) testimony from Johnston's college professor that Johnston was one of his better students and did not engage in any unusual behavior, 6) testimony from Johnston's friend Brian Picard that Johnston never mentioned that people were after him before going to Hawaii, and 7) testimony from Dr. Peebles and the Commonwealth's expert, Dr.Welner, that Johnston did not show psychotic symptoms at Bridgewater. In light of the other evidence of Johnston's sanity, the evidence of Johnston's silence on advice of counsel "played a minor role in the battle of experts on the question of legal sanity, with an enormous amount of personal history, conduct, and testing material as ammunition for that battle." See id. at 815.

The Court gave the limiting instruction to the jury at defense counsel's request after the

prosecutor elicited testimony from Dr. Kelly on cross-examination about Johnston's refusal to answer questions. Trial counsel may reasonably have concluded that the limiting instruction was consistent with his strategy of allowing the jury to hear about Johnston's silence on advice of counsel to explain the absence of psychotic statements at Bridgewater while avoiding the potentially adverse inferences that the evidence could also give rise to, e.g., that Johnston's compliance with his attorney's advice was evidence of his sanity.

Accordingly, the admission of the evidence of Johnston's silence on advice of counsel was neither erroneous nor manifestly unreasonable on the part of defense counsel. Defense counsel's action on this matter therefore did not amount to ineffective assistance of counsel. See Commonwealth v. Harbin, 435 Mass. 654, 656-657 (2002).

**D)   Johnston's Understanding of the Lamb Warning**

Dr. Carol Feldman, a forensic psychologist, testified at trial as a defense expert. On cross-examination, the prosecutor elicited testimony from Dr. Feldman that Johnston understood the *Lamb* warning that she gave at the beginning of their interviews. Dr. Feldman also testified that Johnston had "an appropriate understanding of what his lawyer does for him." Trial counsel did not object to this testimony. Dr. Feldman qualified her responses to this line of inquiry by stating that "the fact that he understood the *Lamb* warning, that is entirely consistent with a diagnosis of paranoid schizophrenia." At the time of Dr. Feldman's interviews of Johnston, trial counsel did not instruct her not to administer the *Lamb* warnings.

Johnston's contention that the prosecutor's inquiry into his understanding of the *Lamb* warning unfairly burdened his right to present an insanity defense or his right to counsel is without support. A defendant must be given a fair opportunity to marshal an insanity defense.

17

However, that certain aspects of the testimony from a defense expert may have led to undesirable inferences does not mean that Johnston was unfairly deprived of an opportunity to present an insanity defense. Commonwealth v. Mamay, 407 Mass. 412, 420 (1990).

Johnston's argument appears to implicitly equate his expression of understanding of the *Lamb* warnings with the protected exercise of a constitutional right, such as the right to remain silent or the right to counsel. Johnston did not exercise either right in this context. The defendant's privilege against self-incrimination does not apply to statements made to a defense psychiatrist because such statements are voluntarily made and not compelled by the government. See, Commonwealth v. Sliech-Brodeur, 457 Mass. 300 (2000). Although a defendant's exercise of the right to remain silent after being arrested and receiving *Miranda* warnings cannot be used to infer sanity, it is the **exercise** of right that is protected, not the understanding of its content. See, Commonwealth v. Brown, 449 Mass. 747, 764 (2007). As a prosecutor may elicit testimony about a defendant's understanding of *Miranda* waiver in order to combat an insanity defense, a defendant's understanding of *Lamb* warnings is permissible, especially where the exercise of rights is not involved.

Further, the questioning did not unfairly burdened the defendant's right to present an insanity defense because Dr. Feldman responded to the question by stating "the fact that he understood the *Lamb* warning, that is entirely consistent with a diagnosis of paranoid schizophrenia." To the extent that the questioning may have otherwise weakened Johnston's insanity defense, Dr. Feldman's response could certainly be deemed to have rectified the harm and lessened the prejudice to the defense.

There is also no merit to the defendant's contention that the prosecutor's inquiry "unfairly

18

burdened Johnston's right to consult with counsel." Johnston's argument is essentially that his understanding of the warnings was a product of his prior consultation with counsel and the prosecutor therefore violated his right to counsel by using that understanding to undermine his insanity defense. As the Commonwealth notes, such a rule, if taken to its logical extreme, would prohibit evidence of any statement by the defendant that was influenced by prior consultation with counsel. This case is distinguishable from cases in which the prosecution impermissibly infringed on the defendant's right to counsel. Contrast Commonwealth v. Person, 400 Mass. at 138; Commonwealth v. Sezama, 339 Mass. at 157-158.

Johnston argues that trial counsel was ineffective both for failing to object to the aforementioned testimony and for failing to instruct Dr. Feldman at the time of the interview not to give *Lamb* warnings, which Johnston suggests were not necessary in this context. Johnston asserts that Dr. Feldman's administration of the warnings and confirmation that Johnston understood them generated a powerful line of attack from the prosecution against Johnston's insanity defense. Counsel's failure to object did not amount to ineffective assistance because, for the reasons discussed above, the testimony was not objectionable. See Brown, 449 Mass. at 763-764. Counsel's failure to instruct Dr. Feldman at the time of the interview not to administer *Lamb* warnings does not amount to ineffective assistance. See Commonwealth v. Seabrooks, 433 Mass. 439, 450-451 (2001).

Assuming that *Lamb* warnings were not required, counsel was not ineffective for failing to instruct the defense expert not to give them. See G. L. c. 233, § 20B (b); Seabrooks, 433 Mass.

at 450-451,[6] In light of (1) Dr. Feldman's testimony that Johnston's understanding of the *Lamb*

warnings was entirely consistent with a diagnosis of paranoid schizophrenia, and (2) the

substantial amount evidence of Johnston's sanity presented at other junctures of the trial,

counsel's failure to prevent Dr. Feldman from giving the *Lamb* warnings cannot be said to have

deprived the defendant of "an otherwise available, substantial ground of defense." Baran, 74

Mass. App. Ct. at 271-272, quoting Saferian, 366 Mass. at 96.

### E)      Johnston's Personal Communications and Financial Records

The Commonwealth's expert, Dr. Welner testified on direct examination in discussing the

sources of his expert opinion; 1) "I requested but was not given a history of [Johnston's]

spending and any kind of financial . . . spending, credit," and 2) "I requested [Johnston's internet

communications] and I was told it was not available to me." Trial counsel did not object to this

testimony. The defendant argues that trial counsel was ineffective for failing to object. Given

the ambiguous and limited nature of this testimony, as well as the lack of evidence that Johnston

ever refused to produce his personal communications and financial records, this evidence did not

violate Johnston's right, under art. 12, not to be compelled to furnish evidence against himself.

Contrast Conkey, 430 Mass. at 141-142; Commonwealth v. Martinez, 34 Mass. App. Ct. 131,

132-134 (1993).

Dr. Welner did not make any reference in his testimony to Johnston refusing to furnish

evidence of his personal communications or financial records. Dr. Welner's statements such as "I

---

[6] The defendant cites Commonwealth v. Sliech-Brodeur, 457 Mass. 300, 316 n.21 (2010).
However, in Sliech-Brodeur, the court held that the privilege against self-incrimination protects a
defendant's communications to his own psychiatric expert from compelled disclosure to the
Commonwealth's expert through pretrial discovery order. Such compelled disclosure to the
Commonwealth's expert has not occurred in this case.

requested and I was told it was not available to me" are ambiguous at best. When viewed in context, a reasonable interpretation of these statements is that Welner requested additional information from the prosecutor's office, rather than from Johnston himself. Further, the first two statements regarding information that Dr. Welner was not able to obtain were couched within a very long list of other sources of information that Dr. Welner was able to obtain. The brief and passing nature of the complained-of testimony is thus distinguishable from the evidence in cases such as Martinez, which was far more repeated and obvious. See Martinez, 34 Mass. App. Ct. at 132 n.2. Neither Conkey nor Martinez required a chain of inferences to reach the conclusion that the defendant had refused to furnish evidence and unlike Conkey, the prosecutor in this case did not refer to this matter in closing argument. See Conkey, 430 Mass. at 141.

Given the context and brevity of the complained-of testimony, a finding that trial counsel was ineffective for failing to object to the statements is unwarranted. See e.g., Commonwealth v. Mercado, 452 Mass. 662, 668 (2008); Commonwealth v. Matthews, 450 Mass. 858, 866-867 (2008). The context in which the testimony was given did not suggest, as the defense contends, that the information was plainly within the defendant's control. There is no basis in the record for to conclude that the jury might have inferred that the defendant refused to provide material to the Commonwealth. The failure to object to such testimony was not ineffective assistance of counsel.

Dr. Welner's isolated statement on cross examination that he "had asked for e-mail and computer files [and] was told that they had been destroyed before they could come to the possession of the prosecutor's office" does not change the conclusion that no evidence was presented to suggest that evidence was requested of the defendant which he refused to give. The

21

answer was made in the context of Dr. Welner's testimony that he asked police officers to follow up in their questions and did not discriminate in his requests to the prosecutor whom they should speak to. Neither in the unobjected to testimony on direct nor in the answers elicited on cross examination was the jury provided with evidence from which a juror could have inferred that the police had requested the defendant turn over records or communications. Objecting in these circumstances would therefore not amount to better work that "might have accomplished something material for the defense." Baran, 74 Mass. App. Ct. at 272, quoting Satterfield, 373 Mass. at 115.[7]

**F)   Johnston's Statements about Hallucinations**

Dr. Martin Kelly, a psychiatrist, was called as a second expert witness for the defense. The Court sustained the Commonwealth's objection when trial counsel asked whether Johnston's "description of the hallucinations was consistent with an identifiable trait of someone who is mentally ill." The Commonwealth later asked Dr. Welner when, based on his review of the records, Johnston had last experienced hallucinations. In responding to this question, Dr. Welner indicated that his response was based on his review of records previously admitted in evidence. Trial counsel did not object to this testimony.

During cross-examination of Dr. Welner, the Court sustained the prosecutor's objection to the following hypothetical question from defense counsel: "So that if I become anxious

---

[7] Johnston points out that the prosecutor elicited from Dr. Welner that he requested the Amherst Police Department to do "follow-up work." Johnston accordingly concludes that "the prosecutor left no room for doubt: the police requested Bryan Johnston's emails and did not get them." However, when read in context, it is clear that Welner's requests for police assistance corresponded solely with his need to further interview witnesses. There is nothing to suggest that the police requested Johnston's emails and did not receive them.

because I think in my delusion that the world is shrinking and I go to a psychiatrist, that psychiatrist would consider giving me Lexapro and Ativan to deal with my anxiety isn't that true?" Trial counsel did not call Dr. Kelly as a rebuttal witness after Dr. Welner finished testifying.

Johnston asserts error on the part of the Court and defense counsel relating to the exclusion of testimony from Dr. Kelly about the relationship between Johnston's hallucinations and mental illness. He argues 1) that the exclusion of the testimony violated his right to present a defense, 2) that counsel was ineffective for failing to object to Dr. Welner's testimony on the same point and for failing to recall Dr. Kelly as a rebuttal witness, and 3) that the Court improperly excluded a hypothetical question that was aimed at establishing that it would be proper for a psychiatrist to prescribe an anxiety medication to a patient with delusions. Each of these contentions will be addressed in turn.

The exclusion of Dr. Kelly's testimony on direct examination did not violate Johnston's right to present a defense because the testimony would have been inadmissible hearsay and the right to present the defense of lack of criminal responsibility does not require the admission of hearsay. See Commonwealth v. Roman, 414 Mass. 235, 239 (1993). See also Department of Youth Servs. v. A Juvenile, 398 Mass. 516, 531-532 (1986). Defense counsel posed the following question to Dr. Kelly: "Was *the description of* the hallucinations consistent with an identifiable trait of someone who is mentally ill?" (emphasis supplied). If permitted to answer the question, Dr. Kelly would have testified about Johnston's statements to him. Because the statements concerned hallucinations that occurred years earlier in Hawaii, they would not fall under the hearsay exception for statements showing the declarant's present state of mind. See

23

Commonwealth v. Whitman, 453 Mass. 331, 342 (2009).

Further, other substantial evidence was presented relating to Johnson's hallucinations and delusions and their connection with mental illness at other junctures in the trial. Before the hearsay testimony was excluded, Dr. Kelly had testified that Johnston demonstrated delusions and that "he was not malingering in his delusional thought processes." Shortly after the hearsay testimony was excluded, Dr. Kelly stated his opinion, to a reasonable degree of medical certainty, that Johnston suffered from "the mental disease of a psychotic delusional disorder." Dr. Kelly went on to testify that "it's a paranoid delusional disorder in that he has an extensive belief system about the world and particularly about certain evil forces having evil intent, an intent to harm and to kill him and his parents . . . it was present in Hawaii . . . it continued here, but on occasionally lesser levels, and then had intensified again, as it had in Hawaii, in the fall of 2004." Later, on redirect, Dr. Kelly read portions of Dr. Peebles report into evidence, including the following: "Mr. Johnston said when he was in Hawaii he experienced auditory hallucinations which he believed were organized by members of organized crime."[8] Dr. Kelly went on to testify that the significance of the report was that it demonstrated Johnston's delusional system to the doctors at Bridgewater, including "the claims of the needle placed in his arm, medicated, anally raped, [and] that organized crime figures were after him." Even though Dr. Kelly did not specifically testifying about his opinion regarding the connection between hallucinations and mental illness, this message was more than adequately conveyed elsewhere in his testimony.

Moreover, Dr. Feldman, the other defense expert, had previously testified in depth regarding Johnston's hallucinations, such as the mafia being after him, being anally raped, people

---

[8] The Peebles report was also admitted as an exhibit.

24

putting pins in his arms such that he had a prickly sensation, people repelling down his building,

hearing voices, and his neighbor drilling a hole in his wall and looking in on him. Dr. Feldman

further testified that "he reports constant, in my opinion, menacing by visual hallucinations as

well as auditory hallucinations" and stated that when Johnston was recounting these experiences

to her, "his face was almost purple . . . he was floridly psychotic." Based on these and other

observations, Dr. Feldman stated her professional opinion that "the morning of [the murder]

Johnston suffered from paranoid schizophrenia." Thus, in light of the fact that there was

substantial testimony about Johnston's hallucinations from two expert witnesses, it cannot be

reasonably concluded that the exclusion of one hearsay statement from Dr. Kelly deprived

Johnston of his right to present a defense or resulted in fundamental unfairness.[9]

The substantial amount of other evidence of Johnston's hallucinations also supports the

conclusion that trial counsel did not provide ineffective assistance on this issue because it greatly

decreases any prejudice to the defense from the exclusion of Dr. Kelly's hearsay testimony. See

Commonwealth v. Mahar, 21 Mass. App. Ct. 307, 319 (1985).

Moreover, counsel was not ineffective for failing to object to Dr. Welner's testimony

because that testimony was not objectionable. Unlike Dr. Kelly's testimony, Dr. Welner's

opinion regarding Johnston's hallucinations was based on the record and materials admitted in

evidence, rather than out-of-court statements that Johnston made to him. See In re McHoul, 445

Mass. 143, 146 (2005); Commonwealth v. Markvart, 437 Mass. 331, 336-337 (2002). The

prosecutor asked Dr. Welner, "based on your review of the records available to you, when did

---

[9] That trial counsel elicited extensive testimony from two defense experts against the
Commonwealth's single expert shows the robust nature of the insanity defense that was
presented at this trial and further undermines the claim of ineffective assistance.

25

Mr. Johnston last experience hallucinations?"  Dr. Welner began his response by stating "the record describes . . ."[10]  The question and answer here stayed within the permissible bounds of McHoul.  See McHoul, 445 Mass. at 146.

Johnston further argues that trial counsel was ineffective for failing to recall Dr. Kelly as a rebuttal witness after Dr. Welner testified.  He claims that Dr. Kelly would have testified that Johnston's hallucinations were distinguishable from drug-induced hallucinations and that visual hallucinations occur in both schizophrenia and paranoid delusional disorder.[11]  Failing to recall Dr. Kelly as a rebuttal witness did not amount to ineffective assistance because there had already been evidence through the testimony of both Dr. Kelly and Dr. Feldman suggesting that Johnston's hallucinations were a symptom of his mental illness.  See Commonwealth v. Freeman, 442 Mass. 779, 791-792 (2004); Commonwealth v. Ortiz, 67 Mass. App. Ct. 349, 360-361 (2006).[12]

Johnston further asserts that the Court erred in excluding the following hypothetical question from defense counsel to Dr. Welner on cross-examination: "So that if I become anxious because I think in my delusion that the world is shrinking and I go to a psychiatrist, that

---

[10]The Peebles report describing the hallucinations had already been admitted in evidence at this point.

[11]Dr. Welner had testified that psychiatric illness is *primarily* associated with auditory rather than visual hallucinations.

[12]Dr. Kelly's rebuttal testimony would not necessarily have rebutted or impeached Dr. Welner's testimony regarding visual and auditory hallucinations.  The provisions of the DSM-IV-TR that Dr. Kelly cites in his affidavit provide, for example, that both visual and auditory hallucinations occur in schizophrenia but that auditory hallucinations are by far the most common.  Dr. Welner did not testify that visual hallucinations never occur as part of psychiatric illness, he only testified that "psychiatric illness is *primarily* associated with auditory hallucinations."

psychiatrist would consider giving me Lexapro and Ativan to deal with my anxiety isn't that

true?" Trial counsel's hypothetical question was confusing and was improper both in form and

substance. The hypothetical was not based on facts in evidence and did not properly set up the

assumed facts the expert was to consider. It required the witness to answer what a hypothetical

psychiatrist "would consider giving" and did so without proper foundation for the question. See

Molloy, 343 Mass. at 405-406.   Finally, even if the question was admissible, the prejudice of

excluding it was minimal because the jury had already heard from Dr. Kelly that 1) a person with

delusional disorder who refuses anti-psychotic medication can be treated with anxiety medication

to reduce the anxiety, and 2) Dr. Berlin's first choice was to give Johnston antipsychotic

medication.[13]   In these circumstances, excluding the hypothetical was not an abuse of the Court's

considerable discretion in this area.  See Burke, 376 Mass. at 541; O'Brien, 346 Mass. at 173.

### G)    Johnston's Statements about Delusions

On direct examination, trial counsel asked Dr. Kelly to explain the nature of Johnston's

delusions.  Dr. Kelly stated, "when given the opportunity to basically tell the story in a narrative

fashion, he went back to talking about his time in Hawaii and he told a rather elaborate . . ."  At

this point, the prosecutor objected and the Court sustained the objection.  The Court also

sustained the prosecutor's objection to trial counsel's later question regarding how Dr. Kelly

formed his opinion as to why Johnston targeted David Sullivan.  The Court sustained this latter

objection after defense counsel indicated at sidebar that direct communications with Johnston

were the basis of Dr. Kelly's opinion.

---

[13]Dr. Kelly was not permitted to elaborate on the point about Dr. Berlin's first choice
because the court found that his answer was nonresponsive and instructed the prosecutor to pose
another question.

Johnston contends that his statements to Dr. Kelly describing his delusions were erroneously excluded, violating his right to present a defense and his right to effective assistance of counsel. This argument lacks merit for essentially the same reasons as Johnston's argument about the exclusion of Dr. Kelly's testimony about his hallucinations. Johnston suggests that had Dr. Kelly been permitted to testify in each of these instances, the testimony would have either been non-hearsay, as statements not offered for the truth of the matter asserted, or admissible hearsay under the present state of mind exception. The latter suggestion can be rejected because Johnston was recounting his state of mind in the past, e.g., his delusional experiences in Hawaii. See Whitman, 453 Mass. at 342. The statements do not constitute any exception other to hearsay.

The defendant is entitled to present psychiatric testimony based on his own statements or on facts or data not in evidence if independently admissible and a permissible basis for an expert to consider in forming an opinion. Commonwealth v. Harvey, 397 Mass. 803 (1986); Department of Youth Services v. A Juvenile, 398 Mass. 516 (1986). However, only the expert's opinion is admissible, not the underlying details of what the expert might have been told. Commonwealth v. Cutts, 444 Mass. 821 (2005); Commonwealth v. Markvart, 437 Mass. 331 (2002). The statements were offered for the truth asserted; that is that Johnston had experienced hallucinations in Hawaii. They do not fall within any exception to hearsay.

Even if the excluded testimony was admissible, the exclusion did not violate Johnston's right to present a defense or his right to effective assistance of counsel because there was an abundance of testimony both from Dr. Kelly and other witnesses that conveyed all the same points that the excluded testimony would have raised. See Freeman, 442 at 791-792; Ortiz, 67

28

Mass. App. Ct. at 360-361.  There were at least thirty other instances in the trial where the

substance of Johnston's delusions was discussed in-depth.  The testimony of both of the

defendant's experts made clear to the jury their position that Johnston's delusions were a result

of his mental illness.

There is no merit to Johnston's suggestion that the exclusion of the testimony prevented

the jury from hearing Dr. Kelly's opinion that Johnston was sincere in his delusional beliefs.

Shortly after the testimony was excluded, Dr. Kelly testified that Johnston "was not malingering

in his delusional thought processes" and that "he didn't regard it as false. He believed it, okay?"

On cross-examination, Dr. Kelly stated that Johnston "remained convinced it was factual."

Finally, the exclusion of the testimony did not, as Johnston suggests, prevent the jury

from hearing Dr. Kelly's opinion as to why Johnston targeted the victim, David Sullivan.  Dr.

Kelly testified on cross-examination that Johnston targeted Sullivan because he believed that

Sullivan was in a conspiracy to kill him.[14]  In these circumstances, it cannot be said that counsel's

performance with respect to the limited exclusion of testimony was below that of an ordinarily

fallible lawyer or deprived Johnston of an otherwise available substantial ground of defense.  See

Satterfield, 373 Mass. at 115; Saferian, 366 Mass. at 96-97.

**H)    Dr. Welner's Hearsay Testimony**

On direct examination, Commonwealth expert Dr. Welner offered testimony concerning

---

[14]Additionally, Dr. Feldman had previously testified that Johnston told her 1) that
Sullivan had paid to have him raped in Hawaii, 2) that Sullivan knew about the bugging on his
apartment, 3) that he had seen Sullivan at Westfield State (where Sullivan was not a student) and
Sullivan said with an eerie smile on his face "I can get you whenever I want," and 4) that
Sullivan was watching him through a camera set up in his shower stall.  Earlier in the trial,
Lindsey Tucker testified about an incident at a party where Johnston told a group of people that
Sullivan was not really his friend and that he was "after him."

1) a confrontation between Tyler Mauk and Johnston at a wedding, 2) Johnston's work and school performance, 3) the lack of irrational or delusional statements from Johnston during the weeks preceding the murder, 4) the fact that a number of acquaintances had expressed concern to Johnston about his drinking but that he continued to drink because it was easier for him to be belligerent, 5) Johnston's pattern of quickly restoring normal relations with his friends after expressing that they were a threat to him or had a bad agenda, 6) Johnston's conversations with police officers and others shortly after the murder, 7) statements Johnston made about leaving the country, and 8) conversations that Johnston had with Lindsey Tucker, Phil Swift, and David Sullivan. Trial counsel objected after some of these instances but not others. Prior to Dr. Welner's testimony, the jury had previously heard evidence from other witnesses on nearly all of these topics.

As discussed above, expert witnesses may base their opinions on "(1) facts personally observed; (2) evidence already in the records or which the parties represent will be admitted during the course of the proceedings, assumed to be true in questions put to the expert witnesses; and (3) facts or data not in evidence if the facts or data are independently admissible and are a permissible basis for an expert to consider in formulating an opinion." Markvart, 437 Mass. at 336-337, citing Department of Youth Servs., 398 Mass. at 531. Where an expert relies on facts or data falling under the third category, the expert is prohibited on direct examination from "informing the jury about the facts or data she considered that were not in evidence but that would be admissible with the right witness or proper foundation." Commonwealth v. Barbosa, 457 Mass. 773, 785 (2010).

With one exception, Dr. Welner offered testimony based on evidence previously

30

admitted, on evidence that would be admissible or on his review of the records available to him.

The Commonwealth concedes that Dr. Welner's hearsay testimony about Johnston's

conversation with Phil Swift was objectionable because Phil Swift had not previously testified.

Although counsel may have had grounds to object to Dr. Welner's discussion of the Phil Swift

conversation, failure to do so was not unduly prejudicial, as there were similar accounts from

multiple other witnesses who had spoken with Johnston or received messages from him on the

same night. See Jaime, 433 Mass. at 578-579. The failure to object was not manifestly

unreasonable. It neither deprived the defendant of an available defense nor did it fall below the

standard of the ordinarily fallible lawyer. See Dyer, 460 Mass. at 754-755; Commonwealth v.

Perez, 460 Mass. 683, 704 (2011).

**H.      Cross-Examination Regarding the Term "Moon-faced"**

        During cross-examination, trial counsel asked Dr. Welner why he used the term "moon-

faced" to describe Johnston in his written report. Dr. Welner replied that this was a medical term

used to describe facial roundness that results from particularly heavy steroid use. Counsel did

not appear to be prepared for this response and did not inquire further after Dr. Welner gave the

explanation. In his affidavit, trial counsel states that he believed that Dr. Welner used the term to

personally demean Johnston. Prior to Dr. Welner's testimony, a significant amount of evidence

had been introduced regarding Johnston's steroid use. Johnston asserts that it was ineffective

assistance for counsel to ask this question because 1) he did not know why Dr. Welner used the

term, and 2) had he investigated the meaning of the term "moon-faced," he would have been able

to impeach Dr. Welner's testimony by showing that the steroids that Johnston used, anabolic-

androgen steroids, do not result in "moon-faces."

31

Counsel made a mistake by asking this question. However, counsel's mistake was not grave enough to amount to ineffective assistance in that the jury had already heard ample evidence relating to Johnston's steroid use prior to the cross examination of Dr. Welner. For example, the jury heard 1) that Johnston's father turned over a fanny pack containing bottles of steroids and syringes to the police on the morning after the murder, 2) testimony from Justin Bond that the extent of Johnston's steroid use became more prevalent in the six-month period leading up to the murder, 3) testimony from Evan Donovan that Johnston told him he had been using steroids for a long time, 4) testimony from Dr. Feldman that Johnston began using steroids after returning from Hawaii, 5) testimony from Dr. Kelly that Johnston had reported using steroids, 6) testimony from Johnston's father that his increase in body size and bulk had not changed at the time of the murder, 7) testimony from Dr. Welner on cross-examination that Johnston was using steroids at the time of the Levarnoch incident, 8) testimony from Dr. Welner on redirect that Johnston had indicated to him that he was using four different steroids at the time of the killing, and 9) testimony from Dr. Peebles that Johnston had reported steroid use during their interviews.

Thus, while counsel's question to Dr. Welner was arguably not helpful to the defense, it was not a catalyst in either direction when viewed in the context of the previously admitted evidence. Counsel did not render ineffective assistance by asking the question. See *Rondeau*, 378 Mass. at 412-413; *Mahar*, 21 Mass. App. Ct. at 319.

**J)      Reference to Johnston's Statements at Jail Disciplinary Proceeding**

On direct examination, defense counsel asked Dr. Kelly whether or not he believed that Johnston's fight in jail was related to his delusional system. The prosecutor's objection to this

question was sustained.  Later, the prosecutor asked Dr. Kelly the following question on cross-examination: "Are you aware that . . . there was a disciplinary hearing that was conducted in which Mr. Johnston pled not guilty to the offenses and in which he implied that a fight took place; however he, Johnston, said he did not provoke it[?]"  Dr. Welner later testified that Johnston" mentioned no irrational idea, fixed or not fixed" in his "responses" to jail officials in the disciplinary action.

Johnston contends that the prosecutor's question to Dr. Kelly on cross-examination was fundamentally unfair because it used Johnston's choice of defense and plea of not guilty at the disciplinary hearing to infer sanity.  The choice to plead not guilty to the disciplinary charge was not evidence used to imply a lack of mental illness.  Here, the defendant chose to speak during a disciplinary proceeding.  Johnston appears to be implicitly suggesting that the prosecution is prohibited from introducing evidence of a defendant's prior statements concerning the exercise of *any* constitutional right during the criminal process to establish sanity.  This would exponentially expand the scope of the *Mahdi* decision far beyond its original parameters.  There are no grounds to impose a stricter prohibition on the use of a defendant's prior statements at a disciplinary hearing than would apply to a judicial proceeding.  See, Commonwealth v. Beauchamp, 49 Mass. App. Ct. 591 (2000).   There is, accordingly, no basis to conclude that the prosecutor impermissibly burdened Johnston's right to plead not guilty or his right to choose and present a defense.

33

## CONCLUSION

Accordingly, for the reasons stated above, the defendant's motions for a new trial and an evidentiary hearing are **DENIED**.

Bertha D. Josephson
Justice of the Superior Court

Dated: 6-28-12

34

467 Mass. 674
Supreme Judicial Court of Massachusetts,
Hampshire.

COMMONWEALTH
v.
Bryan R. JOHNSTON.

SJC–09919. | Argued Dec. 6, 2013. | Decided April
8, 2014.

**Synopsis**
**Background:** Defendant was convicted in a jury trial in
the Superior Court Department, Hampshire County,
Bertha D. Josephson, J., of first-degree murder, armed
burglary, possession of a large capacity firearm in the
commission or attempted commission of a felony, and
possession of a large capacity firearm without a license.
After his motion for new trial was denied, defendant
appealed.

**Holdings:** The Supreme Judicial Court, Spina, J., held
that:

[1] evidence that defendant had refused to take field
sobriety tests at the request of police 20 minutes after the
shooting was admissible;

[2] defendant's refusal to answer questions on advice of
counsel did not amount to the assertion of his right to
assistance of counsel as to require state hospital staff to
refrain from talking to him;

[3] testimony concerning defendant's refusal to answer
questions during his time at house of correction and state
hospital was admissible;

[4] evidence of defendant's requests to confer with counsel
and his refusals identified as having been on advice of
counsel was not admissible;

[5] error in admitting evidence of defendant's requests to
confer with counsel and his refusals identified as having
been on advice of counsel did not create a substantial
likelihood of a miscarriage of justice;

[6] prosecutor's opening argument description of the
chronology of events surrounding victim's shooting death
was not designed to improperly suggest that defendant's

criminal responsibility defense was concocted; and

[7] evidence was sufficient to support jury's rejection of
defendant's claim of lack of criminal responsibility.

Affirmed.

**Attorneys and Law Firms**

**\*\*429** David J. Nathanson, Boston, (Dan A. Horowitz
with him) for the defendant.

Steven Greenbaum, Assistant District Attorney, for the
Commonwealth.

Present: SPINA, CORDY, BOTSFORD, DUFFLY, &
LENK, JJ.

**Opinion**

SPINA, J.

**\*676** The defendant was convicted of (1) murder in the
first degree on theories of deliberate premeditation,
extreme atrocity or cruelty, and felony-murder; (2) armed
burglary; (3) possession of a large capacity firearm in the
commission or attempted commission of a felony; and (4)
possession of a large capacity firearm without a license.
He filed a motion for a new trial that was denied without
an evidentiary hearing. His appeal from the denial of his
motion for a new trial has been consolidated with **\*677**
his direct appeal. The defendant asserts that the judge
erred in several evidentiary rulings, that counsel rendered
ineffective assistance by failing to object to inadmissible
evidence and by offering inadmissible evidence, that the
prosecutor made improper closing argument, and that the
judge gave erroneous instructions to the
jury—particularly as to the issue of lack of criminal
responsibility. We affirm the judgments of conviction and
decline to reduce the degree of guilt or order a new trial
pursuant to our power under G.L. c. 278, § 33E.

1. *Background.* a. *The offenses.* We summarize facts the
jury could have found and reserve other details for
discussion of particular issues. The defendant and the
victim were members of a large circle of friends who had
graduated from the same high school in June, 2000, and
remained close. Both men attended a friend's wedding in
June, 2004. The defendant became drunk and told the
victim's girl friend that her brother was taking drugs. This
upset her, and she asked the victim if what the defendant

told her was true. The victim confronted the defendant. The details of the conversation are not certain.

The defendant telephoned the victim at about 10:30 *P.M.* on December 6, 2004, and invited him to go out drinking. The victim declined and the conversation did not end well. A few details of the conversation are known. A few minutes later the victim told his girl friend that the defendant "[was not] the same anymore." At about the same time a woman who lived in an apartment directly above the defendant's apartment heard angry shouting and cursing coming from the defendant's apartment. It sounded as if it were taking place during a telephone call.

Shortly thereafter the defendant drove approximately thirty-one miles from his apartment in Westfield to the house in Amherst where the victim lived. At about 12:20 A.M. on December 7, the defendant entered the house. He had been there many times. He walked upstairs to the victim's bedroom with a rifle and fired six hollow-point bullets into the victim, killing him. A roommate of the victim, the only other person in the house, heard the gunshots but he did not see the shooter. He **430 telephoned 911 and Amherst police arrived within minutes.

On his way back to Westfield the defendant stopped in the vicinity of a restaurant in Hadley. He disposed of the rifle in a *678 wooded swampy area. As he was leaving he drove over a log, immobilizing his car. A snow plow operator stopped to help. The defendant said he had been drinking and did not want the police to come. The operator applied his own strength while the defendant worked the car's engine, but they were unable to free the car. The defendant asked the operator to use his truck, but the operator declined and drove off.

At about 12:45 A.M. two Hadley police officers driving separate police cars were dispatched to the area of the restaurant. They observed the defendant's disabled car and stopped. The defendant approached one officer and said that his car was stuck and he needed help to free his car. He added that he had come from a friend's house and had stopped to urinate. The officers detected a mild odor of alcohol on the defendant's breath. His eyes were glassy and mildly bloodshot. When asked if he had been drinking the defendant said that he had consumed some alcohol much earlier that evening, but was fine at that time. The defendant said that he was a Springfield police officer, but later clarified that he was a special police officer at Baystate Medical Center (Baystate) in Springfield. One of the officers had worked at Baystate and telephoned a night supervisor there. He learned that the defendant was not a Baystate special police officer but

a patrol officer. When he confronted the defendant with this information, the defendant apologized and said he had taken the test to become a Baystate security officer (the next position above patrol officer) and in his mind he thought he had the job.

When asked to perform a series of field sobriety tests the defendant said that one of his college professors told him that field sobriety tests were illegal, so he was unwilling to perform them at that time. The defendant asked if he was going to be arrested. He was told that he would not be arrested, but that the officers needed to have him take a series of tests to determine if he was capable of driving his car safely. The defendant agreed. After administering one field sobriety test and based on their other observations of the defendant, the officers determined that he was too impaired to drive safely. Arrangements were made to have the defendant's car towed away. The defendant was allowed to telephone a friend (a security officer at Baystate) who arrived and drove him to Westfield.

*679 At 12:58 A.M. on December 7, 2004, while he was waiting for his friend to arrive and drive him to Westfield, the defendant left a voice message for a female friend. He apologized for missing her call and said he was "wondering what you're up to tonight." He spoke in his typical "calm, easygoing, fun-loving ... nonchalant" tone.

As the defendant's friend was driving him home from the restaurant the defendant said, "It's a good thing the cop didn't search me.... I have my piece on me." The defendant produced a handgun and said there were six rounds in it. He also said that his license to carry a gun had been revoked.

As a result of a telephone call the defendant made to his parents at about 4:45 A.M. on December 7, they drove from Boston to Westfield and initiated civil commitment proceedings against him. At about 9 A.M. the same day two Westfield police officers went to the defendant's apartment and asked him to accompany them to Noble Hospital in Westfield for a psychiatric **431 evaluation that was ordered by a District Court judge pursuant to G.L. c. 123, § 12, on the application of his parents. The defendant refused to comply and a struggle ensued. The defendant was subdued through the use of pepper spray.

In the meantime, Amherst and State police investigators were given the name of the defendant by the victim's girl friend. They went to the defendant's apartment in Westfield and were made aware of the defendant's civil commitment. The defendant's father consented to a search of his own car, which contained some items he and his

wife had removed from the defendant's apartment for their son's safety, including a .38 caliber handgun. The defendant's father also consented to a search of the defendant's apartment. Among the items recovered from the two locations were a .223 caliber magazine having a capacity of ninety rounds, and a loaded .40 caliber Sig Sauer pistol. The next day, December 8, investigators returned to the defendant's apartment with a search warrant. They recovered several items, including a "fanny" pack containing hypodermic syringes and bottles of two different anabolic steroids. From a Dumpster at the apartment complex, investigators also recovered a gun case capable of holding a rifle.

During a search of the wooded swampy area near the Aqua *680 Vitae restaurant on December 9, police recovered a .223 caliber Colt model CAR–A3 semiautomatic rifle, one live round of ammunition found near the rifle, and a forty-round magazine. Two latent fingerprints found on the rifle matched those of the defendant. Deoxyribonucleic acid (DNA) testing of blood found on the defendant's jeans matched the DNA profile of the victim.

Trial counsel told the jury in his opening statement that the defense was lack of criminal responsibility. The Commonwealth's theory was that the defendant did not suffer from a mental illness, and any delusions he ever experienced were the result of substance abuse. The Commonwealth also focused upon the absence of any evidence of delusional thinking on the part of the defendant in the hours before and approximately one hour after the killing.

b. *History relevant to criminal responsibility.* A great many of the issues in this appeal involve the subject of criminal responsibility. Rather than recite facts that the jury could have found in returning a verdict of guilty, it is more useful to offer a summary of the evidence relevant to criminal responsibility.

The defendant was a regular user of alcohol and drugs in high school, as were many of his friends. After high school the defendant attended Hawaii Pacific University. His substance abuse continued, and he began experiencing delusions and hallucinations. In December, 2000, during the holiday break after his first semester, the defendant told his father he wanted to move out of the dormitory and get his own apartment. He reported that a roommate's father was involved with the Chicago mafia, and it made him feel uncomfortable.

The defendant's sister visited him at college in the fall of 2001. He told her not to answer his telephone because it

was "bugged." He reported that Federal Bureau of Investigation (FBI) agents had rappelled off the roof of his apartment complex and observed him from the window of his twenty-seventh floor apartment. This caused him to keep his curtains closed. In addition, he informed his sister that a next door neighbor had watched him through the walls, and that a pizza shop in the commercial space of his apartment building was run by the mafia.

**432 In January, 2002, a friend (the brother of the victim's girl friend) visited him at college. The two men spent most of their *681 time together drinking alcohol and taking drugs. By April, 2002, the defendant left Hawaii in haste and refused to return. When his family suggested they go back to Hawaii to retrieve his belongings, he said they could not do that because their lives would be in danger. He explained that he had to leave because various ethnic mafia groups and gangs (he mentioned the "Bloods") were going to kill him and his family. The defendant began taking steroids to help protect himself and his family. He wanted people to fear him because he felt vulnerable. After he left Hawaii his family and friends did not recognize the defendant as the same person they once had known. He rejected his father's request that he see a psychiatrist.

In September, 2002, the defendant enrolled at Westfield State College (now University) as a criminal justice major. He moved out of his parents' home and took an apartment in Westfield. His professors recalled him as being friendly, highly competent, intelligent, and well respected by his peers. They did not observe any unusual behavior or comments. On October 19, 2002, the defendant walked into the State police barracks in Westfield and claimed people were chasing him. A State police officer tried to reassure him that no one was in the parking lot. The defendant would not accept the officer's assertions as true, and he dialed 911. The defendant's state of agitation did not abate, so the officer telephoned the defendant's father and then handcuffed the defendant to a bench for safety purposes. After his father arrived the defendant was released. The defendant told his father that he had visited a friend in the Albany, New York, area and was followed by the mafia on his drive back to Westfield.

The defendant refused an offer to move into the victim's apartment in Amherst because he believed that the victim was a crime family boss and that a great many of their group of friends were involved with organized crime. He also reported that the victim had told him that his crime family had paid to have the defendant anally raped in Hawaii, and that they "bugged" his apartment in Hawaii and his parents' home. The defendant claimed to have

seen the victim at Westfield State College the day before the murder. The victim walked out of a class (where he was not a student), smiled eerily at the defendant, and said, "I can get you whenever I want."

**\*682** In November, 2003, the defendant obtained employment as a security officer at Baystate. He was considered polite and very reliable. He was well liked. The defendant dealt with gang members there without displaying or expressing any fear of them.

On at least five occasions between November, 2003, and mid-November, 2004, the defendant brandished a firearm when he was in the company of his friends. Each occasion involved a different friend. In several of those instances he fired his gun at an inanimate object. In several instances he pointed his gun at the friend. On at least two occasions he alluded to a belief that the friend was involved with organized crime. On at least one occasion he acknowledged that alcohol had brought on his behavior.

The defendant experienced paranoid delusions both when he was intoxicated or on drugs, and when he was sober. He was not always delusional when intoxicated or on drugs. His delusional fear of organized crime families and of gangs intensified during the six months preceding the victim's death.

**\*\*433** In July, 2004, the defendant began psychiatric treatment with Dr. Richard Berlin. Lexapro, an antidepressant, provided modest relief. However, by October, 2004, the defendant presented with increasing anxiety. By November, 2004, he was sweaty and tense. He reported weekly panic attacks and "out of body" experiences.

Approximately four hours after the murder, at 4:45 A.M. on December 7, 2004, the defendant telephoned his parents. He was making no sense, talking about the mafia and gangs, and threatening to commit suicide. At 6 A.M., his sister, a psychiatric nurse, returned a telephone call she had received from him. He made no sense. When his parents arrived at his apartment at 8 A.M., he was saying bizarre things and his eyes were unfocused. As mentioned earlier, Westfield police officers served a commitment order on him later that morning. He was taken forcibly to Noble Hospital in Westfield, where he was placed in four-point restraints and sedated. A toxicology screen was negative for cocaine and amphetamines.

*c. Expert testimony.* The defendant presented the opinion **\*683** testimony of two experts: Dr. Carol Feldman, a forensic psychologist, and Dr. Martin Kelly, a forensic psychiatrist.

Dr. Feldman opined that, at the time of the killing, the defendant suffered from the mental illness paranoid schizophrenia, and although he generally appreciated the wrongfulness of killing, he lacked substantial capacity to appreciate the wrongfulness of killing the victim, and he was unable to conform his conduct to the requirements of the law. She explained that the defendant believed he was being persecuted by several organized crime groups, and he believed himself to be the prisoner of the victim. She had interviewed the defendant six times, describing one interview in which the defendant's facial color deepened to purple, his tone was emotionally intense, and he was "floridly psychotic" as he described circumstances that caused him to flee Hawaii, namely, persecution by organized crime. Dr. Feldman determined that the defendant had experienced hallucinations in which he heard voices of people intending to kill him, and delusions of being subjected to surveillance.

Dr. Kelly testified that the defendant lacked criminal responsibility due to a paranoid delusional disorder. He described the defendant's illness as an "extensive belief system about the world and particularly about certain forces having evil intent ... to harm and to kill him and his parents." Dr. Kelly indicated that the disorder does not go into remission without medication, and that the intensity of the defendant's delusions had abated somewhat because he had been placed on a relatively low dose of Risperdal, an antipsychotic medication. Unlike paranoid schizophrenia, a paranoid delusional disorder is not characterized by a decline in functioning, which explains his capacity to work at Baystate and attend college. Both disorders tend to onset between the late teens and mid-twenties.

Dr. Kelly ruled out cocaine and alcohol intoxication as the cause of the defendant's delusions. He also opined that cocaine could not have played a part in the killing because the toxicology screen done at Noble Hospital approximately twelve hours after the shooting was negative for cocaine and amphetamines, a reliable basis to exclude recent cocaine use.

Dr. Kelly also ruled out "ecstasy," an amphetamine the defendant was **\*684** known to use, as a cause of the defendant's delusions. Amphetamines, he said, do not cause systematized delusions such as the defendant's, and psychosis is a very rare complication of amphetamine use. But **\*\*434** even if the defendant had experienced the rare psychosis induced by amphetamines, the symptoms typically disappear after a few days, or after weeks or months at most. They do not persist for fifteen months,

the duration of the defendant's psychotic symptoms after the shooting.

Dr. Kelly opined that alcohol did not cause the defendant's delusions. He noted that the defendant experienced his delusions when he was sober (e.g., during his sessions with Dr. Berlin), as well as when he was drinking.

The Commonwealth's expert in rebuttal, Dr. Michael Welner, a forensic psychiatrist who also was board certified in psychopharmacology (the science of treatment of psychiatric conditions with medication and physical treatment), testified that the defendant did not suffer from a major mental illness. He ruled out paranoid delusional disorder because the defendant had reported to Dr. Berlin that his symptoms were not worsening or intensifying.[1] He also considered that the defendant did not report persecutory or delusional behavior on the job[2] or at school, and that up to the night of the shooting the defendant continued to be sociable, even though his friends avoided him.

[1]      However, Dr. Berlin's notes indicate that the defendant was "more sweaty [and] tense than self-report," and that on October 1, 2004, the defendant's anxiety level had risen.

[2]      On October 2, 2004, the defendant went out socially with some coworkers at Baystate Medical Center. The defendant became delusional about the Central Intelligence Agency and fired a shot into the air with his handgun. He then claimed the mafia was trying to get him for a rape he purportedly committed. The record shows that he did not commit rape. He later apologized and attributed his behavior to alcohol.

Dr. Welner opined that the defendant's hallucinations originated from his drug use, and not from mental illness. He explained that psychiatric illness is primarily associated with auditory hallucinations, not visual hallucinations. When a person has visual as well as auditory hallucinations, the indication is that they are drug induced.

Dr. Welner cited the defendant's ability to mislead Hadley police officers about where he had been and his concerns about *685 their presence as evidence of his ability to appreciate the wrongfulness of his conduct.

2. *Claims of ineffective assistance of counsel.* The defendant advances six claims of ineffective assistance of

counsel, as follows.

[1] a. The defendant's first claim of ineffective assistance of counsel asserts that trial counsel failed to object to evidence that the defendant refused to take field sobriety tests at the request of Hadley police twenty minutes after the shooting. Contrary to the defendant's assertion that he made a "flat" refusal and thereby invoked his right to remain silent, he merely stated that a college professor of his said they were illegal, and he "wasn't willing to do it at that point." The defendant asked if he was going to be arrested. The officers said they were not going to arrest him, but that they wanted to administer some tests to make sure he was capable of driving his car. The defendant said he was willing to cooperate, and one field sobriety test was administered.

The officers had been dispatched to the scene; they did not just happen upon it. The defendant's car was protruding onto the highway. Their primary focus on arrival was to "clear the hazard and make sure we get him out of there safely." This was essentially a community caretaking function. See *Commonwealth v. Murdough,* **\*\*435**  428 Mass. 760, 761–762, 704 N.E.2d 1184 (1999). Within that framework, they were entitled to consider likely criminal violations, but they never acted beyond that realm. Both officers had determined that they did not have probable cause to arrest the defendant, and told him so. Moreover, as the prosecutor developed the testimony of the officers, neither she nor the officers used the term "refusal" to take field sobriety tests. The incident was portrayed as an exercise of the community caretaking function.

Contrary to the defendant's view of the case he did not refuse to take field sobriety tests; he did not agree to take just one field sobriety test and refuse others, as in *Commonwealth v. Grenier,* 45 Mass.App.Ct. 58, 60, 695 N.E.2d 1075 (1998); and he did not invoke his right to remain silent. Indeed, he did a considerable amount of talking, including falsely describing himself first as a Springfield police officer, then as a special police officer at Baystate. He then *686 offered multiple explanations for his misrepresentations. He also admitted drinking earlier in the evening, but insisted that he was not under the influence at that time. His agreement to submit to field sobriety tests was not the subject of a "Catch–22" situation, as he argues. That is, he was not placed in the dilemma of taking the field sobriety tests and perhaps producing potentially incriminating real evidence; or refusing to take the tests and have adverse testimonial evidence used against him at trial. See *Opinion of the Justices,* 412 Mass. 1201, 1209, 591 N.E.2d 1073 (1992). Here, if he took the tests and passed, he could drive his

car home. If he did not take the tests or if he took them and failed, he could not drive his car home. Either way, there would be absolutely no risk of self-incrimination. As it happened, he failed and had to call a friend to drive him home. The evidence was offered to show that the defendant was not delusional but quite rational and well oriented twenty minutes after the shooting. It was relevant to his state of mind. Had trial counsel objected, he would not have been entitled to have the evidence excluded. Consequently, the defendant has not shown that counsel was ineffective. See *Commonwealth v. Comita,* 441 Mass. 86, 91, 803 N.E.2d 700 (2004).

[2] b. The defendant next claims that trial counsel was ineffective for failing to move to suppress all responses the defendant made to officers at the Hampshire County house of correction on December 9, 2004, and at Bridgewater State Hospital from December 10, 2004, to January 6, 2005, after invoking his right to assistance of counsel. Records from the house of correction indicate that during a medical intake procedure on December 9 the defendant refused to answer questions on advice of counsel. On December 10, a psychologist approved by the Department of Mental Health interviewed the defendant at the request of the Hampshire County sheriff. Trial counsel attended the interview. The defendant presented as depressed and suicidal. He reported having experienced hallucinations on prior occasions, but not on that day. He stated that he would not inform staff at the house of correction if he was close to harming himself. As a result, the psychologist determined that the defendant was in need of hospitalization due to mental illness, and he filed a petition with the Northampton Division of the District Court Department **687** the same day seeking commitment of the defendant to Bridgewater State Hospital for up to thirty days, pursuant to G.L. c. 123, § 18 (*a* ). A judge in the District Court issued an order of commitment on December 10.

[3] It is important to understand what is not being argued. The defendant does **436** not argue that he invoked his right to remain silent. Although the defendant refused to answer questions on advice of counsel during the medical intake procedure at the house of correction, this was not an invocation of the right to remain silent. The defendant merely set limits about what he was willing to discuss. Similarly, the records of Bridgewater State Hospital indicate that the defendant refused to answer some questions on advice of counsel, but he did not refuse to answer all questions. He answered many questions concerning his current levels of anxiety and thoughts of suicide. Thus, he did not exercise his right to remain silent, an argument unsuccessfully raised below but wisely not pursued on appeal. The privilege against self-incrimination does not include the right to exclude from evidence the refusal to respond to particular or select questions. See *Commonwealth v. Womack,* 457 Mass. 268, 276–278, 929 N.E.2d 943 (2010). However, the defendant's statements to staff at the hospital were admissible only as to the defendant's mental or emotional condition. See G.L. c. 233, § 20B (*b* ).

The defendant instead focuses on the right to counsel under the Sixth Amendment to the United States Constitution, which attached at the time of his arraignment on the complaint that issued in the District Court. See *Commonwealth v. Ortiz,* 422 Mass. 64, 67 n. 1, 661 N.E.2d 925 (1996). He argues that his refusal to answer questions on advice of counsel were assertions of his right to assistance of counsel which required hospital staff to refrain from talking to him.

[4] [5] The Sixth Amendment applies to all critical stages of a criminal proceeding. See *Commonwealth v. Trapp,* 423 Mass. 356, 358, 668 N.E.2d 327, cert. denied, 519 U.S. 1045, 117 S.Ct. 618, 136 L.Ed.2d 542 (1996). The decision to order a psychiatric interview for purposes of criminal responsibility is a critical stage to which the right applies, but the resulting interview is not. A defendant does not have a Sixth Amendment right to have his lawyer present during the court-ordered psychiatric interview. *Id.* at 359, 668 N.E.2d 327, citing **688** *Estelle v. Smith,* 451 U.S. 454, 470 & n.14, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), and *United States v. Byers,* 740 F.2d 1104, 1118–1121 (D.C.Cir.1984). Passing on the question whether a hearing under G.L. c. 123, § 18 (*a* ), is a critical stage of a criminal proceeding, the court-ordered interview is not. The defendant had no Sixth Amendment right that required hospital staff to refrain from interviewing him or to terminate interviews with him until counsel was present.

[6] In order to succeed on a claim of ineffective assistance of counsel based on the failure to file a motion to suppress evidence, the defendant must show that he would have prevailed on such a motion. See *Commonwealth v. Comita,* 441 Mass. at 91, 803 N.E.2d 700. Such a motion, based on an alleged violation of the defendant's Sixth Amendment right to counsel, would not have succeeded. Consequently, counsel was not ineffective.

c. The defendant next asserts that counsel was ineffective for failing to object to evidence that while at the house of correction and at Bridgewater State Hospital he had refused to answer some questions, that he had refused to answer some questions on advice of counsel, and that he had asked to speak with counsel before answering certain questions.[3]

[3]     The handwriting in the various reports is difficult to decipher, but it appears that the defendant refused to answer some questions on advice of counsel once at both the house of correction and Bridgewater State Hospital. The Bridgewater records indicate he refused to answer some questions on several occasions, without any reference to counsel. The Bridgewater records also indicate that he refused to answer certain questions on at least twelve occasions, stating he first wanted to speak with counsel. These refusals to answer commenced on December 10, 2004, the date of his admission, and continued until December 21, 2004, when trial counsel attended an interview with the defendant and hospital staff.

**437 [7] [8] We first address the issue of testimony concerning his refusal to answer questions. With respect to the conversation at the medical intake interview at the house of correction, although the defendant refused to answer select questions on advice of counsel, as discussed above, he had not invoked his right to silence. Similarly, where the defendant answered some questions at Bridgewater State Hospital, his refusals to answer select questions put to him by staff at the hospital did not constitute an invocation of his right to remain silent. There is no dispute that the defendant had been warned that his interviews with *689 hospital staff would not be privileged, and that he understood the warning. See *Commonwealth v. Lamb,* 365 Mass. 265, 270, 311 N.E.2d 47 (1974). Consequently, all statements made by the defendant to psychotherapists at Bridgewater State Hospital, including his refusals, are admissible (only) on issues involving his mental or emotional condition.[4] See *Commonwealth v. Benoit,* 410 Mass. 506, 518–519, 574 N.E.2d 347 (1991). See also G.L. c. 233, § 20B (*b* ).

[4]     If a defendant raises a defense of lack of criminal responsibility and offers expert testimony based on statements of the defendant as to his or her mental condition at the time of the alleged crime, the refusal to submit to a court ordered examination under G.L. c. 123, § 15, may result in the admission of evidence of such refusal to submit to examination. See Mass. R. Crim. P. 14(b)(2)(B)(iv), as appearing in 442 Mass. 1518 (2004); *Blaisdell v. Commonwealth,* 372 Mass. 753, 769, 364 N.E.2d 191 (1977).

We turn now to the defendant's references to his lawyer. The first is his refusal to answer certain questions on advice of counsel. The second is his request to confer with counsel before answering certain questions. The fact that the defendant refused to answer certain questions on advice of counsel is entitled to no greater protection than unadvised refusals to answer. However, the portion of the refusals that are identified with the advice of counsel is protected, as is the defendant's request to confer with counsel before answering. All references to counsel, but not the refusals themselves (he did not invoke his right to silence), should have been the subject of a motion to redact.

[9] [10] "The fundamental character of the right of a person accused of a serious crime to have the *aid and advice of counsel* ... is a right upon which the essential element of fairness in the administration of justice depends" (emphasis added; citations omitted). *Guerin v. Commonwealth,* 339 Mass. 731, 734, 162 N.E.2d 38 (1959). Although the defendant was not entitled to have counsel present during the psychiatric interviews, his requests to confer with counsel are not a proper subject for comment. They " 'are not competent testimony against' him." *Commonwealth v. DePace,* 433 Mass. 379, 384, 742 N.E.2d 1054 (2001), S.C., 442 Mass. 739, 816 N.E.2d 1215 (2004), quoting *Commonwealth v. Sazama,* 339 Mass. 154, 158, 158 N.E.2d 313 (1959). See *Commonwealth v. Person,* 400 Mass. 136, 141, 508 N.E.2d 88 (1987). They may, however, be admissible to explain why a particular interview ended, or explain why certain information that customarily is requested as a matter of sound medical practice is absent *690 from the file. See *Commonwealth v. Habarek,* 402 Mass. 105, 110, 520 N.E.2d 1303 (1988), S.C., **438 421 Mass. 1005, 657 N.E.2d 228 (1995). Stymied by the defendant's refusals and desirous of determining if he was a suicide risk, hospital staff reached out to counsel, who attended two interviews with the defendant and hospital staff on December 21 and 23, 2004. The records indicate those interviews went well. No refusals to answer or requests to confer with counsel before answering appear thereafter in the hospital records. Indeed, the defendant was later interviewed for seventy minutes, without counsel, on January 6, 2005.

[11] [12] We next inquire whether the admission in evidence of the defendant's requests to confer with counsel and that portion of his refusals identified as having been on advice of counsel created a substantial likelihood of a miscarriage of justice. We need not concern ourselves with which party was at fault. See *Commonwealth v. Wright,* 411 Mass. 678, 682, 584 N.E.2d 621 (1992). When determining error of this type we consider five factors: "(1) the relationship between the evidence and the premise of the defense; (2) who introduced the issue at trial; (3) the weight or the quantum of evidence of guilt; (4) the frequency of the reference; and (5) the availability or effect of curative instructions" (footnotes omitted). *Commonwealth v. Mahdi,* 388 Mass. 679, 696–697, 448

N.E.2d 704 (1983).[5]

[5]    We consider the factors set forth in *Commonwealth v. Mahdi,* 388 Mass. 679, 696–697, 448 N.E.2d 704 (1983), whether evidence of a defendant's refusal was admitted over objection and we apply the harmless error standard, see *Commonwealth v. Peixoto,* 430 Mass. 654, 657–661 & n. 6, 722 N.E.2d 470 (2000), or whether refusal evidence is admitted without objection and we apply the unpreserved error standard under G.L. c. 278, § 33E, see *Commonwealth v. Brown,* 449 Mass. 747, 763, 872 N.E.2d 711 (2007).

Applying the first *Mahdi* factor, the prosecutor used refusal evidence to rebut the defense that the defendant was delusional at or shortly after the time he committed the murder. This established a direct relationship between the refusal evidence and the defense of lack of criminal responsibility.

As to the second *Mahdi* factor, evidence of the defendant's refusals on advice of counsel and his requests to confer with counsel were first introduced by the defendant during the direct examination of Dr. Kelly, without objection or motion to strike. Trial counsel then moved to admit the report of Dr. J. Leonard **\*691** Peebles, a psychologist at Bridgewater State Hospital, prepared pursuant to G.L. c. 123, § 18 (*a* ), as well as the Bridgewater State Hospital medical records, with no request to redact references to the defendant's refusals on advice of counsel or requests to confer with counsel. The decision to introduce these unredacted records was a conscious strategic decision by trial counsel, who had submitted a limiting instruction regarding the defendant's refusals on advice of counsel just before Dr. Kelly testified. Trial counsel later asked that the instruction be given as soon as the prosecutor began to inquire about the defendant's refusals during her cross-examination of Dr. Kelly. The judge gave a substantially similar instruction at that time, as requested. Trial counsel did not object to the prosecutor's cross-examination of Dr. Kelly concerning the refusal evidence. Her purpose was to show that the defendant was not delusional but acting in a reality-based state of mind.

The weight or quantum of evidence of criminal responsibility (not guilt, in this case), the third *Mahdi* factor, was significant. Shortly after the murder the defendant disposed of the murder weapon and cleverly avoided potential problems with the two Hadley police officers who were **\*\*439** dispatched to the restaurant. His work supervisor at Baystate testified that he was polite and reliable and capable of handling stressful situations well. A professor from Westfield State College testified

the defendant was one of his better students and did not engage in unusual behavior. Friends testified that he appeared normal when sober. He had no prior psychiatric hospitalizations. Dr. Peebles testified the defendant did not show psychotic symptoms while at Bridgewater State Hospital. The evidence of the defendant's refusals on advice of counsel and his request to confer with counsel "played a minor role in the battle of experts on the question of [criminal responsibility], with an enormous amount of personal history, conduct, and [other] material as ammunition for that battle." *Commonwealth v. Adams,* 434 Mass. 805, 815, 753 N.E.2d 105 (2001).

Turning to the fourth *Mahdi* factor, the frequency of the reference, house of correction and hospital records indicate references to counsel on fifteen occasions. The prosecutor touched on the refusals approximately five times during her **\*692** cross-examination of Dr. Kelly. She never mentioned the refusals on advice of counsel in her closing argument, focusing instead on the absence of any indications of active mental illness while the defendant was at Bridgewater State Hospital. Of significance is the fact that after trial counsel attended interviews at the hospital on December 21 and 23, there were no further refusals. The hospital eventually obtained the defendant's history, which was not appreciably different from the history on which the experts relied or to which the many civilian witnesses related in their testimony.

Regarding the final *Mahdi* factor, the availability or effect of curative instructions, as noted previously, trial counsel had prepared a limiting instruction which the judge gave immediately after the prosecutor broached the subject of the refusals. The judge did not give the precise instruction requested, but she gave one that was substantially similar. She forcefully instructed the jury that the defendant's refusals to answer questions on advice of counsel were "appropriate," and they should "not draw any adverse inference from the fact that somebody has been advised by their attorney not to answer questions," "either because of the advice or because actions were taken pursuant to the advice."

Weighing these factors, we conclude that there was no substantial likelihood of a miscarriage of justice. Trial counsel was able to avoid harmful consequences from improper use of this evidence by virtue of the judge's limiting instruction, which the jury are presumed to follow. See *Commonwealth v. Auclair,* 444 Mass. 348, 358, 828 N.E.2d 471 (2005), and cases cited. The limiting instruction also had the salutary effect of eliminating jury speculation that might have arisen from redactions in the records. The prosecutor did not focus upon this evidence,

and instead made no reference to it in her closing argument. As the trial judge observed in her decision on the defendant's motion for a new trial, counsel was able to use the refusal evidence and the defendant's requests for counsel "to explain the absence of psychotic statements at Bridgewater while avoiding the potentially adverse inferences that the evidence could also give rise to, e.g., that [the defendant's] compliance with his attorney's advice was evidence of his sanity." In these circumstances we conclude that trial counsel followed a reasonable strategy. We conclude that *693 there is no substantial likelihood of a miscarriage of justice. See *Commonwealth v. Adams,* 434 Mass. at 815, 753 N.E.2d 105.

**440 d. The defendant's fourth claim that trial counsel was ineffective involves the failure to object to the prosecutor's opening statement where, in describing the chronology of events on the morning of December 7, 2004, she said that "his mother first had spoken to [the family] attorney, ... [then] contacted the crisis services in Westfield, and the police department was called in to assist in taking him into custody." The defendant contends that the prosecutor was suggesting that the defense was concocted because the defendant and his family consulted lawyers. The defendant further cites a point during the prosecutor's redirect examination of Dr. Welner where she elicited statements of a psychiatrist who treated the defendant at the house of correction to the effect that the psychiatrist advised the defendant that trial counsel was concerned he get treatment for schizophrenia, and that treatment with antipsychotic medication was something trial counsel was urging. Finally, the defendant asserts that the coup de grâce in this impermissible theme of the prosecutor's theory of the case culminated in the prosecutor's closing, where she stated that the defendant's statements in the Bridgewater State Hospital and house of correction records "are evidence of a defense that was constructed very soon after the event."

[13] We begin our analysis with the complaint about the prosecutor's opening, to which there was no objection. The prosecutor did not suggest in her opening that the defense was concocted by the family and their attorneys. She merely laid out a chronology of the expected testimony. The family attorney in fact testified that he spoke to the defendant on the telephone for about fifteen seconds. During that conversation the defendant was agitated, rude, and unresponsive, and walked away from the telephone. The lawyer then made telephone calls to a local crisis team and to the Westfield police department. There was no impropriety that could have been remedied by objecting.

With respect to the prosecutor's redirect examination of Dr. Welner, the nature of the questioning set forth in the transcript is quite different from what the defendant describes. Trial counsel had cross-examined Dr. Welner at length about two separate *694 incidents at the house of correction in which the defendant assaulted two different inmates, without provocation. Dr. Feldman, the defendant's expert psychologist, had attached considerable importance to the incidents. The defendant reported to Dr. Feldman that he did this because undercover State and Federal law enforcement agents told him it would be his ticket out of the institution if he completed the assault by a specific time of day. Because he was five minutes late, he remained confined. The significance to Dr. Feldman was that the defendant, who had been confined at the house of correction, was sober, yet delusional, at the time of the two incidents with inmates.

During his cross-examination on the subject of the inmate incidents, Dr. Welner allowed for the possibility that the defendant was delusional because there was "contradictory information" about the defendant's state of mind and the defendant's account of what happened. Dr. Welner also testified that the available records from the house of correction indicated that the defendant "was demonstrating absolutely no distress or any sign of any other kind of psychiatric symptom or the same anxiety which had in the past ... driven him to Dr. Berlin's office to seek care for the symptoms that he had associated with those irrational ideas."

When the prosecutor returned to this subject in her redirect examination of Dr. **441 Welner, she attempted to clarify that the source of the "contradictory information" was not internal to the house of correction, but rather was Dr. Feldman, whose opinion on the incidents had been provided to the house of correction staff by trial counsel. The prosecutor further elicited information from the report of a psychiatrist at the house of correction, who expressed the same concerns as Dr. Welner about the inconsistent information. The defendant never mentioned to house of correction staff that he had assaulted the two inmates on the recommendation of undercover agents. The house of correction psychiatric report said, "It is notable that ... emotionally [the defendant] doesn't present as schizophrenic, and there are concerning inconsistencies in his subjective report [to Dr. Feldman] and observed presentation." Both psychiatrists had, in effect, been compelled to consider the information on which Dr. Feldman had relied, as transmitted by trial counsel. It also bears *695 mention that at no point in Dr. Welner's summary of his reasons for concluding as he did is there any indication that the defense of lack of criminal

responsibility had been concocted.

[14]  Finally, the prosecutor's comment in her closing argument about "a defense that was constructed very soon after the event" was directed not at trial counsel, but the defendant's family. The argument occupies about two lines of fifty-three transcript pages of a closing argument that otherwise was focused on a close and careful analysis of the evidence. Trial counsel objected to some portions of the prosecutor's closing argument, but not to this statement. The absence of an objection is some indication that the argument did not land a hard, foul blow, and was not unfairly prejudicial. See *Commonwealth v. Toro,* 395 Mass. 354, 360, 480 N.E.2d 19 (1985). We are satisfied that this minor flaw in a closing argument that otherwise was delivered in a way that must have impressed the jury that the case was entitled to their full, thorough, and respectful consideration of all the evidence did not create a substantial likelihood of a miscarriage of justice.

[15]  [16]  e.  The defendant faults counsel for asking Dr. Welner a question on cross-examination, the answer to which he did not know. He asked why the doctor had described the defendant as "moon faced," and thereby attempted to show that Dr. Welner was demeaning the defendant. Dr. Welner responded that the term had medical significance that indicated a manifestation of steroid use that would persist up to one year after cessation of use. The defendant further contends that based on affidavits from Dr. Kelly and Dr. Jeffery Korff, an endocrinologist, submitted in support of his motion for a new trial, the steroids that the defendant used would not cause "moon face" and the symptoms would not have persisted for one year after cessation of steroid use. Thus, he argues, trial counsel's lack of preparation not only failed at impeachment but it produced false and damaging evidence.

The trial judge concluded that although counsel was negligent, there was no prejudice because there was strong evidence that the defendant in fact used anabolic steroids. We agree. Although this was a lost opportunity to impeach Dr. Welner, whose credentials also included board certification in psychopharmacology, that is, expertise in matters that include side effects and **696** consequences of drugs, the record indicates that trial counsel impeached him on multiple fronts during 270 transcript pages of his cross-examination. Failure to use a particular method of impeachment does not constitute ineffective assistance of counsel. See **442** *Commonwealth v. Hudson,* 446 Mass. 709, 715, 846 N.E.2d 1149 (2006), quoting *Commonwealth v. Fisher,* 433 Mass. 340, 357, 742 N.E.2d 61 (2001).

[17]  [18]  f.  The defendant's final claim of ineffective assistance of counsel is based on trial counsel's failure to object to hearsay testimony elicited by the prosecutor during her direct examination of Dr. Welner. In particular, Dr. Welner summarized written statements provided to him of witnesses that he said gave no indication during the weeks before the alleged murder that the defendant expressed irrational or delusional ideas in the absence of alcohol or cocaine intoxication. Some of the authors of those statements did not testify, and Dr. Welner did not identify them. Dr. Welner also referred to the statement of a person he identified and who did not testify. The statement of the named person indicated that he spoke to the defendant at 9:30 *P.M.* on December 6, 2004, approximately three hours before the shooting, and the defendant was not delusional. Had there been an objection to such testimony it should have been sustained. Although it was a proper basis for Dr. Welner's opinion testimony, it was hearsay evidence that should not have been elicited during his direct examination. See *Department of Youth Servs. v. A Juvenile,* 398 Mass. 516, 531–532, 499 N.E.2d 812 (1986); Mass. G. Evid. § 705 (2013).

However, we perceive no substantial likelihood of a miscarriage of justice. See *Commonwealth v. Wright,* 411 Mass. at 682, 584 N.E.2d 621. The evidence was largely cumulative of the testimony of six witnesses, especially as to the defendant's mental state, and his consumption of alcohol, between twenty-five and forty minutes after the killing.[6]  The defendant admitted to the snow plow operator and the Hadley police officers that he had been drinking. Trial counsel impeached Dr. Welner with statements and testimony of one witness to the effect the defendant had experienced delusions when sober. He used the notes of Dr. Berlin to the same effect. Trial counsel stressed these points in **697** his closing argument. He also recalled the incident at the Westfield State police barracks where there was no evidence that the defendant was intoxicated, and the testimony of witnesses who said the defendant expressed delusional ideas even when sober. In the circumstances of this case, we are satisfied that the error did not prejudice the defendant in any appreciable way. See *Commonwealth v. Jaime,* 433 Mass. 575, 576–578, 745 N.E.2d 320 (2001).

6      There also was testimony from the defendant's father and sister regarding conversations they had with him approximately four and one-half and five hours, respectively, after the shooting in which he was delusional.

[19]  3.  *Evidentiary issues.*  a.  The defendant alleges that the judge erred in allowing the prosecutor, during her

cross-examination of Dr. Kelly, to refer to a textbook entitled "The Sociology of Deviant Behavior" found in the rear seat of the defendant's automobile and used in a course that he was taking at the time of the shooting. The book was not admitted in evidence. The defendant argues that because there was no evidence that he had read the chapter on mental disorders that included a discussion on schizophrenia, the specific chapter referred to, this evidence should not have been admitted. See *Commonwealth v. LaSota,* 29 Mass.App.Ct. 15, 26–27, 557 N.E.2d 34 (1990). The defendant also alleges that the prosecutor unfairly used this evidence to imply that the defendant had specialized knowledge that enabled him to feign schizophrenia.

The prosecutor cross-examined Dr. Kelly on the question whether the defendant was malingering or "faking" his mental **\*\*443** illness. Dr. Kelly had ruled out malingering, but he admitted that having specialized knowledge in certain fields could require an evaluator to proceed with great caution before ruling out malingering. He acknowledged knowing that the defendant was enrolled in college as a criminal justice major, knowing that he had taken at least eight courses in or related to his major, including psychology, in which he earned grades ranging from B to A, and knowing he was enrolled in a course entitled "Sociology of Deviant Behavior." Dr. Kelly further acknowledged that he had not explored whether the defendant had acquired any specialized knowledge from these courses that would be relevant to a determination of malingering.

The subject on which Dr. Kelly was cross-examined, namely, consideration of specialized knowledge as it relates to malingering, was medically relevant by Dr. Kelly's own admission, and it was legally relevant. See **\*698** *Commonwealth v. Kappler,* 416 Mass. 574, 584, 625 N.E.2d 513 (1993). The prosecutor's cross-examination of Dr. Kelly on the defendant's specialized knowledge went to the thoroughness of Dr. Kelly's examination of the defendant, and thus the credibility of his entire opinion as to the defendant's lack of criminal responsibility. It was not an attempt to show the defendant actually was malingering, as the defendant argues. There was no error.

[20] b. There was no error in the exclusion of evidence of statements made by the defendant to Dr. Kelly during the direct examination of Dr. Kelly. The statements involved the defendant's descriptions of hallucinations he experienced in Hawaii three years before the shooting. They were offered as proof that the defendant experienced delusional thinking. As such they constituted hearsay and are inadmissible on direct examination of an expert. See

*Commonwealth v. Cutts,* 444 Mass. 821, 831, 831 N.E.2d 1279 (2005), citing *Department of Youth Servs. v. A Juvenile,* 398 Mass. at 531–532, 499 N.E.2d 812.

There was no unequal treatment of the parties' respective experts, as the defendant argues. Dr. Welner had described the defendant's hallucinations, without objection, as "auditory," based in part on records that had been admitted in evidence. There had been an objection to Dr. Kelly's testimony, and it was properly sustained on hearsay grounds. Dr. Kelly properly expressed his opinion that the defendant suffered from a psychotic delusional disorder and that his delusional belief paranoid system had been in place since about 2001, and was present when he was in Hawaii. The defendant's "right to produce all proofs, that may be favorable to him," as provided in art. 12 of the Massachusetts Declaration of Rights, does not require the admission of hearsay. *Commonwealth v. Roman,* 414 Mass. 235, 239, 606 N.E.2d 1333 (1993). He was able to elicit the expert opinion he desired from Dr. Kelly. He was not allowed to elicit the hearsay basis for that opinion. There was no error.

[21] c. There is no merit to the defendant's claim that Dr. Welner testified that he had requested various categories of information including the defendant's financial, telephone, and electronic mail records; that they had not been made available; and that this testimony constituted impermissible refusal evidence in violation of the defendant's rights under the Fifth Amendment **\*699** to the United States Constitution and under art. 12. See *Commonwealth v. Conkey,* 430 Mass. 139, 141–143, 714 N.E.2d 343 (1999), *S.C.,* 443 Mass. 60, 819 N.E.2d 176 (2004) and 452 Mass. 1022, 897 N.E.2d 28 (2008). There was no objection. Dr. Welner's testimony made clear that **\*\*444** the request for the information was made to the prosecutor, not the defendant. At the end of this segment of his testimony the prosecutor asked, "You also mentioned that you had requested any Internet communications of the Defendant." Dr. Welner responded, "I was told it was not available." In context, we are satisfied that no reasonable juror would have inferred that the defendant had refused to produce requested evidence. The default clearly was on the prosecutor.

4. *Prosecutorial misconduct.* The defendant accuses the prosecutor of general unfairness in the way she questioned witnesses, specifically, by insinuating that she and Dr. Welner had suggested they had more evidence of the defendant's guilt than the jury heard, by implying motives the defendant may have had for killing the victim where there was no evidence of motive, and by arguing that the defendant's delusions were ruses appropriated

[22] [23] Argument based on facts not in evidence is improper. *Commonwealth v. Storey,* 378 Mass. 312, 324, 391 N.E.2d 898 (1979), cert. denied, 446 U.S. 955, 100 S.Ct. 2924, 64 L.Ed.2d 813 (1980), and cases cited. Similarly, it is improper for an attorney, through cross-examination of a witness, to communicate an impression by innuendo that he or she possesses as yet undisclosed information, with no good faith basis for doing so. See *Commonwealth v. Christian,* 430 Mass. 552, 561, 722 N.E.2d 416 (2000), overruled on other grounds by *Commonwealth v. Paulding,* 438 Mass. 1, 777 N.E.2d 135 (2002). This principle applies equally to direct examination.

[24] The prosecutor's direct examination of Dr. Welner did not suggest that they had undisclosed information of guilt. The prosecutor was demonstrating that Dr. Welner had considered more information than Dr. Feldman and thus was more thorough. This was neither improper nor unfair.

[25] There was record support for the prosecutor's argument that the defendant resented the victim and was enraged at being "disrespect[ed]" by him. Dr. Kelly testified to disrespect being a motivating factor, and there was evidence of two incidents in *700 which the victim had confronted the defendant and chastised him in the presence of friends. Dr. Kelly also was aware of these incidents. Contrary to the defendant's argument, there also was record support for the prosecutor's argument that one friend testified that people laughed when the victim chastised the defendant during one of the two incidents.

Also contrary to the defendant's argument, the judge did not preclude the prosecutor from pursuing her theory that the defendant was resentful toward the victim because the victim was enjoying a measure of success on most fronts in his life at a time when the defendant was experiencing losses on parallel fronts in his life. The judge merely cautioned the prosecutor that the probative value of any testimony offered in support of that theory would have to outweigh any potential for prejudice. Our review of the record reveals evidentiary support for this portion of the prosecutor's closing argument, and that the corresponding portion of her argument was unemotional, strictly fact-based, and not unduly prejudicial. There was no error.

[26] Finally, the prosecutor's argument that the defendant's delusions were a ruse based on popular culture had mild record support. We perceive the argument as rather weak. It also is somewhat surprising that the prosecutor even advanced the idea in light of Dr. Kelly's exposure of a

similar weakness in the prosecutor's suggestion **445 that the defendant's delusions were a recent fabrication. He reminded the prosecutor that the defendant had a history of delusional thinking at least three years prior to the shooting, and stated convincingly that it was highly improbable that the defendant began to concoct a defense of lack of criminal responsibility at that time. Any error in that aspect of the prosecutor's closing probably had no appreciable impact on the jury, at least none favorable to the prosecutor. We also note that there was no objection to this portion of the prosecutor's closing, which is some indication by experienced trial counsel that it did not rise to the level of a foul blow. See *Commonwealth v. Toro,* 395 Mass. at 360, 480 N.E.2d 19.

5. *Jury instructions.* The defendant identifies four aspects of the judge's instructions that he alleges created reversible error.

[27] a. First, he argues that the judge gave an unfairly one-sided instruction regarding state of mind. In particular, he cites the *701 judge's instruction where she told the jury that they could consider evidence of the defendant's relationship with the victim on the question of the defendant's state of mind. The judge identified only one incident, where the victim allegedly disarmed the defendant, but made no reference to the evidence of the defendant's delusions regarding the victim. This, he continues, unfairly singled out evidence that supported the Commonwealth's theory of motive. See *Commonwealth v. Sneed,* 376 Mass. 867, 872, 383 N.E.2d 843 (1978).

The defendant has taken the judge's instruction out of context. The instruction was one of several in a series that reviewed various limiting instructions the judge had given during the course of the trial relating to evidence of prior bad acts. She told the jury they could consider evidence of this particular incident, "as all evidence of the relationship between the [victim and defendant], on the issue of [the defendant's] state of mind toward [the victim]," and not as evidence that he possessed a bad character or had a propensity to commit crimes. The instruction did not have the import about which the defendant complains. There was no error.

[28] b. The defendant requested that the judge instruct the jury as to the consequences of a verdict of not guilty by reason of lack of criminal responsibility, as was his right. See *Commonwealth v. Mutina,* 366 Mass. 810, 821–822, 323 N.E.2d 294 (1975). The defendant requested a specific instruction based on the model jury instructions used in the District Court, with the following addition or modification:

"He would not be released unless a finding is made that his discharge would not create a likelihood of serious harm to himself or others. Otherwise, he could spend the rest of his life in a locked facility."

The judge instructed the jury in substantially the same language as the District Court model instruction.[7] She declined to **446 include the modification requested by the defendant. The defendant argues this was error.

[7]   The judge's instruction on the consequence of a verdict of not guilty by reason of lack of criminal responsibility was as follows:

"If a defendant is found not guilty by reason of [lack of criminal responsibility], a Court may order the Defendant to be hospitalized at a mental facility for a period of 40 days for observation and examination. During this observation period, or within 60 days after a verdict of not guilty by reason of [lack of criminal responsibility], the district attorney or other appropriate authorities may petition a Court to commit the Defendant to a mental health facility or to Bridgewater State Hospital.

"If, after hearing, it is proved beyond a reasonable doubt that the Defendant continues to be mentally ill and that his discharge would create a likelihood of serious harm to himself or others, then the Court may commit the Defendant to a proper mental facility or to Bridgewater State Hospital for six months. Thereafter, periodically a court reviews the order of commitment. If the person is still suffering from a mental illness or defect and is still dangerous, he is kept in the facility. If the person is no longer mentally ill and can resume a normal life, he or she is later discharged.

"The district attorney must be notified of any hearing concerning whether the person may be released, and may be heard at any such hearing. However, the final decision on whether to recommit or release a person is made by a judge."

See Model Jury Instructions for Use in the District Court 6.03 (now 9.200).

[29] [30]   **702 This court's decision in *Commonwealth v. Mutina, supra,* does not prescribe any particular language on the matter. See *Commonwealth v. Callahan,* 380 Mass. 821, 827, 406 N.E.2d 385 (1980), *S.C.,* 386 Mass. 784, 438 N.E.2d 45 (1982) and 401 Mass. 627, 519 N.E.2d 245 (1988). A judge is not bound to instruct in the exact language of a request. A judge must carefully explain the applicable law to the jury, but the method and extent of the charge lies in her discretion. *Commonwealth v. Kelley,* 359 Mass. 77, 92, 268 N.E.2d 132 (1971). See

*Commonwealth v. Ward,* 412 Mass. 395, 399, 590 N.E.2d 173 (1992) ("We have no confidence that any particular charge on the consequences of a verdict of not guilty by reason of [lack of criminal responsibility] will provide just the right information to the jury").

[31]   Here, the requested instruction is not necessarily an accurate statement of the law. Not every commitment following a verdict of not guilty by reason of lack of criminal responsibility is to a "locked facility." See *Commonwealth v. Nassar,* 380 Mass. 908, 917–918, 406 N.E.2d 1286 (1980) (least restrictive alternative analysis applies to commitment proceedings). Moreover, the defendant's proposed modification could be misunderstood to accommodate a one-time order of commitment for life. We conclude the judge's instruction allowed for an accurate understanding that the defendant may **703 indeed never be released." His instruction was fair and balanced, and explained with reasonable clarity the commitment procedure following a verdict of not guilty by reason of lack of criminal responsibility. There was no error.

[32]   c. There is no merit to the defendant's contention that the portion of the model instruction on the consequences of a verdict of not guilty by reason of lack of criminal responsibility, as requested by trial counsel and as given by the judge, which requires the Commonwealth to prove beyond a reasonable doubt that the defendant is mentally ill and would create a likelihood of serious harm to himself or others if discharged, is error. In particular, the defendant argues that it eviscerates the so-called *Mutina* instruction because (1) it requires the Commonwealth to take inconsistent positions: it argued at the criminal trial that the defendant *is not* mentally ill, but it must argue at the commitment hearing that he *is* mentally ill, and (2) a jury will, as a result of this inconsistency, conclude that the Commonwealth necessarily will fail to meet its proof at the commitment hearing. We disagree.

The premise at the commitment hearing is that the Commonwealth failed to meet its burden of proof at the criminal trial, and now must accept that failure and use the defendant's successful trial defense **447 against him at the commitment hearing. To borrow from a common metaphor, the defendant's shield is now the prosecutor's sword. There is nothing difficult to understand about this state of affairs. The two proceedings are altogether different, and there is nothing confusing about the Commonwealth's different burdens. As this court said in *Commonwealth v. Robbins,* 422 Mass. 305, 312, 662 N.E.2d 213 (1996), a judge's instruction on the consequences of a verdict of not guilty by reason of lack of criminal responsibility, including the burden of proof at

a commitment hearing, is not error.

[33] d. The defendant's final claim of error is the judge's failure to instruct the jury, conformably with *Commonwealth v. Berry,* 457 Mass. 602, 617–618 & n. 9, 931 N.E.2d 972 (2010), *S.C.,* 466 Mass. 768, 2 N.E.3d 177 (2014), and revised by *Commonwealth v. DiPadova,* 460 Mass. 424, 439, 951 N.E.2d 891 (2011), that "if the defendant's mental illness *did* reach the level of lack of criminal responsibility even in the absence of his consumption of [alcohol or] drugs, it was irrelevant *704 whether he took [alcohol or] drugs knowing that they would exacerbate that condition" (emphasis in original). *Commonwealth v. DiPadova, supra* at 437, 951 N.E.2d 891. The defendant's trial was completed before our decisions in *Berry* and *DiPadova* were released, but he is entitled to the benefit of changes in decisional law that are announced after trial and pending his direct review. *Commonwealth v. Bray,* 407 Mass. 296, 299, 553 N.E.2d 538 (1990). The defendant did not object to the judge's charge. It had been requested by trial counsel. We review to determine if any error created a substantial likelihood of a miscarriage of justice. *Commonwealth v. Wright,* 411 Mass. at 682, 584 N.E.2d 621.

The instruction given here was very different from the instructions given in both *Berry* and *DiPadova.* Here, the judge instructed that a defendant who "suffers from a mental disease or defect that is activated by the consumption of alcohol or drugs [ ] that results in the lack of substantial capacity ... is not criminally responsible." This instruction leaves room for a finding of a lack of criminal responsibility if the mental illness is not *activated* by drugs or alcohol but already is in play. The instruction, therefore, leaves unaddressed the question whether the consumption of alcohol or drugs that aggravate the effects of a mental illness in effect at the time of the crime will negate the defense of lack of criminal responsibility. A reasonable juror would not be compelled to conclude that a defense of lack of criminal responsibility would be unavailable in the circumstances, unlike the jurors in *Berry* and *DiPadova.* Anticipating *Berry* and *DiPadova* somewhat, trial counsel requested that the judge instruct the jury that they could consider whether the defendant's mental condition might have interfered with his ability to understand the effect of his consumption of alcohol or drugs on his mental disease or defect. The judge so instructed the jury, further ameliorating the lack of a *Berry-DiPadova* instruction.

There are other important differences between this case and *Berry* and *DiPadova.* In those cases, all of the experts testified that the defendant was suffering from a mental disease or defect at the time of the murder. See

*Commonwealth v. Berry,* 457 Mass. at 615, 931 N.E.2d 972; *Commonwealth v. DiPadova,* 460 Mass. at 426, 951 N.E.2d 891. Here, the Commonwealth's expert was of the opinion that the defendant was not suffering from a mental disease or defect. In *705 the other cases, the defendants had lengthy, well-documented histories of diagnosis and treatment for serious mental illness. See *Commonwealth **448 v. Berry, supra* at 607–609, 931 N.E.2d 972; *Commonwealth v. DiPadova, supra* at 426, 951 N.E.2d 891. That is not true in this case. More significantly, both defense experts in this case had ruled out alcohol and drugs as a trigger or a contributor to the defendant's lack of substantial capacity. There was no evidence or opinion from the defense that the defendant's consumption of alcohol or drugs played any role in the defendant's lack of substantial capacity to appreciate the wrongfulness of his crime or to conform his conduct to the requirements of the law. For the foregoing reasons, we conclude that the absence of a *Berry-DiPadova* instruction in this case could not have created a substantial likelihood of a miscarriage of justice.

[34] [35] 6. *Review under G.L. c. 278, § 33E.* The defendant asks us to exercise our power under G.L. c. 278, § 33E, and reduce the degree of guilt or order a new trial. He bases his request on the extensive evidence of mental illness. When we undertake review under § 33E, we do not function as a second jury. *Commonwealth v. Smith,* 357 Mass. 168, 181, 258 N.E.2d 13 (1970), *S.C.,* 427 Mass. 245, 692 N.E.2d 65 (1998). That is, we do not determine what verdict we would have returned, but whether the verdict "was against the law or the weight of the evidence, or because of newly discovered evidence, or for any other reason that justice may require." G.L. c. 278, § 33E. See *Commonwealth v. Brown,* 449 Mass. 747, 773, 872 N.E.2d 711 (2007).

Although the defendant presented substantial evidence supporting his defense of lack of criminal responsibility, the Commonwealth presented substantial evidence to the contrary. It presented evidence that the defendant was not delusional on the evening of the murder: he was concerned about encountering police; he quick-wittedly negotiated his way through his encounter with police at the restaurant; he demonstrated no signs of delusional thinking as his coworker drove him from the restaurant to Westfield; and he demonstrated no signs of delusional thinking while at Bridgewater State Hospital or the house of correction where he was held pending appeal.

The defense of lack of criminal responsibility was fully and fairly presented to the jury. The judge's instructions were *706 adequate, and the error in the "activation/aggravation" instruction (*Berry-DiPadova* )

**Com. v. Johnston, 467 Mass. 674 (2014)**

7 N.E.3d 424

did not create a substantial likelihood of a miscarriage of justice in light of the defense experts' testimony that alcohol or drugs played no part in their opinions. Unlike *Commonwealth v. Berry,* 466 Mass. 763, 771, 774, 2 N.E.3d 177 (2014), where we reduced the verdict to murder in the second degree, this is not a case where every testifying expert agreed that the defendant was mentally ill at the time of the murder, which itself is no assurance of a reduction in the degree of guilt. Tragic as this case is, it is a case where the question of criminal responsibility was truly for the jury, and justice does not require that their verdict be disturbed. See *Commonwealth v. Brown, supra,* and cases cited. We see no basis for reducing the degree of guilt or ordering a new trial.

*Judgments affirmed.*

*Order denying motion for a new trial affirmed.*

**Parallel Citations**

7 N.E.3d 424

---

End of Document

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.