**UNITED STATES DISTRICT COURT**
**FOR THE**
**DISTRICT OF MASSACHUSETTS**

**15-cv-12332-WGY**

**Bryan R. Johnston,**
**Petitioner**

**v.**

**Lisa A. Mitchell**
**Superintendent, Old Colony Correctional Center**

**MEMORANDUM IN SUPPORT OF PETITION FOR HABEAS CORPUS**

*Introduction*

The Court should grant Johnston's petition for habeas corpus. Johnston was deprived of the effective assistance of counsel in several ways that struck at the heart of his defense. His counsel permitted the defendant's statements to jail and Bridgewater State Hospital Staff to be introduced into evidence where they were obtained in response to questioning after Johnston had invoked his right to counsel. Counsel also allowed the jury to hear not only those statements, but Johnston's invocations of his right to counsel. Similarly, counsel failed to object to the prosecutor's argument that Johnston's insanity defense was "concocted". Finally, counsel elicited damaging and demonstrably false testimony from the prosecution's supposed board-certified psychopharmacologist that Johnston's facial appearance was due to anabolic steroid use.

*Procedural History*

On January 19, 2005, Johnston was indicted for (1) murder, (2) use of a large capacity firearm in commission or attempted commission of a felony, (3) possession of a large capacity

firearm without a license, and (4), armed burglary.[1] On March 29, 2006 through May 2, 2006, Johnston proceeded to a jury trial before the Superior Court (Josephson, J.). (R.8–9).

The jury convicted Johnston of all charges. (Tr.22:61–68). The judge sentenced Johnston to natural life on the murder indictment and substantial consecutive sentences for each of the other offenses. (Tr.23:36–37). Johnston timely appealed. (R.14).

Johnston eventually filed a motion for a new trial. The trial judge denied Johnston's motion without an evidentiary hearing. (Add.2); (R.17). Johnston again timely appealed. (R.19).

On April 8, 2014, the Supreme Judicial Court affirmed Johnston's convictions. *Commonwealth v. Johnston*, 467 Mass. 674 (2014).

### Statement of Facts

The SJC summarized the facts of this 23-day trial this way:

> *Background.* a. *The offenses.* We summarize facts the jury could have found and reserve other details for discussion of particular issues. The defendant and the victim were members of a large circle of friends who had graduated from the same high school in June, 2000, and remained close. Both men attended a friend's wedding in June, 2004. The defendant became drunk and told the victim's girl friend that her brother was taking drugs. This upset her, and she asked the victim if what the defendant told her was true. The victim confronted the defendant. The details of the conversation are not certain.
>
> The defendant telephoned the victim at about 10:30 *P.M.* on December 6, 2004, and invited him to go out drinking. The victim declined and the conversation did not end well. Few details of the conversation are known. A few minutes later the victim told his girl friend that the defendant "[was not] the same anymore." At about the same time a woman who lived in an apartment directly above the defendant's apartment heard angry shouting and cursing coming from the defendant's apartment. It sounded as if it were taking place during a telephone

---

[1] (Tr.1:5); (R.1–4). The trial transcripts will be cited in the following form: "(Tr. [volume]:[page])"; other transcripts will be cited as "Tr. [date]:[page]"; Johnston's record appendix will be cited in the following form "(R.[page])"; the addendum will be cited in the following form "(Add.[page])". Johnston's brief, Johnston's reply brief, and the Commonwealth's brief to the SJC will be cited as "DBr:[page]", "RBr:[page]", and "CBr:[page]" respectively. Johnston's appendix in the SJC and in this Court are identical. If the Court prefers, Johnston will happily file a substitute memorandum with citations instead to the Supplemental Answer filed by the respondent in this Court.

call.

Shortly thereafter the defendant drove approximately thirty-one miles from his apartment in Westfield to the house in Amherst where the victim lived. At about 12:20 A.M. on December 7, the defendant entered the house. He had been there many times. He walked upstairs to the victim's bedroom with a rifle and fired six hollow-point bullets into the victim, killing him. A roommate of the victim, the only other person in the house, heard the gunshots but he did not see the shooter. He telephoned 911 and Amherst police arrived within minutes.

On his way back to Westfield the defendant stopped in the vicinity of a restaurant in Hadley. He disposed of the rifle in a wooded swampy area. As he was leaving he drove over a log, immobilizing his car. A snow plow operator stopped to help. The defendant said he had been drinking and did not want the police to come. The operator applied his own strength while the defendant worked the car's engine, but they were unable to free the car. The defendant asked the operator to use his truck, but the operator declined and drove off.

At about 12:45 A.M. two Hadley police officers driving separate police cars were dispatched to the area of the restaurant. They observed the defendant's disabled car and stopped. The defendant approached one officer and said that his car was stuck and he needed help to free his car. He added that he had come from a friend's house and had stopped to urinate. The officers detected a mild odor of alcohol on the defendant's breath. His eyes were glassy and mildly bloodshot. When asked if he had been drinking the defendant said that he had consumed some alcohol much earlier that evening, but was fine at that time. The defendant said that he was a Springfield police officer, but later clarified that he was a special police officer at Baystate Medical Center (Baystate) in Springfield. One of the officers had worked at Baystate and telephoned a night supervisor there. He learned that the defendant was not a Baystate special police officer but a patrol officer. When he confronted the defendant with this information, the defendant apologized and said he had taken the test to become a Baystate security officer (the next position above patrol officer) and in his mind he thought he had the job.

When asked to perform a series of field sobriety tests the defendant said that one of his college professors told him that field sobriety tests were illegal, so he was unwilling to perform them at that time. The defendant asked if he was going to be arrested. He was told that he would not be arrested, but that the officers needed to have him take a series of tests to determine if he was capable of driving his car safely. The defendant agreed. After administering one field sobriety test and based on their other observations of the defendant, the officers determined that he was too impaired to drive safely. Arrangements were made to have the defendant's car towed away. The defendant was allowed to telephone a friend (a security officer at Baystate) who arrived and drove him to Westfield.

At 12:58 A.M. on December 7, 2004, while he was waiting for his friend to arrive

and drive him to Westfield, the defendant left a voice message for a female friend. He apologized for missing her call and said he was "wondering what you're up to tonight." He spoke in his typical "calm, easygoing, fun-loving ... nonchalant" tone.

As the defendant's friend was driving him home from the restaurant the defendant said, "It's a good thing the cop didn't search me.... I have my piece on me." The defendant produced a handgun and said there were six rounds in it. He also said that his license to carry a gun had been revoked.

As a result of a telephone call the defendant made to his parents at about 4:45 A.M. on December 7, they drove from Boston to Westfield and initiated civil commitment proceedings against him.

At about 9 A.M. the same day two Westfield police officers went to the defendant's apartment and asked him to accompany them to Noble Hospital in Westfield for a psychiatric evaluation that was ordered by a District Court judge pursuant to G.L. c. 123, § 12, on the application of his parents. The defendant refused to comply and a struggle ensued. The defendant was subdued through the use of pepper spray.

In the meantime, Amherst and State police investigators were given the name of the defendant by the victim's girl friend. They went to the defendant's apartment in Westfield and were made aware of the defendant's civil commitment. The defendant's father consented to a search of his own car, which contained some items he and his wife had removed from the defendant's apartment for their son's safety, including a .38 caliber handgun. The defendant's father also consented to a search of the defendant's apartment. Among the items recovered from the two locations were a .223 caliber magazine having a capacity of ninety rounds, and a loaded .40 caliber Sig Sauer pistol. The next day, December 8, investigators returned to the defendant's apartment with a search warrant. They recovered several items, including a "fanny" pack containing hypodermic syringes and bottles of two different anabolic steroids. From a Dumpster at the apartment complex, investigators also recovered a gun case capable of holding a rifle.

During a search of the wooded swampy area near the Aqua Vitae restaurant on December 9, police recovered a .223 caliber Colt model CAR–A3 semiautomatic rifle, one live round of ammunition found near the rifle, and a forty-round magazine. Two latent fingerprints found on the rifle matched those of the defendant. Deoxyribonucleic acid (DNA) testing of blood found on the defendant's jeans matched the DNA profile of the victim.

Trial counsel told the jury in his opening statement that the defense was lack of criminal responsibility. The Commonwealth's theory was that the defendant did not suffer from a mental illness, and any delusions he ever experienced were the result of substance abuse. The Commonwealth also focused upon the absence of

any evidence of delusional thinking on the part of the defendant in the hours
before and approximately one hour after the killing.

b. *History relevant to criminal responsibility.* A great many of the issues in this
appeal involve the subject of criminal responsibility. Rather than recite facts that
the jury could have found in returning a verdict of guilty, it is more useful to offer
a summary of the evidence relevant to criminal responsibility.

The defendant was a regular user of alcohol and drugs in high school, as were
many of his friends. After high school the defendant attended Hawaii Pacific
University. His substance abuse continued, and he began experiencing delusions
and hallucinations. In December, 2000, during the holiday break after his first
semester, the defendant told his father he wanted to move out of the dormitory
and get his own apartment. He reported that a roommate's father was involved
with the Chicago mafia, and it made him feel uncomfortable.

The defendant's sister visited him at college in the fall of 2001. He told her not to
answer his telephone because it was "bugged." He reported that Federal Bureau of
Investigation (FBI) agents had rappelled off the roof of his apartment complex
and observed him from the window of his twenty-seventh floor apartment. This
caused him to keep his curtains closed. In addition, he informed his sister that a
next door neighbor had watched him through the walls, and that a pizza shop in
the commercial space of his apartment building was run by the mafia.

In January, 2002, a friend (the brother of the victim's girl friend) visited him at
college. The two men spent most of their time together drinking alcohol and
taking drugs. By April, 2002, the defendant left Hawaii in haste and refused to
return.

*Johnston*, 467 Mass. at 677–81. The opinion omits these details regarding Johnston leaving

Hawaii "in haste". Johnston called his sister, Kim, and "told me he was at the airport and he

needed to pick me (sic) up the next morning." (Tr.12:142). His voice shook and he spoke

quickly. *Id.* at 143. He refused to tell Kim anything more. *Id.* at 145. When he landed, "[h]e was

still very anxious. He told me he needed to get out of the airport. He told me that people

followed him back on the plane." *Id.* at 144. Johnston had no luggage. (Tr.12:144).[2]

When his family suggested they go back to Hawaii to retrieve his belongings, he

_____

[2] Johnston told defense expert Dr. Carol Feldman that he heard someone ask for him by name at
a restaurant he believed to be controlled by organized crime, causing him to immediately flee to
the airport at 2:30 a.m. carrying only a backpack. (Tr. 12:231–32). He saw people hooting and
howling. *Id.* at 232.

> said they could not do that because their lives would be in danger. He explained
> that he had to leave because various ethnic mafia groups and gangs (he mentioned
> the "Bloods") were going to kill him and his family.[3] The defendant began taking
> steroids to help protect himself and his family. He wanted people to fear him
> because he felt vulnerable. After he left Hawaii his family and friends did not
> recognize the defendant as the same person they once had known.

*Johnston*, 467 Mass. at 681.

The opinion omits these details. After his return from Hawaii, Johnston's father observed

him to be "very quiet, withdrawn, isolated. He would stay downstairs [in his room], drapes

closed, pulled. We didn't talk on the phone, and he was afraid the phones were bugged."

(Tr.16:38–39); (Tr.12:145); (Tr.11:56); *accord* (Tr.16:154). At one point, he insisted that there

was a white FBI van outside their house watching him. *Id.* at 41. When Johnston's father said he

would go out to the van to show him that it was not the FBI, Johnston prevented him, saying he

feared for his father's life. *Id.* at 42. Johnston's friend Adreanna Allaire told police that Johnston

"didn't make sense, even when he was sober, when discussing Hawaii." (Tr.11:222).

He rejected his father's request that he see a psychiatrist.

In September, 2002, the defendant enrolled at Westfield State College (now
University) as a criminal justice major. He moved out of his parents' home and
took an apartment in Westfield. His professors recalled him as being friendly,
highly competent, intelligent, and well respected by his peers. They did not
observe any unusual behavior or comments. On October 19, 2002, the defendant
walked into the State police barracks in Westfield and claimed people were
chasing him. A State police officer tried to reassure him that no one was in the
parking lot. The defendant would not accept the officer's assertions as true, and
he dialed 911. The defendant's state of agitation did not abate, so the officer
telephoned the defendant's father and then handcuffed the defendant to a bench
for safety purposes. After his father arrived the defendant was released. The
defendant told his father that he had visited a friend in the Albany, New York,
area and was followed by the mafia on his drive back to Westfield.

---

[3] He told his parents and others that he fled because he feared that the Mafia, the "Beta
Mafia" and the Irish Republican Army were following him and were going to kill him
and his family. (Tr.16:36–37); (Tr.11:46). He told Evan Donovan "that people with
trench coats and silencers followed him back. He told me that his house and car phone
were tapped." (Tr.15:226).

> The defendant refused an offer to move into the victim's apartment in Amherst because he believed that the victim was a crime family boss and that a great many of their group of friends were involved with organized crime.

*Johnston*, 467 Mass. at 681. Johnston also told Allaire that he refused to move into Sullivan's apartment because "Dave was talking in code" to him. (Tr. 11:56).

> He also reported that the victim had told him that his crime family had paid to have the defendant anally raped in Hawaii, and that they "bugged" his apartment in Hawaii and his parents' home. The defendant claimed to have seen the victim at Westfield State College the day before the murder. The victim walked out of a class (where he was not a student), smiled eerily at the defendant, and said, "I can get you whenever I want."

*Johnston*, 467 Mass. at 681. The SJC omitted these facts regarding Johnston's behavior in the summer of 2003. At that time, Johnston told Riley

> that his whole apartment was bugged; that . . . people were watching him. . . There was surveillance cameras. . . . He would point to spots on the ceiling and say that those were surveillance cameras.

(Tr.11:56–57). "[H]e took out his gun and he was kind of sweating, I don't know, scared, it seems. And he loaded the gun." *Id.* at 59. Johnston told Riley that he saw someone get shot by the Mafia. *Id.* at 60. Johnston also told Riley that people were following him. *Id.* at 45. Every time they went out, Johnston would "say that I knew that guy in Hawaii and this guy was following me there, and he's here now; and he would pick out random people." *Id.* at 47. Johnston also believed that the "FBI is watching me, but they are on my side." *Id.* at 109. Jeremy Levernoch similarly reported that Johnston "would start to eye someone, pick someone out of the crowd, and start saying that he was either in intelligence or talking about us or watching us." *Id.* at 256. On another occasion, Johnston told Allaire that they had had to leave a party people there were after him; they hid in a room and then left. *Id.* at 216. Johnston also told Allaire that he feared if they were to become involved, the people conspiring against Johnston would come after Allaire. *Id.* at 218.

> In November, 2003, the defendant obtained employment as a security officer at Baystate. He was considered polite and very reliable. He was well liked. The defendant dealt with gang members there without displaying or expressing any fear of them.
>
> On at least five occasions between November, 2003, and mid-November, 2004, the defendant brandished a firearm when he was in the company of his friends. Each occasion involved a different friend. In several of those instances he fired his gun at an inanimate object. In several instances he pointed his gun at the friend. On at least two occasions he alluded to a belief that the friend was involved with organized crime.[4] On at least one occasion he acknowledged that alcohol had brought on his behavior.
>
> The defendant experienced paranoid delusions both when he was intoxicated or on drugs, and when he was sober. He was not always delusional when intoxicated or on drugs. His delusional fear of organized crime families and of gangs intensified during the six months preceding the victim's death.

*Johnston*, 467 Mass. at 682.

The SJC omitted these facts regarding this period of time which Johnston's delusional fears intensified.  Evan Donovan concurred that Johnston's delusions intensified in this period:

> It was first people chasing him; and then he got into, involved in it as if he was involved with those people chasing him, whoever they were, Mafia it was unspecific. And then towards the end it was -- he was fully part of that group of people. . . . Meaning that he was a Mobster, or like he thought he was in the IRA, a captain, he had told me.

(Tr.15:231). When Donovan suggested that Johnston seek therapy, Johnston "refused it and said that these things were true." *Id.* at 232. Johnston was not intoxicated at the time he made this statement. *Id.* at 233.

In the summer of 2004, the Johnstons took a family vacation to St. Martin. Johnston's father testified that,

---

[4] In November, 2003, Johnston told Jeffrey Rose in a serious tone never to discuss anything criminal in Johnston's house or car because "the DEA had his belongings bugged." (Tr. 19: 169, 181). In early 2004, Johnston pulled a gun on Bruce Reardon at Sullivan's apartment and accused him of being a "snitch." (Tr.19:154–55). Around the same time: (1) Johnston told Mark Perras at a party in a paranoid manner, something like "I know what's going on." (Tr.19:73–74) and (2) Johnston told Justin Bond that he was no longer friends with Sullivan. (Tr.11:147).

> My wife and I were at a beach, sitting under an umbrella on a chair, and Bryan got very nervous and agitated, and he pointed to a person sitting on a chaise lounge, or a beach towel, and he said: "That person is from Hawaii. They followed me here. That person is from Hawaii." He was very upset. . . . We left the beach.

(Tr. 16:52). Similarly, Ed Arasimowicz asked Johnston at some point whether his concerns about the Mafia just in his head because "it always seemed like it really bothered him." (Tr.16:226). Johnston responded by yelling and screaming "[y]ou just don't fucking know"; he was "freaked out." *Id.* at 229–30. Both Arasimowicz and Johnston were sober. *Id.* at 226.

> In July, 2004, the defendant began psychiatric treatment with Dr. Richard Berlin. Lexapro, an antidepressant, provided modest relief. However, by October, 2004, the defendant presented with increasing anxiety. By November, 2004, he was sweaty and tense. He reported weekly panic attacks and "out of body" experiences.

*Johnston*, 467 Mass. at 682. Around that same time, Levernoch slept at Johnston's house after going to a bar. (Tr.11:259). They returned to Johnston's apartment around 3 a.m. *Id.* Levernoch went to sleep wearing a red t-shirt. *Id.* at 260. At around 8 a.m., Levernoch awoke to Johnston "on top of me pulling my shirt off . . . saying that I was in the Bloods and I couldn't have that on at his house." *Id.* They argued for half an hour, with Johnston "insisting that I was part of the Bloods and that I was sending people to see him." *Id.* at 261. Levernoch took his shirt off and went back to sleep. *Id.*

About a week later, Levernoch was at Evan Donovan's house. *Id.* at 262. Johnston called Donovan and said

> he needed to come meet me. I'm going to wind up in jail. Something bad, horrible is going to happen." I said, "What are you talking about?" And he said, like, he just got to meet me. I was like, "I have my girlfriend over here, and Jeremy's over here." Then he abruptly stopped and says, "Jeremy's there?"

(Tr.15:235). Johnston said Levernoch's name angrily. *Id.* at 236. When he arrived at Donovan's, he said "Do you want me to kill him upstairs or downstairs?" *Id.* at 238. Donovan took Johnston

upstairs to talk to him. (Tr.11:263); (Tr.15:239). Johnston "was stuttering and sweaty and seemed anxious." *Id.* He told Donovan about Levernoch's red t-shirt. *Id.* at 239–40. Johnston said,

> 'That's how I knew he was a Blood.' I said, 'As in the gang?' Then he proceeded to tell me that the previous night he was at work and the same kids that he saw Jeremy talk to came to his work and tried to 'put a hit on' him, as he put it. And then I told him I didn't see how that would be possible, me and Jeremy are your friends. How would he do that? Why would he do that? He kept saying it was too late. . . . He said that his boss had already put the hit -- had gave him the orders to kill Jeremy, and that there was nothing that he could do about it. I told him, "That's absurd." I said, "Why would he do that," again. And you know, he rolled up his sleeve and pointed to his tattoo, which says IRA, or Ireland something.

*Id.* at 239–41. While saying this, Johnston was

> anxious and distressed. He hit his head a couple of times, like that (demonstrating, with hand). He was doing a lot of pacing. He would take his gun out, put it back in, take his gun out, put it back in.

*Id.* at 241. After about 35 minutes, Donovan said "no one is going to die here tonight," and Johnston acquiesced. *Id.* But when they went back downstairs, Johnston took out his gun again. *Id.* at 241–42. Donovan hit Johnston in the arm and Johnston laughed. *Id.* at 242. Donovan then told Levernoch he had to leave. (Tr.11:263). Levernoch asked why and Johnston said that, "I sent over some Bloods to him at his work . . . he had instructions to kill me." *Id.* at 264. Johnston said "I have to kill you because I'm a captain in the IRA and I have this mission." *Id.* at 290. He waved a weapon around and pointed it at Levernoch. *Id.* at 264.

Levernoch denied that he tried to have Johnston killed. (Tr.15:242). Levernoch reasoned with Johnston, telling him that he was one of Johnston's best friends. (Tr.11:294). He asked Johnston talk to "his bosses, to try to see if he can get a way around killing me." *Id.* at 296. Johnston "continued to pace and pull his hair." (Tr.15:242). Johnston responded that he would

"try to talk to his boss . . . but he was still very nervous." (Tr.11:265). They then drank with
Donovan for about an hour but Johnston "wouldn't look [Levernoch] straight in the eye." *Id.* at
265. The next day, Johnston apologized to Donovan only for keeping Donovan up. (Tr.15:244).
He made no mention of displaying his gun. *Id.*

The SJC then went on to discuss the night of the killing but omitted the following
facts, Johnston's upstairs neighbor Jennifer Rollins awoke at 2 a.m. and for two hours
periodically heard "loud yelling, sounded like arguing, like on a telephone again, pacing
back and forth." (Tr.6:39, 49–50).

> Approximately four hours after the murder, at 4:45 A.M. on December 7, 2004,
> the defendant telephoned his parents. He was making no sense, talking about the
> mafia and gangs, and threatening to commit suicide. At 6 A.M., his sister, a
> psychiatric nurse, returned a telephone call she had received from him. He made
> no sense. When his parents arrived at his apartment at 8 A.M., he was saying
> bizarre things and his eyes were unfocused. As mentioned earlier, Westfield
> police officers served a commitment order on him later that morning. He was
> taken forcibly to Noble Hospital in Westfield, where he was placed in four-point
> restraints and sedated. A toxicology screen was negative for cocaine and
> amphetamines.

> c. *Expert testimony.* The defendant presented the opinion testimony of two
> experts: Dr. Carol Feldman, a forensic psychologist, and Dr. Martin Kelly, a
> forensic psychiatrist.

> Dr. Feldman opined that, at the time of the killing, the defendant suffered from
> the mental illness paranoid schizophrenia and, although he generally appreciated
> the wrongfulness of killing, he lacked substantial capacity to appreciate the
> wrongfulness of killing the victim, and he was unable to conform his conduct to
> the requirements of the law. She explained that the defendant believed he was
> being persecuted by several organized crime groups, and he believed himself to
> be the prisoner of the victim. She had interviewed the defendant six times,
> describing one interview in which the defendant's facial color deepened to purple,
> his tone was emotionally intense, and he was "floridly psychotic" as he described
> circumstances that caused him to flee Hawaii, namely, persecution by organized
> crime. Dr. Feldman determined that the defendant had experienced hallucinations
> in which he heard voices of people intending to kill him, and delusions of being
> subjected to surveillance.

> Dr. Kelly testified that the defendant lacked criminal responsibility due to a

paranoid delusional disorder. He described the defendant's illness as an "extensive belief system about the world and particularly about certain forces having evil intent ... to harm and to kill him and his parents." Dr. Kelly indicated that the disorder does not go into remission without medication, and that the intensity of the defendant's delusions had abated somewhat because he had been placed on a relatively low dose of Risperdal, an antipsychotic medication. Unlike paranoid schizophrenia, a paranoid delusional disorder is not characterized by a decline in functioning, which explains his capacity to work at Baystate and attend college. Both disorders tend to onset between the late teens and mid-twenties.

Dr. Kelly ruled out cocaine and alcohol intoxication as the cause of the defendant's delusions. He also opined that cocaine could not have played a part in the killing because the toxicology screen done at Noble Hospital approximately twelve hours after the shooting was negative for cocaine and amphetamines, a reliable basis to exclude recent cocaine use.

Dr. Kelly also ruled out "ecstasy," an amphetamine the defendant was known to use, as a cause of the defendant's delusions. Amphetamines, he said, do not cause systematized delusions such as the defendant's, and psychosis is a very rare complication of amphetamine use. But even if the defendant had experienced the rare psychosis induced by amphetamines, the symptoms typically disappear after a few days, or after weeks or months at most. They do not persist for fifteen months, the duration of the defendant's psychotic symptoms after the shooting.

Dr. Kelly opined that alcohol did not cause the defendant's delusions. He noted that the defendant experienced his delusions when he was sober (e.g., during his sessions with Dr. Berlin), as well as when he was drinking.

The Commonwealth's expert in rebuttal, Dr. Michael Welner, a forensic psychiatrist who also was board certified in psychopharmacology (the science of treatment of psychiatric conditions with medication and physical treatment), testified that the defendant did not suffer from a major mental illness. He ruled out paranoid delusional disorder because the defendant had reported to Dr. Berlin that his symptoms were not worsening or intensifying.[5] He also considered that the defendant did not report persecutory or delusional behavior on the job[6] or at school, and that up to the night of the shooting the defendant continued to be sociable, even though his friends avoided him.

---

[5] In a footnote, the SJC added: "However, Dr. Berlin's notes indicate that the defendant was "more sweaty [and] tense than self-report," and that on October 1, 2004, the defendant's anxiety level had risen." *Johnston*, 467 Mass. at 684 n. 1.

[6] In a footnote, the SJC added: "On October 2, 2004, the defendant went out socially with some coworkers at Baystate Medical Center. The defendant became delusional about the Central Intelligence Agency and fired a shot into the air with his handgun. He then claimed the mafia was trying to get him for a rape he purportedly committed. The record shows that he did not commit rape. He later apologized and attributed his behavior to alcohol." *Johnston*, 467 Mass. at 684 n. 2

Dr. Welner opined that the defendant's hallucinations originated from his drug use, and not from mental illness. He explained that psychiatric illness is primarily associated with auditory hallucinations, not visual hallucinations. When a person has visual as well as auditory hallucinations, the indication is that they are drug induced.

Dr. Welner cited the defendant's ability to mislead Hadley police officers about where he had been and his concerns about their presence as evidence of his ability to appreciate the wrongfulness of his conduct.

467 Mass. at 682–85.

The SJC reserved parts of its factual recitation for the body of its decision. Some of that recitation constituted an "unreasonable determination of the facts". 28 U.S. § 2254(d)(2). Johnston reserves discussion of those facts for the body of this memorandum.

## ARGUMENT

I.   **Counsel was ineffective for failing to move to suppress Johnston's post-Miranda responses to questioning at the jail and at Bridgewater State Hospital. Johnston repeatedly and clearly invoked his right to counsel when questioned at the jail and at Bridgewater State Hospital. Nevertheless, Johnston was re-approached and questioned numerous times. All his responses should have been suppressed. Johnston is entitled to *de novo* review of this claim because he has rebutted the presumption that the state court decided his claim on the merits.**

Within hours of his transfer from a psychiatric hospital to jail, Johnston repeatedly requested to speak to counsel and have counsel present during questioning. Johnston was nevertheless questioned repeatedly. Despite the holdings of *Edwards v. Arizona*, 451 U.S. 477, 485–86 (1981); *Minnick v. Mississippi*, 498 U.S. 146, 153 (1990), forbidding reapproach after a request for counsel Johnston's trial counsel failed to move to suppress the resulting statements. The Commonwealth introduced those statements into evidence to undercut Johnston's only defense. *Kimmelman v. Morrison*, 477 U.S. 365 (1986) (ineffective assistance in failing to move to suppress).

A.   Factual Background

In deciding a different claim raised by Johnston (claim II, *infra* at 37–46), the SJC said that the facts were these:

> Records from the house of correction indicate that during a medical intake procedure on December 9 the defendant refused to answer questions on advice of counsel. On December 10, a psychologist approved by the Department of Mental Health interviewed the defendant at the request of the Hampshire County sheriff. Trial counsel attended the interview. The defendant presented as depressed and suicidal. He reported having experienced hallucinations on prior occasions, but not on that day. He stated that he would not inform staff at the house of correction if he was close to harming himself. As a result, the psychologist determined that the defendant was in need of hospitalization due to mental illness, and he filed a petition with the Northampton Division of the District Court Department the same day seeking commitment of the defendant to Bridgewater State Hospital for up to thirty days, pursuant to G.L. c. 123, § 18 (*a* ). A judge in the District Court issued an order of commitment on December 10.

It is important to understand what is not being argued. The defendant does not argue that he invoked his right to remain silent. Although the defendant refused to answer questions on advice of counsel during the medical intake procedure at the house of correction, *this was not an invocation of the right to remain silent*. The defendant merely set limits about what he was willing to discuss. Similarly, the records of Bridgewater State Hospital indicate that the defendant refused to answer some questions on advice of counsel, but he did not refuse to answer all questions. He answered many questions concerning his current levels of anxiety and thoughts of suicide.

*Johnston*, 467 Mass. at 686–88 (emphasis added). In a later section of the opinion, the SJC

described its view of the documents showing Johnston's requests for counsel.

The handwriting in the various reports is difficult to decipher, but it appears that the defendant refused to answer some questions on advice of counsel once at both the house of correction and Bridgewater State Hospital. The Bridgewater records indicate he refused to answer some questions on several occasions, without any reference to counsel. *The Bridgewater records also indicate that he refused to answer <u>certain</u> questions on at least twelve occasions, stating he first wanted to speak with counsel.* These refusals to answer commenced on December 10, 2004, the date of his admission, and continued until December 21, 2004, when trial counsel attended an interview with the defendant and hospital staff.

*Johnston*, 467 Mass. at 688 n.3 (emphases added)

The above statement needs correcting by specific citations to the record.

Johnston's invocations did not just "set limits" and refuse to answer only "some questions".

Johnston invoked his Fifth Amendment right to counsel in terms that any layman would

understand. Upon his December 8 admission to jail, Johnston "refused examination 'upon advice

of my attorney'". (R.171). On December 9, Johnston was "seen for medical intake. He refused

stating 'My lawyer said not to say a word.'" (R.172). These are the supposedly "limited"

invocations referenced by the SJC.

After December 9, 2004, evaluators reapproached Johnston numerous times. In response,

Johnston invoked his right to counsel multiple additional times not referenced by the SJC. A

chronological list of some of those invocations follows:

<u>December 10, 2004</u>:

Johnston refused "admission process until he spoke [to] my lawy[er]." (R.34)

Johnston "refused Hx [history] & PE [physical examination] taking until he talks to lawyer. . . . P[atien]t contracts for safety – "I'm not homicidal + I'm not suicidal. I just don't want to do anything till I talk to my lawyer." (R.68)

<u>December 12, 2004</u>:

When an evaluator spoke to Johnston he "requests phone call to his atty…Does not want to answer my questions" (R.72).

Johnston told an evaluator that he "Does not want to talk. Wants atty present." (R.74).

<u>December 13, 2004</u>:

Johnston "Denies being SI, HI then says he needs to speak to his atty. Refuses to answer questions or contract for safety without speaking to his atty first. Atty's phone number & name are in pt's property." (R.76) And, later: " Refusing to answer ?'s. 'I just want to call my lawyer'" *Id.*

Johnston "requesting to call his attorney…Otherwise in no distress but not willing to answer any questions about his mental status & therefore cannot be properly evaluated." (R.78).

Johnston "is focussed [sic] on getting in touch ć his atty….Needs atty's card from property…refusing interview" (R.79).

<u>December 14, 2004</u>:

Johnston "said he was ok but refused to discuss anything related to his mental status or history. He continued to request to speak with his attorney." (R.25)

 "Refusing to discuss anything relating to his mental status, history. Requesting to speak ć attorney before any further interview." (R.80).

 "Refuses to discuss any issues until he calls his attorney. . . Pt. refuses interview. . . inquires only about his phone privileges." (R.81).

Johnston "continues to focus on getting to call his atty. Refuses other questions . . . Refusing interview . . . Pt does not want to talk" (R.82).

<u>December 15, 2004</u>:

"Refusing interviews pending consultation w/ his atty." (R.83).

"[R]efusing to engage interview, states he will only talk with his attorney present" and a few hours later "Refused interview wants to talk to his attorney." (R.86)

December 16, 2004:

"Refusing to engage in interview, states that he needs his attorney to be present." "Refusing to talk" "Refused to engage in interview" (R.89).

December 17, 2004:

Johnston "continues to be focused on meeting w/ atty before talking to us although he does say "Oh, I'm OK, I'm not going to hurt myself or anything." (R.90)

Johnston addresses the import of these invocations in the body of this memorandum.

B.      Standard of review

Johnston's claim is that unusual case in which the petitioner is entitled to *de novo* review because he can rebut the presumption that the state court decided his claim. *Johnson v. Williams*, —— U.S. ——, 133 S.Ct. 1088, 1097 (2013). Because this question turns on the substantive claim advanced and the SJC's evaluation of it, Johnston discusses first his substantive claim, his entitlement to *de novo* review, and then the familiar performance and prejudice prongs of an ineffective assistance claim. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984).

C.      Substantive Fifth Amendment ground for suppression

As recited above, *supra* at 16–17, Johnston repeatedly and clearly invoked his Fifth Amendment right to counsel when questioned at the jail and at Bridgewater State Hospital. He was nevertheless re-approached and questioned numerous times. Therefore, all of his statements should have been suppressed. The earliest date from which statements should have been suppressed was December 8, 2004, but one could have picked a starting point anywhere in the next nine days. There is simply no question that Johnston invoked his right to counsel.

Once a criminal defendant invokes his Fifth Amendment right to counsel, he may not be questioned again without counsel actually present. *Edwards v. Arizona*, 451 U.S. 477, 485–86 (1981) (reapproach following invocation forbidden); *Minnick v. Mississippi*, 498 U.S. 146, 153 (1990) (following invocation, intervening consultation with counsel irrelevant, counsel must be actually present for further questioning). Responses to questioning after invocation of the right to counsel must be excluded. *Edwards*, 451 U.S. at 486–87.

D.      The SJC's analysis of the claim as a Sixth Amendment claim

The SJC explicitly misconceived Johnston's argument for suppression. It declared the claim to be based on the Sixth Amendment right to counsel, and in doing so entirely omitted any mention of the *Fifth* Amendment right to counsel. *Johnston*, 467 Mass. at 687. It incorrectly stated that

> It is important to understand what is not being argued. The defendant does not argue that he invoked his right to remain silent. . . . The defendant instead focuses on the right to counsel under the Sixth Amendment to the United States Constitution

*Johnston*, 467 Mass. at 687. The SJC then disposed of the claim this way:

> A defendant does not have a Sixth Amendment right to have his lawyer present during the court-ordered psychiatric interview. . . . *Estelle v. Smith,* 451 U.S. 454, 470 & n.14, (1981), and *United States v. Byers,* 740 F.2d 1104, 1118–1121 (D.C.Cir.1984). Passing on the question whether a hearing under G.L. c. 123, § 18 (*a* ), is a critical stage of a criminal proceeding, the court-ordered interview is not. The defendant had no Sixth Amendment right that required hospital staff to refrain from interviewing him or to terminate interviews with him until counsel was present.

> In order to succeed on a claim of ineffective assistance of counsel based on the failure to file a motion to suppress evidence, the defendant must show that he would have prevailed on such a motion. See *Commonwealth v. Comita,* 441 Mass. at 91, 803 N.E.2d 700. Such a motion, based on an alleged violation of the defendant's Sixth Amendment right to counsel, would not have succeeded. Consequently, counsel was not ineffective.

*Johnston*, 467 Mass. at 687–88.

**E.      Because Johnston actually argued a Fifth Amendment claim to the SJC he is entitled to** *de novo* **review.**

   **1.      What Johnston actually argued to the SJC**

   In contrast to the SJC's Sixth Amendment straw man, Johnston's brief and reply brief

made clear both in his citations to authority and the explicit text of his pleadings that he was

relying on the Fifth Amendment right to counsel. He phrased the argument in terms essentially

identical to Johnston's substantive argument summarized above. (DBr:58); *supra* at 17–18.

   Indeed, Johnston pointed out the Commonwealth's conflation or misunderstanding of the

issues in his reply brief, making it abundantly clear that his claim was based in the *Fifth*

Amendment right to counsel, not the Sixth Amendment right to counsel

> The Commonwealth confuses Johnston's claim. (CBr:59–62). Let it be
> clear: Johnston invoked his right to counsel; he was questioned again multiple
> times in spite of that invocation; statements elicited after that invocation were
> inadmissible (except for those made with counsel actually present) and counsel
> should have acted accordingly. (DBr:58–63); *Edwards v. Arizona*, 451 U.S. 477,
> 485–86 (1981).
> The Commonwealth appears to be deliberately confusing the issues by
> stating that the right to presence of counsel does not extend to psychiatric
> examinations. (CBr:60) (citing *Estelle v. Smith*, 451 U.S. 454, 470 n.14 (1981)).
> Johnston did not have a *Sixth* Amendment right to have counsel physically present
> during a formal court-ordered psychiatric examination. But when he is questioned
> for things like mental status checks after he has invoked his right to counsel, the
> *Fifth* Amendment required that any resulting statements be excluded unless
> counsel is actually present.

(RBr:15) (citations omitted, emphasis original). Johnston's actual argument to the SJC invoked

the protections of the Fifth Amendment.

   **2.      Johnston is entitled to** *de novo* **review**

   In *Johnson v. Williams*, the Supreme Court held that there is a rebuttable presumption

that a federal claim presented to a state court was adjudicated on the merits. *Magraw v. Roden*,

743 F.3d 1, 10 (1st Cir. 2014) (*citing Williams,* 133 S.Ct. at 1096). If the state court adjudicated

the petitioner's federal claim on the merits, habeas claims are reviewed under the extremely strict standards set out in 28 U.S.C. § 2254(d). *See Evans v. Thompson*, 465 F. Supp.2d 62, 72 (D. Mass. 2006) *aff'd*, 518 F.3d 1 (1st Cir. 2008) (under § 2254(d) "the Great Writ is great no longer").

In contrast, if the petitioner can rebut the presumption that the state court adjudicated the claim on the merits, then the petitioner is entitled to *de novo* review. *Williams*, 133 S.Ct. at 1097; *see DiBenedetto v. Hall*, 272 F.3d 1, 6–7 (1st Cir. 2001) and *Fortini v. Murphy,* 257 F.3d 39, 47 (1st Cir. 2001) (prior to *Williams*, granting *de novo* review without rebuttable presumption).

Relevant here, the presumption can be rebutted if "the evidence leads very clearly to the conclusion that a federal claim was inadvertently overlooked in state court." *Williams*, 133 S.Ct. at 1097.

If ever a case were to fit into that category, it would be this one. Johnston made it abundantly clear that he was raising a *Fifth* Amendment right to counsel claim and distinguished it from Sixth Amendment claims. (RBr:15). Johnston relied on *Edwards* and *Minnick*, both well-known Supreme Court cases implementing the Fifth Amendment right to counsel recognized in *Miranda v. Arizona*. In *Edwards*, the Supreme Court explicitly based its ban on re-initiation of questioning on the Fifth Amendment, not the Sixth. *Edwards*, 451 U.S. at 480 & n.7. The first words of *Minnick* are similarly clear:

> To protect the privilege against self-incrimination guaranteed by the *Fifth Amendment*, we have held that the police must terminate interrogation of an accused in custody if the accused requests the assistance of counsel. *Miranda v. Arizona,* 384 U.S. 436, 474 (1966). We reinforced the protections of *Miranda* in *Edwards v. Arizona,* 451 U.S. 477, 484–485 (1981), which held that once the accused requests counsel, officials may not reinitiate questioning "until counsel has been made available" to him.

*Minnick* 498 U.S. at 147 (emphasis added); *see also Michigan v. Harvey*, 494 U.S. 344, 349

(1990) ("*Edwards v. Arizona* … announced [a] … 'prophylactic rule' in the *Fifth* Amendment

context.") (citations omitted; emphasis added). The next cases cited by Johnston clarify that

these Fifth Amendment right to counsel protections also extend to questioning by psychologists.

*Estelle v. Smith*, 451 U.S. 454, 467 (1981); (DBr:58). The Court in *Smith* noted that "[t]he Fifth

Amendment privilege… is directly involved here because the State used as evidence against

respondent the substance of his disclosures during the pretrial psychiatric examination." *Smith*,

451 U.S. at 464–465. Additionally, "[t]he fact that respondent's statements were uttered in the

context of a psychiatric examination does not automatically remove them from the reach of the

Fifth Amendment." *Id.* at 465. All of these cases and the passages cited clearly relate to the *Fifth*

Amendment right to counsel. Therefore it is clear that Johnston raised a Fifth Amendment claim,

as was explicitly reiterated in his reply brief. (RBr:15). But the SJC made it abundantly clear that

it was deciding only a *Sixth* Amendment right to counsel claim. (DBr:57–58); (RBr:15);

*Johnston*, 467 Mass. at 687.

      Given that Johnston explicitly raised a Fifth Amendment claim, and the SJC clearly failed

to consider that claim, Johnston is entitled to *de novo* review. The Ninth Circuit recently held

that *de novo* review was required in a case in which the state court was presented with two

distinct claims, but only considered one of those claims in its opinion. *Murdaugh v. Ryan*, 724

F.3d 1104, 1121–1122 (9th Cir. 2013) *cert. denied,* 134 S. Ct. 2840 (2014). The petitioner

argued that both the sentencing court and the state appellate court made an unconstitutional error

regarding his sentence. *Id*. at 1121. The state post-conviction court expressly considered and

rejected the claim with regard to the sentencing court but did not mention the claim regarding the

appellate court. *Id*. The Ninth Circuit found *de novo* review appropriate, stating,

> "[g]iven that this claim had arguable merit, and in light of the state post-conviction court's otherwise careful consideration and evaluation of every other claim in Murdaugh's petition, 'the evidence leads very clearly to the conclusion that a federal claim was inadvertently overlooked in state court,' thus permitting *de novo* review."

*Id.* at 1121–22 (quoting *Williams*, 133 S.Ct. at 1097).

Johnston's case provides an even more pronounced example of a state court overlooking a federal claim. Johnston clearly raised a *Fifth* Amendment right to counsel claim. The SJC clearly misunderstood this claim, basing their decision on the Sixth Amendment and entirely ignoring the Fifth Amendment right to counsel. Further, the SJC explicitly considered all of the other claims raised by Johnston in a lengthy brief. All of this evidence "leads very clearly to the conclusion that [this] federal claim was inadvertently overlooked in state court." *Williams*, 133 S.Ct. at 1097. Therefore, Johnston has rebutted the presumption that the SJC made a decision on the merits of that claim, and is entitled to *de novo* review.

F.      *De novo* analysis

        1.      Substantive claim

As recited above, *supra* at 17–18, Johnston clearly invoked his Fifth Amendment right to counsel both upon his arrival at jail and at Bridgewater State Hospital. From the time he arrived in jail on the evening of December 8 and then again from his arrival at Bridgewater on December 10, Johnston continuously refused to answer questions and asked for counsel. (R.25, 27, 34, 45, 52, 54, 68, 72, 74, 76, 78, 80–83, 85, 86, 89, 90, 93, 100, 108, 171–172); (Tr.14:61); (Tr.15:32–34, 36–39, 44–46, 194, 195, 208); (Tr.17: 205); (Tr.19: 291, 299–301, 304, 307–08, 317–18).

All his subsequent statements to jail and Bridgewater staff should have been suppressed under *Edwards* and *Minnick*.[7] *Supra* at 17–18.

---

[7] With the exception of three interviews where counsel was physically present.

If the Respondent (hereafter "Commonwealth") argues that Johnston did not unambiguously invoke his right to counsel, that argument is flatly contradicted by both the record and the clear force of precedent.[8]

Johnston unambiguously invoked his right to counsel more than a dozen times. *Supra* at 16–17.[9] While this conclusion should be obvious on its face, Johnston cannot afford to leave this to chance. Below, the Court will find categories of invocations, similar to words used by Johnston, held to constitute "some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney" correlated with Johnston's invocations. *See Davis v. United States,* 512 U.S. 452, 459 (1994) (citation and quotation marks omitted).

Statements requesting attorney's presence before questioning occurs

Cases: *Minnick*, 498 U.S. at 148–49 ("Minnick stated 'Come back Monday when I have a lawyer,' and stated that he would make a more complete statement then with his lawyer present."); *Nom v. Spencer*, 337 F.3d 112, 117 (1st Cir. 2003) ("the defendant stated that he

_____

[8] It is unclear what standard should apply to the SJC's finding, in assessing Johnston's *Doyle*-based claim, that Johnston did not invoke his right to *silence*. *Johnston*, 467 Mass. at 686–88. Johnston proceeds only on the state court record and accepts the burden to prove that the SJC's determination was an unreasonable determination of the facts, to the extent that it is relevant to Johnston's right to *counsel* claim. *Anderson v. Terhune*, 516 F.3d 781, 784 (9th Cir. 2008) (state court determination of "ambiguous" Miranda invocation held unreasonable where transcript revealed defendant stated "I plead the Fifth"); *Wiggins v. Smith*, 539 U.S. 510, 528 (2003) (presumed correctness of state court findings rebutted and unreasonable determination of the facts found where state court asserted that certain records recorded instances of sexual abuse of defendant and therefore reasonable investigation by counsel when the records simply did not contain such information); *see also Brumfield v. Cain*, 135 S.Ct. 2269, 2276–78 (2015) (state court determination of no intellectual disability based on IQ test score of 75 held unreasonable determination of fact where other tests showed IQ scores between 65 and 70); *Weddell v. Webber*, 290 F.Supp.2d 1011, 1021–1022 (D.S.D. 2003) (state court determination of trial counsel's strategy held unreasonable determination of facts where transcript showed counsel making the argument that the court said counsel did not make).

[9] Even the most general statements indicating a desire to have an attorney sufficiently invoke the right to counsel. *Smith v. Illinois*, 469 U.S. 91, 93 (1984) ("Uh, yeah. I'd like to do that."); *Kyger v. Carlton*, 146 F.3d 374, 379 (6th Cir. 1998) (defendant would "just as soon have an attorney"); *Alvarez v. Gomez*, 185 F.3d 995, 998 (9th Cir. 1999) (three questions to the effect of "Well, like right now you got one?").

wanted an attorney present"); *Lujan v. Garcia*, 734 F.3d 917, 932 (9th Cir. 2013) *cert. denied sub nom. Martel v. Lujan*, 135 S. Ct. 477 (2014) ("Can I have an attorney present?")

Johnston: "[R]efusing to engage interview, states he will only talk with his attorney present" (R.86); "Refusing to engage in interview, states that he needs his attorney to be present." (R.89); Johnston: "Does not want to talk. Wants atty present." (R.74).

<u>Statements requesting to call an attorney.</u>

Cases: *United States v. Swanger*,  221 Fed.Appx. 599, 601 (9th Cir. 2007) ("'I want my attorney present. I don't want to talk to you without an attorney. I want to use a telephone.'. . . it is difficult to imagine an invocation with less ambiguity or equivocation than the above-cited statement.") ;*United States v. Hunter*, 708 F.3d 938, 943–44 (7th Cir. 2013) ("Can you call my attorney?"); *Robinson v. Borg*, 918 F.2d 1387, 1391 (9th Cir. 1990) ("I have to get me a good lawyer, man. Can I make a phone call?"); *United States v. Williams*, 435 F. App'x 868, 869–70 (11th Cir. 2011) (defendants request to call his attorney to tell him "he was going to cooperate with the Government");*Moore v. Berghuis*, 700 F.3d 882, 887 (6th Cir. 2012), cert. denied, 133 S.Ct. 2340 (2013) (defendant requested that police call his attorney's phone number)

Johnston: When an evaluator spoke to Johnston he "requests phone call to his atty…Does not want to answer my questions" (R.72); And, later: " Refusing to answer ?'s. 'I just want to call my lawyer'" (R.76); "requesting to call his attorney…Otherwise in no distress but not willing to answer any questions about his mental status." (R.78); "focused [sic] on getting in touch ć his atty….Needs atty's card from property…refusing interview" (R.79); "said he was ok but refused to discuss anything related to his mental status or history. He continued to request to speak with his attorney." (R.25); "Refuses to discuss any issues until he calls his attorney. . . Pt. refuses interview. . . inquires only about his phone privileges." (R.81); Johnston "continues to

focus on getting to call his atty. Refuses other questions . . . Refusing interview . . . Pt does not want to talk" (R.82).

<u>Statements that the person would like to speak to a lawyer before doing something.</u>

Cases: *Edwards*, 451 U.S. at 479  ("I want an attorney before making a deal."); *Arizona v. Roberson*, 486 U.S. 675, 678 (1988) ("Respondent replied that he "wanted a lawyer before answering any questions."); *Shea v. Louisiana*, 470 U.S. 51, 52 (1985) ("He said, however, that he did not wish to make any statement until he saw a lawyer.")

Johnston: refused "admission process until he spoke [to] my lawy[er]." (R.34); "refused Hx [history] & PE [physical examination] taking until he talks to lawyer. . . . P[atien]t contracts for safety – "I'm not homicidal + I'm not suicidal. I just don't want to do anything till I talk to my lawyer." (R.68); "Refusing to discuss anything relating to his mental status, history. Requesting to speak ċ attorney before any further interview." (R.80); "Refusing interviews pending consultation w/ his atty." (R.83); "continues to be focused on meeting w/ atty before talking to us although he does say "Oh, I'm OK, I'm not going to hurt myself or anything." (R.90); "Denies being SI, HI then says he needs to speak to his atty. Refuses to answer questions or contract for safety without speaking to his atty first. Atty's phone number & name are in pt's property." (R.76)

<u>Statements reciting the advice of counsel.</u>

Cases: *United States v. Cheely*, 36 F.3d 1439, 1448 (9th Cir. 1994) (refusal to sign form combined with "my attorney does not want me to talk to you").

Johnston: "[R]efused examination 'upon advice of my attorney'". (R.171); "seen for medical intake. He refused stating 'My lawyer said not to say a word.'" (R.172).

The Commonwealth may argue (incorrectly) that Johnston's invocations were ambiguous because, after the above clear invocations, Johnston would give some limited information upon being re-approached and questioned. An ambiguity cannot be created by looking to statements obtained after a clear invocation of the right to counsel. In *Smith v. Illinois*, the Supreme Court held that "an accused's *postrequest* responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself." *Smith*, 469 U.S. at 99–100 (emphasis original). The Supreme Court noted that

> [t]he courts below were able to construe Smith's request for counsel as 'ambiguous' *only* by looking to Smith's *subsequent* responses to continued police questioning and by concluding that, 'considered in total, Smith's '*statements*' were equivocal. This line of analysis is unprecedented and untenable.

*Smith*, 469 U.S. at 97 (emphasis original) (citations omitted). Any suggestion that Johnston's invocation was ineffective because he later wavered is foreclosed as a matter of law.

Further, the suggestion is offensive. There is no obligation for a mentally disturbed, suicidal defendant (or any defendant who feels that he cannot undergo questioning without counsel) to attempt to ensure that questioning stops (nor would he have the power to do so). That obligation lies squarely with the individuals doing the questioning. *Edwards*, 451 U.S. at 484–85 ("An accused… having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him…").

Nevertheless, Johnston's evaluators explicitly laid out a plan to "encourage" Johnston to respond to their queries despite his statements that he wanted his attorney present for questioning.[10] *United States v. Ortiz*, 177 F.3d 108, 110 (1st Cir. 1999) (re-Mirandizing

---

[10] Johnston was "seen every day by clinical staff to monitor [his] mental status." (Tr. 19:316). On December 14, 2004, after days of re-approaches, one evaluator notes Johnston's refusing to engage in an interview and concludes that the plan should be to "[e]ncourage cooperation".

defendant and asking him to cooperate violated *Edwards*); *Bachynski v. Warren*, -- F.Supp.3d -- , 2015 WL 1469207 at *13–18 (E.D. Mich. 2015) (reminding defendant she could change her mind about requesting lawyer before speaking required suppression). It is no wonder that Johnston — held in isolation in a paper johnny[11] —gave in. "[T]he accused having expressed his own view that he is not competent to deal with the authorities without legal advice, a later decision at the authorities' insistence to make a statement without counsel's presence" does not deprive his prior request for counsel of its legal force. *Roberson*, 486 U.S. at 681 (citation and quotation marks omitted); *Davis v. United States*, 512 U.S. 452, 472–73 (1994) (Souter, J. concurring) ("when a suspect understands his (expressed) wishes to have been ignored . . . he may well see further objection as futile"). The facts are the facts and the record is clear. Johnston asked for his lawyer.

### 2.      Ineffective assistance claim

The familiar *Strickland* standard requires a showing of both deficient performance and prejudice resulting from that deficient performance. *Strickland v. Washington*, 466 US 668, 687 (1984). To establish deficient performance, "a defendant must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. "[A] single, serious error may support a claim of ineffective assistance of counsel", including trial counsel's failure "to file a timely suppression motion." *Morrison*, 477 U.S. at 383, 385.

---

(R.81). On December 15, 2004, one doctor wrote that "Refuses interview selectively. . . . continues to focus on need to call lawyer . . . still refuses any [illegible] until he speaks to his attorney. . . . I encouraged him to comply." (R.85) And on December 20, an evaluator explicitly states that they will "encourage p[atien]t to disclose more relevant aspects of his h[istory]." (R.54).

[11] Johnston was held in a paper johnny in seclusion from December 10 to 17, 2004 in the following conditions: "Seclusion is locked alone in a room where the person can't get out. It's a unit on the grounds there that has separate cells. They are roughly 6 by 10 with an observation window, food slot, and correctional officers and mental health staff on the floor." (Tr. 19:314–15). He was frequently strip-searched. (Tr. 19:316). He was "reviewed every 3 to 4 hours by the psychiatrist, by the nurse practitioner, by the mental health clinician". (Tr. 20:24)

The defendant is then required to show prejudice resulting from the deficient performance. The defendant need only show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

> Importantly, the prejudice inquiry does not require the defendant to show that the unlawfully obtained evidence was unreliable, or that its admission created a risk of convicting an innocent person. "The 'prejudice' essential to a violation of the Sixth Amendment right to the effective assistance of counsel is not being convicted though one is innocent, although that is the worst kind; it is being convicted when one would have been acquitted, or at least would have had a good shot at acquittal, had one been competently represented." *Owens v. United States,* 387 F.3d 607, 610 (7th Cir. 2004) (Posner, J.).

*United States v. Mercedes-De La Cruz*, 787 F.3d 61, 67 n.6 (1st Cir. 2015). That "good shot", defined as a reasonable probability of a different outcome is something *less than a preponderance*. *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000) (emphasis added).[12]

Because Johnston's claim is reviewed *de novo*, *supra* at 19–22, the Court does not apply the harsh provisions of 28 U.S.C. § 2254(d). *See Harrington v. Richter*, 562 U.S. 86, 101–102, 106 (2011) (§ 2254 review of ineffective assistance claims allows Court to postulate hypothetical reasons for denying the claim); see also *Hittson v. Chatman*, 131 S.Ct. 2126, 2127–28 (2015) (Ginsburg, J. concurring in denial of certiorari) (stating that lower courts have misapplied *Richter*; it only applies where the last state court decision was an "unexplained" or "summary" order").[13]

a.      Deficient Performance

---

[12] The cited section of the opinion of Justice O'Connor in *Williams* is the majority opinion on this point. *Lafler v. Cooper,* 132 S.Ct. 1376, 1390 (2012).

[13] Obviously, the SJC's decision in Johnston is neither unexplained nor summary. It is a full opinion.

Johnston's trial counsel was ineffective for failing to move to suppress Johnston's statements to Bridgewater and jail staff. Counsel's strategic concern was apparent from the record. Counsel clearly did not want Johnston to engage with Bridgewater and jail staff because he was justifiably concerned that statements by Johnston regarding his mental status and history would be used against him. Obviously, that was why he advised Johnston to say he would not talk without his lawyer present.

But instead of moving to exclude the damaging evidence that he was concerned about, counsel made matters worse. He pre-emptively asked for a limiting instruction regarding evidence of Johnston's reliance on the advice of counsel. (Tr. 14:16). He then appears to have elicited from Dr. Kelly on direct examination that "[o]n advice of you, his counsel, he, for the first couple of weeks while [at Bridgewater], would not discuss any matters with them." (Tr.14:61). He then actually put in evidence the *entire* Bridgewater record without redaction. (Tr.14:64). But counsel did essentially nothing with the Bridgewater records to advance the defense, as the Commonwealth admitted in state court. (CB:65) ("the heart of [the expert] opinions derived from personal interviews of the defendant and review of the defendant's behavioral history, prior to the murder and the hospital commitments").

The evidence shows that counsel did not want the jury to rely on Johnston's statements to staff in the Bridgewater record. Trial counsel objected when the prosecutor elicited from Dr. Kelly that Johnston also refused to answer booking questions at the jail on the advice of counsel. (Tr.15:32). But he only asked for a limiting instruction — which the judge gave — not that the testimony be stricken. (Tr.15:33, 36).

Further, when the prosecutor cross-examined Dr. Kelly on Johnston's statements in the Bridgewater record denying symptoms of mental illness or refusing to answer such questions

(Tr. 15:38-42), counsel tried to keep those statements out or limit them, but he simply could not

summon up a basis for the objection. (Tr. 15:47).

> But then he drew the jurors' attention to such statements in closing
>
> day after day after day that Mr. Johnston doesn't give answers to any of the
> questions that he's asked, and Ms. Steese has offered that evidence for the
> purpose of establishing that he demonstrated no psychiatric problems during that
> hospitalization, take a look at, "Wouldn't talk to me because his lawyer told me
> not to." "Over and over and over again."

(Tr. 21:80). Counsel gave a weak non-explanation to the jury, saying that there were "good

reasons" that they should not consider evidence that Johnston consulted counsel.

> You know, there has been made reference to the fact that Mr. Johnston didn't
> cooperate on some of the interviews when he went to Bridgewater. And he did so
> on my advice. Remember, Mr. Johnston didn't even know my name at our first
> meeting. And the judge has instructed you that things that he did on my advice
> cannot be considered by you. And there are very good reasons for that -- very,
> very good reasons for that. So his lack of cooperation during parts of the
> assessment phase cannot be considered by you for at least any negative
> inference."

(Tr. 21:59–60). Despite his highlighting of the issue, counsel did not ask the judge to repeat the

limiting instruction.

As explained above, *supra* at 15–20, Johnston had a meritorious *Edwards/Minnick*

motion to suppress such statements. But counsel never moved to suppress or exclude statements

on this basis. *Morrison*, 477 U.S. at 385 (failure to move to suppress due to counsel's mistaken

legal view held to be deficient performance); *see also Hinton v. Alabama*, 134 S. Ct. 1081, 1089

(2014) ("inexcusable mistake of law" constitutes ineffective assistance). The simple bungling of

an *Edwards* suppression motion constitutes deficient performance under *Morrison*. By way of

example, trial counsel in *Laurito v. State* rendered ineffective assistance where he brought a

motion to suppress statements based on involuntariness but failed to argue that the defendant's

request to call a lawyer barred further interrogation under *Edwards*. *Laurito v. State*, 120 So. 3d 203, 204–06 (Fla. Dist. Ct. App. 2013) (footnote omitted).

But it is worse than that here. Trial counsel did not even attempt to suppress Johnston's statements (particularly to Bridgewater staff) under *Edwards*, even though he had everything to gain and nothing to lose. A timely motion to suppress would have excised numerous damaging statements and left counsel with essentially all of the evidence he relied on at trial: multiple civilian accounts of Johnston's bizarre behavior, two defense forensic evaluations, and Dr. Peebles' evaluation with counsel present.[14] He would not have had to deal with the evidence in closing or attempt to justify his and Johnston's actions to the jury. As the First Circuit recently held,

> That a timely motion to suppress [the defendant's] statements would likely have been meritorious and without repercussion to other defense strategies confutes any argument that counsel's failure to file such a motion was professionally reasonable. *See, e.g., Gentry v. Sevier,* 597 F.3d 838, 851–52 (7th Cir.2010); *Owens,* 387 F.3d at 608–09; *State v. Reichenbach,* 153 Wash.2d 126, 101 P.3d 80, 84, 87 (2004); *State v. Silvers,* 255 Neb. 702, 587 N.W.2d 325, 334 (1998); *Commonwealth v. Davis,* 743 A.2d 946, 953 (Pa.Super.Ct.1999).

*Mercedes-De La Cruz*, 787 F.3d at 69. Counsel's failing was a blunder, plain and simple.

b.      Prejudice

Counsel's failure prejudiced Johnston.[15] The statements that counsel should have moved to suppress under *Edwards* fall into two related categories. First, there were numerous statements that the prosecutor pointed to as evidence of a rational, calculating mind. Second, the jury were

---

[14] Indeed, if counsel later felt during trial that the evidence listed above was not persuasive enough, he could have decided at that point whether to take the risky course of admitting the Bridgewater and jail records. *Contrast Janosky v. St. Amand*, 594 F.3d 39, 48 (1st Cir. 2010) (strategy to elicit inadmissible hearsay not ineffective because it substantially strengthened defense argument that police rushed to believe blame-shifting story of unavailable witness without adequate investigation).

[15] Because the SJC found no *Edwards* error, and therefore no deficient performance, it never analyzed for prejudice. *Johnston*, 467 Mass. at 688.

given dozens of especially prejudicial statements by Johnston refusing to answer questions and asking for his attorney.

1.      Statements suggesting a lack of mental illness or sound-mindedness

The Bridgewater records submitted to the jury contained Johnston's denial of mental illness, head trauma, suicidal behavior and hallucinations on December 10. (R.39, 41, 69). The jury heard that Johnston again denied hallucinations on December 11 and again on December 17-18. (Tr.l5:41–42); (Tr.19:305); (R.91, 93).

In addition to their prejudicial value standing alone, these statements also undercut the basis of Dr. Feldman's testimony: Johnston's statements to her that he did have auditory hallucinations. (Tr.12:229–30, 244, 249).

Records from December 20 contain the staff's elicitation of statements from Johnston regarding his mental functioning. That is, they had Johnston perform calculations, word associations, and comprehension tests. (R.49–50). These responses bolstered the Commonwealth's position that Johnston's functioning was unimpaired and dovetailed neatly with the prosecutor's closing argument that Johnston was not mentally ill because he was doing well in school.  (Tr.21:99).

The December 20 records also contain his denial of sexual trauma. (R.51), Undercutting Johnston's bizarre statements to Drs. Kelly, Feldman, and Peebles that believed that Sullivan had him raped in Hawaii. (R.26, 195, 199); (Tr.12:228–29, 232–233); (Tr. 13:47, 59–60);  (Tr.15:94, 185). Most significantly, it undercut Dr. Feldman's testimony that

> It's my thinking that once Bryan Johnston thought he heard David say to him, "We paid to have you raped," that he then became the focus of his delusional system.

(Tr. 13:95); *see id.* at 119; (Tr. 12:246).

The prosecution introduced testimony and Bridgewater records regarding subsequent statements by Johnston denying any homicidal or suicidal ideation. (Tr.19:307, 310); (R.100, 109, 113, 115-16, 118, 120, 139); (Tr. Exh. 89 at 1, 25). The prosecution used these statements to undermine Johnston's statement to Dr. Sherry on December 10 that he was suicidal (and therefore psychotic). (R.21); (Tr.20:22–25); (Tr.21:107).

The statements also include general responses of sound mindedness. (R.79, 80, 90, 94, 96–97, 99, 100, 101). Of particular concern are: the statement on December 23 that Johnston "denies any concerns about his thinking or controls," (R.99), and the statement on December 30 that Johnston "Reports feeling safe and in good control ... able to manage [anxiety] and does not feel overwhelmed." (R.101). These obviously undercut Johnston's defense that he suffers from persistent paranoid delusions.

Closely related are Johnston's statements that he wanted to return to the jail rather than remain at Bridgewater. (R.96–97, 100, 120); (Tr.19:307, 309); (Tr.20:25). The prosecutor used these statements to argue that Johnston attempted to manipulate the system by feigning mental illness but he gave up when it became uncomfortable because it resulted in wearing a "paper Johnny" and strip searches. (Tr.21:107–08).[16]

All of this evidence went to the heart of Johnston's only defense at trial, and its improper presentation to the jury seriously undermines the outcome of that trial. Given the hotly contested nature of Johnston's mental illness at trial, there is more than a reasonable probability that but for counsel's failures the outcome of the trial would have been different. Counsel's decision to elicit

---

[16] "But what was going on at Bridgewater? What was going on at Bridgewater is he was in a room for a week with nothing else going on but people watching him to make sure that he didn't commit suicide. And then he was moved into an area where he had a paper johnny and he was being strip searched and people were watching him to make sure he didn't hurt himself. And I would suggest to you that, very significantly, he did not want to be at Bridgewater any longer. And so you'll see in the record that it is smooth sailing; there is no indication of any mental illness." (Tr. 21:106-07).

Johnston's requests for counsel and move for admission of the Bridgewater records significantly damaged Johnston's defense.

>    2.    Evidence of Johnston requesting counsel and refusing to answer questions

In addition to the above, counsel's deficient performance prejudiced Johnston because it resulted in the jury being exposed dozens of references in Bridgewater records, testimony, and jail records to Johnston's requests for counsel and his refusing to answer questions. That is, after Johnston invoked his right to counsel, he was re-approached multiple times resulting in prejudicial statements by Johnston asking for counsel and refusing to answer questions. To be clear, it does not matter whether the statements listed below constituted valid invocations of Johnston's *Miranda* rights in themselves. The point is that an *Edwards* motion to suppress would have kept these prejudicial subsequent statements from the jurors' consideration.

There can be little dispute that if jurors perceive that a defendant is withholding evidence, that evidence triggers a negative response — and often, assumptions of guilt — in jurors. *United States v. Hale*, 422 U.S. 171, 180 (1975) (juries are likely to draw a "strong negative inference" from the fact that a defendant remained silent); *see also, e.g., United States v. Zaccaria*, 240 F.3d 75, 79 (1st Cir. 2001) ("evidence of the invocation of the right to remain silent is inherently prejudicial").[17] *See* § II, *infra* at 37–46 (impermissible use of invocations results in prejudice if it is repeated and goes to the heart of the defense).

---

[17] Researchers reach a similar conclusion. Justin Sevier, *Omission Suspicion: Juries, Hearsay, and Attorney's Strategic Choices*, 40 Fl. St. Univ. L. Rev. 1, 19–20 (2012); Clyde Hendrick & David R. Shaffer, *Effect of Pleading the Fifth Amendment on Perceptions of Guilt and Morality*, 6 BULL. PSYCHONOMIC SOC'Y 449, 449–52 (1975); David R. Shaffer, Cyril Sadowski & Clyde Hendrick, *Effects of Withheld Evidence on Juridic Decisions*, 42 PSYCHOL. REP. 1235, 1236–38 (1978); David R. Shaffer & Cyril Sadowski, *Effects of Withheld Evidence on Juridic Decisions II: Locus of Withholding Strategy*, 5 PERSONALITY & SOC. PSYCHOL. BULL. 40, 41 (1979); Sharon R. Gromer, *Fifth Amendment – The Right to a No Adverse Inference Jury Instruction*, 72 J. CRIM. & CRIMINOLOGY 1307, 1308–1309, 1322 (1981).

Much of the evidence of Johnston's requests for counsel is documented above. *Supra* at 16–17, 24–26. In addition, after Dr. Kelly mentioned Johnston refusing to answer questions on the advice of counsel, the prosecutor then elicited five more times from Dr. Kelly that Johnston refused to answer questions at the jail and at Bridgewater. (Tr.15:36–39); *see also* (Tr.15:208) (prosecutor attempting to elicit this evidence from sister). She also elicited from Dr. Peebles that upon admission to Bridgewater, Johnston was silent upon advice of counsel. (Tr.19:304).[18]

Other requests for counsel or attempts at silence are listed below chronologically.

December 15:
"Mr. Johnston is currently charged with Murder, and has been instructed by his attorney not to discuss situation with staff. . . . At this time, Mr. Johnston continues to refuse to discuss with staff his history or his current mental status." (R.84)

"Refuses interview selectively. . . . continues to focus on need to call lawyer . . . still refuses any [illegible] until he speaks to his attorney. . . . I encouraged him to comply . . . likely some paranoia, as *the array of topics he will not discuss [illegible] is not reasonable*, as most have 0 input on legal status / issues." (R.85) (emphasis added).

December 16:
"Pt only asks if we have in PIN # — then refuses interview." (R.87)

"Refuses interview, selectively [mute?] . . . pt does not engage in conversation w/ clinical staff except to ask for phone call Atty." (R.88).

December 17:
"Refusing interviews" (R.91)

December 20:

When an evaluator approached Johnston, he "decline[d] to answer most questions unless his attorney is present." (R.45). The resulting evaluation form includes "declines to answer" or "refuses to answer" at least 10 times. (R.45-54). The evaluator noted that

---

[18] And in her closing, the prosecutor obliquely argued that Johnston's "selectively" determining what information he would provide "shows a certain clarity, it shows a certain discipline, it shows a certain level of deliberation that is inconsistent with the presence of a persistent mental illness." (Tr.21:93).

"Mr. Johnston was unable to provide any historical information and stated 'b/c my lawyer

told me not to talk.' The hx in this assessment was provided by his sister." (R.52).

   The evaluator again stated that Johnston's refusal to answer questions was

unreasonable: "unwilling to disclose most aspects of his hx, citing legal concerns. *Extent*

*of information he will not discuss appears in excess of what might be  reasonably*

*withheld* given legitimate concerns for a pre-trial detainee."  (R.53) (emphasis added)

December 21:

"Pt prefers not to sign any releases for prior tx until his attorney can review the forms. He
expects attorney to return to hospital on Thurs." (R.95–96)

"Pt prefers not to sign any document w/o attorney consent." (R.108)

December 29:

"Still unwilling to discuss past [illegible] or symptoms". (R.100)

There can be no serious argument that this evidence did not cause prejudice to Johnston's case.

## II. Trial counsel failed to move to exclude evidence that Johnston invoked his right to counsel and refused to answer questions from staff at the House of Correction and at Bridgewater State Hospital.[19]

   Distinct from the above *Edwards* suppression claim is the fundamental unfairness of

airing before the jury Johnston's actual invocations of his right to counsel and to silence. Counsel

plainly botched the issue.

   Forty years ago, the Supreme Court declared that fundamental unfairness ensues when a

defendant's post-*Miranda* invocations of his rights to silence and counsel admitted against him

because it violates the implicit "assurance that silence will carry no penalty". *Doyle v. Ohio*, 426

---

[19] This claim relies on facts essentially identical to those in claim I. *Supra* at 14–17. It differs only in that it focuses on discrete pieces of evidence that should have been excluded — Johnston's multiple valid invocations of his right to counsel — as opposed to all subsequent statements following the first valid invocation of the right to counsel. Further, because the prejudice prong of issue I necessarily includes the offending evidence discussed here, *supra* at 32–36, Johnston truncates the prejudice analysis here.

U.S. 610, 617–20 (1976); *Wainwright v. Greenfield*, 474 U.S. 284, 297 (1986).[20]  "[S]ilence does not mean only muteness; it includes the statement of a desire to remain silent, as well as of a desire to remain silent until an attorney has been consulted." *Greenfield*, 474 U.S. at 295 n.13; *Jacks v. Duckworth*, 857 F.2d 394, 401 (7th Cir. 1988). Silence obviously includes silence on the advice of counsel. *Gravley v. Mills*, 87 F.3d 779, 788 (6th Cir. 1996) (impeaching defendant with silence on advice of counsel held "egregious").

Three decades ago in *Greenfield*, the Supreme Court refused to carve out any exception to this rule for cases involving the insanity defense, holding that fundamental fairness bars admission of evidence of invocation of one's rights as evidence of sanity. *Greenfield*, 474 U.S. at 292.

Johnston's counsel failed to employ these clearly established precedents of the United States Supreme Court which bar this insolubly ambiguous but particularly poisonous evidence from the jury's consideration.

A.      Factual Background

As discussed above, the jury received a substantial amount of evidence and testimony that Johnston refused to answer questions and invoked his right to counsel as soon as he arrived both at the jail and again at Bridgewater. (Tr.15:32); (R.25, 34, 171); *supra* at 16–17, 24–26, 32–36.

B.      The SJC's resolution of the claim

The SJC considered Johnston's substantive *Doyle* claim along with his ineffective assistance of counsel claim. *Johnston*, 467 Mass. at 688. According to the SJC, Johnston never invoked his right to silence, he only

---

[20] Further, such invocations are "insolubly ambiguous" and near irrelevant. *Doyle*, 426 U.S. at 617 (internal citations omitted); *see Greenfield*, 474 U.S. at 293–94 & n.11.

> refused to answer select questions on advice of counsel… he had not invoked his
> right to silence…. [And] his refusals to answer select questions put to him by staff
> at the hospital did not constitute an invocation of his right to remain silent.

*Johnston*, 467 Mass. at 688. After so deciding, the court declared that all statements made by

Johnston to psychotherapists at Bridgewater, including his refusals, were admissible solely on

issues involving his mental or emotional condition. *Johnston*, 467 Mass. at 689.

The SJC then held inadmissible, in the narrowest way possible, evidence of Johnston's

references to counsel when refusing to answer questions on advice of counsel, and his requests to

confer with counsel before answering questions. *Johnston*, 467 Mass. at 689. To wit, "[a]ll

[Johnston's] references to counsel, but not the refusals themselves (he did not invoke his right to

silence), should have been the subject of a motion to redact." *Id.*

While acknowledging that Johnston's claim was ineffective assistance, the SJC

considered whether the error created a substantial likelihood of a miscarriage of justice.

*Johnston*, 467 Mass. at 688, 690. The SJC's "substantial likelihood" standard is employed for all

ineffective assistance claims in first-degree murder direct appeals and is equivalent to the

*Strickland* test. *Sleeper v. Spencer*, 510 F.3d 32, 39 & n.2 (1st Cir. 2007); *Mello v. DiPaulo*, 295

F.3d 137, 144 (1st Cir. 2002); *Commonwealth v. Wright*, 411 Mass. 678, 681–82 (1992).

The SJC acknowledged that there was a direct relationship between the improperly

admitted evidence and Johnston's defense of lack of criminal responsibility. *Johnston*, 467 Mass.

at 690. It also found that the jail and Bridgewater records contained fifteen references to counsel.

*Johnston*, 467 Mass. at 691; *see id.* at 688 n. 3 (stating that there were twelve references in the

Bridgewater records); but *see supra* at 15–17, 36–37 (recounting eighteen references to

Johnston's requests for counsel). The court also found that the prosecutor mentioned Johnston's

requests for counsel approximately five times during her cross-examination of Dr. Kelly. *Johnston*, 467 Mass. 674, 691–92.

But it affirmed because, according to the SJC, trial counsel *wanted* the jury to learn of Johnston's requests for counsel and silence in order "eliminate[] jury speculation that might have arisen from redactions in the [jail and Bridgewater] records" and "'to explain the absence of psychotic statements at Bridgewater'" and counsel thought that the limiting instruction would adequately prevent the jury from inferring that "[the defendant's] compliance with his attorney's advice was evidence of his sanity." *Johnston*, 467 Mass. at 692 (quoting Superior Court's decision).[21] It also noted that counsel did not object when the evidence first surfaced during direct examination of Dr. Kelly. *Johnston*, 467 Mass. at 690–91.

The SJC noted that the trial judge gave a limiting instruction and noted that the prosecutor did not make any mention of Johnston's requests for counsel in her closing argument. *Johnston*, 467 Mass. at 692. Finally, it stated that the evidence of criminal responsibility was significant, and that the improperly admitted evidence played a minor role in the battle of experts on that issue. *Johnston*, 467 Mass. at 691.

C.      Standard of Review

Because the SJC applied a standard equivalent to the federal *Strickland* standard for ineffective assistance, this Court reviews to determine whether the state court's decision was contrary to, or involved an unreasonable application of, clearly established federal law. 28 U.S.C. §2254(d)(1). *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002).

---

[21] Trial counsel submitted an affidavit stating that he did not recall Dr. Kelly mentioning this evidence on direct examination, that he did not want the jury to hear it, that his later actions were simply damage control, and that if he could have thought of a way to exclude the evidence outside the presence of the jury, he would have done so. (R.185–86). The motion judge discredited trial counsel's affidavit without holding an evidentiary hearing. (SJC Brief Add. at 16–17).

D.      Analysis

Johnston has already set out above the *Strickland* standard for deficient performance and

prejudice. *Supra* at 28–29. The SJC's resolution of this claim resulted both from an unreasonable

application of *Strickland* and an unreasonable determination of the facts.

1.      Deficient performance

As discussed above, *Doyle* and *Greenfield* make clear that evidence of a defendant's

post-arrest silence and requests for counsel are inadmissible. *Doyle*, 426 U.S. at 617–20;

*Greenfield*, 474 U.S. at 292. Despite such long-established law, and regardless of the highly

important nature of these protections, trial counsel failed to object to the admission of at least

five testimonial and fifteen documentary references to Johnston's invocations of his right to

counsel and silence.[22]

According to the SJC, counsel made a deliberate decision to let the jury learn of these

instances of Johnston thwarting government questioning by invoking his constitutional rights.

*Johnston*, 467 Mass. at 692.That is, trial counsel wanted the jury to know that Johnston followed

counsel's advice and refused to talk to Bridgewater staff and instead requested to speak to

counsel because he wanted to (1) explain the absence of psychotic statements at Bridgewater and

---

[22] In contrast, most cases finding no *Doyle* violation contain a single or passing reference which
is immediately cured and stricken from the evidence. *See Greer v. Miller*, 483 U.S. 756, 764–65
(1987) (objection sustained and jury instructed to disregard, no evidence of post-arrest silence
submitted to jury); *Ellen v. Brady*, 475 F.3d 5, 14 (1st Cir. 2007) (objection sustained to single
improper reference, prompt curative instruction); *United States v. Andujar-Basco*, 488 F.3d 549,
560 (1st Cir. 2007) (objection sustained, evidence promptly stricken); *Clarke v. Spencer*, 582
F.3d 135, 142 (1st Cir. 2009) (objections promptly sustained to ambiguous references, jury never
heard evidence that defendant terminated interview);*Isabelle v. Mansfield*, 568 F.Supp.2d 85, 97
(D.Mass. 2008) (objection promptly sustained, no further references). *But see Ainooson v. Gelb*,
973 F. Supp. 2d 105, 119 (D. Mass. 2013) (single oblique reference constituted *Doyle* error).

(2) avoid speculation about redactions in the Bridgewater records. *Johnston*, 467 Mass. at 692. We must accept the SJC's determination that counsel actually made this choice.[23]

But an unreasonable decision constitutes ineffective assistance, strategic or not. "The relevant question is not whether counsel's choices were strategic, but whether they were reasonable." *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000) (citing *Strickland*, 476 U.S. at 688); *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005) (same, choice between alternatives must be reasonable); *Beltran v. Cockrell*, 294 F.3d 730, 734 (5th Cir. 2002) (unreasonable strategic decisions amounted to ineffective assistance).

Counsel's choice was unreasonable. As explained above, *supra* at 30–31, trial counsel should have simply chosen not to introduce the Bridgewater records and testimony regarding Johnston's invocations and moved to exclude such references had the prosecutor elicited them. *Dixon v. Snyder*, 266 F.3d 693, 703 (7th Cir. 2001) (ineffective assistance to fail to take steps to exclude important evidence bearing on the sole defense). Johnston would have been left with the strongest parts of his defense: civilian accounts and the defense experts.

Thus, the SJC's statement that counsel acted reasonably in introducing Johnston's invocations "to explain the absence of psychotic statements at Bridgewater" is unreasonable and its reasoning is contradicted by the record. *Wiggins*, 539 U.S. at 528; *Weddell*, 290 F.Supp.2d at 1021. First, there are numerous statements by Johnston in the immediate aftermath of the

---

[23] Undersigned counsel doubts that the SJC's determination reflects reality. Counsel believes that trial counsel simply did not know the law regarding a crucial point of his defense. *Hinton*, 134 S. Ct. at 1089. However, trial counsel never admitted that and Johnston is essentially stuck with the SJC's finding. 28 U.S.C. § 2254(d) (challenges to factual determinations must demonstrate "unreasonable determination of the facts" by state court). *But see Dixon v. Snyder*, 266 F.3d 693, 703 (7th Cir. 2001) (even if counsel knew the law, a doubtful proposition, his decisions were unreasonable).

killing.[24] In addition, Johnston underwent two proper interviews at Bridgewater with Dr. Peebles and counsel present. (Tr. 19:301). Dr. Peebles could have testified to Johnston's delusional statements to him while at Bridgewater. (R.26–27). As such, even without an instruction not to speculate, the jurors would have had no reason to wonder about any supposed lack of statements because there would not have appeared to be any such lack.

The SJC's additional rationale — that counsel wanted to avoid juror speculation arising from noticeable redactions — is flatly contradicted by the record. *See Johnston*, 467 Mass. at 692. Counsel raised no objection when the prosecutor stated multiple times in front of the jury that certain records would be "sanitized", *including the Bridgewater records*. (Tr. 14:64, 74) (Bridgewater and Dr. Anfang records); (Tr. 18:24) (Dr. Berlin's records). And in fact, trial counsel agreed to have multiple records redacted before they were sent to the jury. (Tr. 20:106) (no dispute regarding redactions). Counsel knew that the jury knew that there would be redactions to these records. As a result, Exhibits 28 (letter revoking firearms license), 83 (Noble Hospital records), 85 (Dr. Peebles report), 86 (Bridgewater records), 88 (Baystate Hospital records), 89 (House of Correction records), 91 (Westfield State College records) were all "sanitized". (Tr. 21:156–57). There was no such strategy of eschewing redactions.

Nor would a strategy of eschewing redactions of inadmissible material to counter uncontrollable jury speculation be reasonable.[25] *See Cauthern v. Colson*, 736 F.3d 465, 486–87 (6th Cir. 2013) (state appellate court's justification of trial counsel's performance based on speculation that jury might have been "insulted by" mitigation evidence unreasonable application

_____

[24] (Tr.5:207–09, 212–13, 220); (Tr.6:36–38, 49–50); (Tr.7: 131–32, 144–45, 163–66); (Tr.8:9–10, 17–22, 33–37, 44–45, 102–109, 123–128); (Tr.12:71); (Tr.12:171–72); (Tr.15:208); (Tr.16:56, 64–65, 75); (Tr.19:235–40, 247, 254, 275–76).

[25] Of course, the Commonwealth *created* the potential "holes" in the records by repeatedly approaching Johnston after he invoked his right to counsel and then noting his invocations in the record. *See* § I, *supra*.

of *Strickland* performance prong). That paper records may have contained invocations does not mean that it is reasonable for defense counsel or permissible for the prosecutor to *draw attention* to the invocations through the live witnesses and closing argument. Introducing the invocations undermined the sole defense. *Johnson v. Bagley*, 544 F.3d 592, 600–02 (6th Cir. 2008) (wholesale introduction of human services agency records ineffective where records contained information that undermined mitigation strategy). And it allowed the prosecutor to make the prejudicial suggestion that Johnston's ability to follow his attorney's advice demonstrated that he was criminally responsible. (Tr.15:32–34, 36–39, 42–47, 208) (Tr.19: 299–301, 304, 307–08); (Tr.21:93); *see Greenfield*, 474 U.S. at 292; *Sulie v. Duckworth,* 864 F.2d 1348, 1350 (7th Cir.1988) (state countered insanity defense by using defendant's request for counsel to prove ability to understand and reason), *cert. denied,* 493 U.S. 828 (1989).[26]

According to the SJC, counsel bet the central issue of his case on inherently contradictory judgments about the power of limiting instructions. Counsel's supposed decision to deliberately present Johnston's invocations rather than redact them, would have relied on the judgment that limiting instructions about redactions would be insufficient to keep the jurors from speculating. At the same time, counsel would rely on the judgment that the prejudice from presenting Johnston's invocations to the jury could be cured by the limiting instruction telling the jury that they should "draw no adverse inferences". (R.20). The SJC's justification of counsel's performance is unreasonable.

2.      Prejudice

Much of what there is to say regarding the prejudice from evidence of Johnston's invocations is already discussed at pages 32–37, *supra*. Therefore, Johnston simply discusses

---

[26] *Sulie* was later overruled by implication only because *Greenfield* was held to be a new rule and non-retroactive. *Vanda v. Lane,* 962 F.2d 583, 585 (7th Cir.), *cert. denied,* 506 U.S. 889, 113 S.Ct. 254, 121 L.Ed.2d 186 (1992).

here separate authority for the proposition that *Doyle/Greenfield* errors amount to prejudice justifying reversal in cases where (1) there were multiple references to the defendant's invocations or (2) where the reference went to the central contested issue.

Here, there were multiple references. Defense counsel appears to have permitted his expert to open the door, in turn permitting the prosecutor to elicit multiple references to Johnston's invocations. Defense counsel then multiplied the references by encouraging the jurors to review the Bridgewater records showing Johnston invoking his rights "day after day after day . . . over and over and over again", i.e. at least fifteen times. (Tr.21:80–81). There was only a single mid-trial curative instruction on the issue, and all of the offending evidence was actually submitted to the jury.[27]

In such cases, courts consistently find *Doyle* violations prejudicial. *See Wainwright v. Greenfield*, 474 U.S. 284, 287, 295 (1986) affirming *Greenfield v. Wainwright*, 741 F.2d 329, 336 (11th Cir. 1984) (*Doyle* error prejudicial where no objection to three elicitations of defendant's invocations, objection to prosecutor's three references in closing); *Hill v. Turpin,* 135 F.3d 1411, 1418–19 (11th Cir.1998) (*Doyle* error prejudicial due to multiple elicitations of defendant's invocations, despite multiple "valiant and well-intentioned" curative instructions); *United States v. Tenorio,* 69 F.3d 1103, 1106–07 (11th Cir.1995) (*Doyle* error due to references during direct examination of government witness, cross-examination of defendant, and in closing); *United States v. Kallin,* 50 F.3d 689, 693–95 (9th Cir.1995) (*Doyle* error prejudicial despite curative instruction, because prosecutor's references were calculated rather than inadvertent); *Fields v. Leapley*, 30 F.3d 986, 991–92 (8th Cir. 1994) (conviction reversed when

---

[27] The First Circuit also holds that "[a] prosecutor's persistence in referring to the defendant's post-*Miranda* silence or a trial judge's failure to provide adequate curative instructions may result in a *Doyle* violation *even when no evidence of the defendant's silence is submitted to the jury.*" *Ellen*, 475 F.3d at 14 (emphasis added).

prosecutor twice violated *Doyle* by impeaching Fields' trial testimony during closing argument with his prior invocation of his *Miranda* rights); *United States v. Meneses-Davila,* 580 F.2d 888, 891–96 (5th Cir.1978) (prosecution's "four separate, intentional references to defendant's post-arrest silence" were not harmless where "[d]efendant's [exculpatory] story is not totally implausible and the indicia of guilt is not overwhelming").[28]

Further, the evidence admitted due to counsel's failures struck at the heart of Johnston's defense. *See United States v. Gentry*, 555 F.3d 659, 664 (8th Cir. 2009) (*Doyle* error prejudicial where there were five improper references and defense was not "transparently frivolous"); *Gov't of Virgin Islands v. Davis*, 561 F.3d 159, 166–67 (3d Cir. 2009) (repeated references to defendant's invocation prejudicial where they went to heart of defense); *United States v. Johnson,* 558 F.2d 1225, 1230 (5th Cir.1977) (improperly admitted statement went to "heart of the sole defense" and was prejudicial); *United States v. Harp,* 536 F.2d 601, 603 (5th Cir.1976) (improperly admitted "comments struck at the jugular" of defense, thus prejudicial), cited with approval in *United States v. Wright,* 777 F.3d 769, 782 (5th Cir. 2015). Here, the SJC found that the prosecutor used Johnston's invocations to rebut the defense that Johnston was delusional at the time he committed the offense. *Johnston*, 467 Mass. at 690. The court noted that there was a direct relationship between this evidence and Johnston's trial defense. *Id.* at 690. The improper references damaged the core of Johnston's defense.

This is not the kind of case in which the trial judge's "curative instruction" remedied the prejudice because a single reference was quickly objected to, the evidence stricken, and the jury instructed to disregard. *See Ellen*, 475 F.3d at 11–12 (single improper reference promptly stricken and curative instruction given). There were at least five testimonial and fifteen

---

[28] *Contrast Cronin v. Comm'r of Prob.*, 783 F.3d 47, 52–53 (1st Cir. 2015) (single ambiguous reference not prejudicial).

documentary references to Johnston's invocations but only a solitary curative instruction following the first reference. *Johnston*, 467 Mass. at 691–92; (Tr.15:35–36). The SJC described this sole instruction as "forceful". *Johnston*, 467 Mass. at 692. This Court can evaluate that characterization itself. Either way, this single instruction left the many subsequent references uncured, or at least left jurors guessing at how they should weigh them. *Girts v. Yanai*, 501 F.3d 743, 759 (6th Cir. 2007) (no objection, one curative instruction not given at time of improper references insufficient to remedy *Doyle* error); *United States v. Okatan*, 728 F.3d 111, 121 (2d Cir. 2013) (limiting instruction not contemporaneously directed at specific improper references insufficient). This was not nearly enough to remedy the prejudice to Johnston's sole defense.

**III.   Trial counsel was ineffective for failing to object to the prosecutor's insinuation that Johnston's early consultation with counsel indicated a false "constructed" defense.**

The prosecutor improperly suggested that Johnston's consultation with an attorney early in the process meant that his insanity defense was "concocted." Johnston's family seeking counsel to assist him was not fair game. All persons, mentally ill or not, are entitled to consult with their counsel at all stages of a prosecution.

A.     Factual Background

Early on the morning of December 7, 2004, the defendant's parents received a call from Johnston stating that he had a gun to his own head. (Tr.16;75). Fearing he would commit suicide, they rushed to his apartment from Boston. (Tr.16:55–56). After they arrived, they first called Dr. Berlin. (Tr.16:66–67). They then called Attorney Michael McCarthy. *Id.* (McCarthy had previously represented Johnston on relatively minor criminal matters. (Tr.16:55–56, 75–76, 110)). Both Johnston's mother and Attorney McCarthy then called the Carson mental health crisis center at Noble Hospital because Johnston refused to go to the emergency room voluntarily. (Tr.16:67–68, 79, 113–15, 137). Attorney McCarthy then called the Westfield Police

Department. *Id.* at 115.

Subsequently, trial counsel began developing an insanity defense and retaining experts as early as December 11–12, 2004. (Tr.15:42–43); (Tr.12:211).

The prosecutor's opening suggested to the jury that Johnston's defense was concocted because Johnston and his family consulted attorneys. She pointedly referenced the fact that Johnston's family "first had spoken to an attorney and after speaking to an attorney, had contacted the crisis services in Westfield, and the police department was called in to assist in taking him into custody." (Tr.5:62).

In response, defense counsel told the Court that he was calling Attorney McCarthy as a witness because the prosecutor's opening and case-in-chief suggested that Johnston, his counsel, and his family concocted the entire insanity defense on that date. (Tr.11:202-03, 335). He then elicited the evidence summarized above regarding the actions taken by Attorney McCarthy and Mr. and Mrs. Johnston on the morning of December 7, 2004.

In her redirect of Dr. Welner, the prosecutor then elicited hearsay statements by Dr. Anfang of the House of Correction to Johnston: "'I advised him that his lawyer was concerned he get treatment for schizophrenia.'[29] So the discussion of his taking anti-psychotic medication came up with the doctor saying that this is what your lawyer wants you to do." (Tr.18:266).

And the unifying theme of the prosecutor's closing argument was that Johnston's insanity defense was concocted after he was charged, and necessarily after he had consulted counsel. (Tr.21:133-36). In particular, she argued that Johnston's statements in the Bridgewater and jail records "are evidence of a defense that was constructed very soon after the event." (Tr.21:133). The prosecutor left no doubt. She turned counsel's legitimate early investigation and concern for his client into counsel concocting a bogus insanity defense.

---

[29] This is a statement of Dr. Anfang, not adopted by either Johnston or trial counsel.

The SJC found that rather than suggesting in her opening that the defense was concocted, the prosecutor merely laid out a chronology of the expected testimony. The SJC also found that regarding the testimony of Dr. Welner the prosecutor was attempting to clarify testimony elicited on cross-examination regarding "contradictory information" about the defendant's state of mind during an incident at the house of correction, and that at no point did Dr. Welner indicate that the defense had been concocted. Finally, the SJC found that the prosecutor's comment in closing regarding "a defense that was constructed very soon after the event" was directed at the defendant's family rather than trial counsel. Noting the lack of objection and "minor flaw" in closing argument the SJC concluded that there was no substantial likelihood of a miscarriage of justice.

B.      Standard of Review

The SJC decided Johnston's ineffective assistance claim on the merits, therefore this Court decides whether the SJC's opinion constitutes an "unreasonable application" of *Strickland*. *See* § II.C., *supra* at 39.

C.      Analysis

Johnston's counsel was ineffective for failing to object to such improper insinuations by the prosecutor, severely prejudicing Johnston's defense. Early involvement by counsel is both a duty and an affirmative good. Investigation of an insanity defense is especially crucial, particularly in a murder case. *Rosado v. Allen*, 482 F.Supp.2d 94, 106 (D.Mass. 2007) (*citing Genius v. Pepe*, 50 F.3d 60, 60–61 (1st Cir. 1995) noting that the First Circuit has found it "inexcusable" not to pursue an insanity defense where there were hints that it might be available). Johnston's counsel was acutely aware of Johnston's mental health issues, having been contacted because Johnston had a gun to his head. (Tr.16:66–67). Counsel's prompt investigation

of Johnston's mental health and a possible insanity defense was nothing more than counsel

performing his constitutional duty. In fact, as courts have consistently held, counsel's failure to

do so would have resulted in constitutionally deficient performance. *Brown v. Sternes*, 304 F.3d

677, 694 (7th Cir. 2002) ("*[W]here a defense attorney has received information from a reliable*

*source that his client has had a history of psychiatric problems, but failed to adequately*

*investigate this history, counsel failed to provide effective assistance*.") (emphasis original)

(collecting cases from multiple circuits).[30]

A defendant's consultation with counsel is off limits, even when he does so in the

immediate aftermath of a shooting. *Sizemore v. Fletcher*, 921 F.2d 667, 671 (6th Cir. 1990) ("A

prosecutor may not imply that an accused's decision to meet with counsel, even shortly after the

incident giving rise to a criminal indictment, implies guilt."); *See also United States v.*

*McDonald*, 620 F.2d 559, 561–64 (5th Cir. 1980) and *United States v. ex rel Macon v. Yeager*,

476 F.2d 613, 616–17 (3rd Cir. 1973). Thus, by using the diligent actions of defense counsel

(and Johnston's parents who legitimately procured counsel for their debilitated son) to impeach

the legitimacy of the defense, the prosecutor crossed the line of permissible advocacy.

The SJC stated that defense counsel's failure to object to this statement in the

prosecutor's closing showed that the argument did not land a hard, foul blow and was not

unfairly prejudicial. *Johnston*, 467 Mass. at 695. It is just as probable an indication that trial

counsel was ineffective. Such powerful accusations by the prosecutor could have been the

tipping point for the jury in a case which rested entirely on the defendant's lack of criminal

---

[30] Even where there is evidence indicating defendant's sanity at the time of the crime, counsel is
not excused from investigating a possible insanity defense. *United States v. Kauffman*, 109 F.3d
186, 189–90 (3rd Cir. 1997) (trial counsel provided ineffective assistance by not investigating
insanity defense despite counsel's testimony that he thought the defendant's admission that he
had the guns in question and arranged to sell them showed the defendant appreciated the
wrongfulness of his conduct).

responsibility. This argument went directly to the heart of the sole defense, and counsel's failure

to object to such improper argument clearly fell below an objective standard of reasonableness

causing significant prejudice to Johnston.

IV.     **Trial counsel was ineffective for eliciting that Dr. Welner characterized Johnston as "moon-faced" – a fact not elicited on direct testimony – in an attempt to show that Welner personally denigrated Johnston. Dr. Welner responded that a moon-face is a medical term describing a symptom of long-term anabolic steroid abuse. That was false. Counsel's failure to impeach Welner's response introduced damaging evidence and left Welner's credibility on psychopharmacology unchallenged.**

A.     Factual Background

        In cross-examination, trial counsel asked Dr. Welner why he described Johnston as

"moon-faced" in his report. (Tr.18:197). He was attempting to demonstrate that Dr. Welner was

personally demeaning Johnston. (R.187); (Tr.18:194–96, 198–202). Welner responded that a

"moon-face" is a "medical term" that refers to "a particularly round face" developed by

"especially heavy steroid users." (Tr.18:197). He claimed to know this "having evaluated,

assessed, people with what is known as moon-faces." Id. Welner further asserted that "moon-

face" would persist even a year after Johnston's cessation of steroids. (Tr.18:197–98). Counsel

did not expect the above answer from Dr. Welner. (R.187).

        Worse, had counsel investigated the "moon face" claim, he could have impeached

Welner. Post-conviction, Johnston submitted affidavits from Dr. Kelly and from endocrinologist

Dr. Jeffrey Korff explaining that it is false that the anabolic steroids that Johnston took cause

moon-face; only glucocorticoid steroids like Prednisone do. (R.190-91, 208-10). Further, the

"moon-face" would not have persisted one year after cessation of steroids. *Id.*

B.     Standard of Review

        The SJC decided Johnston's ineffective assistance claim on the merits, therefore this

Court decides whether the SJC's opinion constitutes an "unreasonable application" of *Strickland.*

*See* § II.C., *supra* at 39.

C.      Analysis

Johnston's counsel was clearly ineffective in eliciting this evidence and then failing to investigate it, especially when such investigation would have led to powerful impeachment. Instead of impeaching Dr. Welner, counsel ended up eliciting false and damaging evidence. *See Matthews v. Rakiey*, 54 F.3d 908, 926–27 (1st Cir. 1995) (trial counsel's failure to impeach witness's credibility "…in a case where the primary evidence consists of the victim's word against that of petitioner…" was constitutionally deficient and highly prejudicial resulting in grant of habeas). As in *Matthews*, Johnston's trial counsel failed to impeach a key witness's credibility in a case which rested entirely on which experts the jury credited in determining the validity of Johnston's insanity defense. *See also Gabaree v. Steele*, 792 F.3d 991, 998–1001 (8th Cir. 2015) (habeas granted due to counsel's ineffective cross-examination in which "she elicited additional statements from Dr. Sisk that bolstered his testimony."); *Peoples v. Lafler*, 734 F.3d 503, 513 (6th Cir. 2013) (habeas granted and Court noted that "[f]ailure to impeach the credibility of key witnesses with known false testimony is an egregious error in a criminal case."); *Wilson v. Mazzuca*, 570 F.3d 490, 503 (2d Cir. 2009) (trial counsel's cross-examination elicited damaging testimony and was objectively unreasonable, resulting in grant of habeas); *Henry v. Poole*, 409 F.3d 48, 64–72 (2d Cir. 2005) (counsel's elicitation of and failure to investigate damaging witness testimony that went to the heart of and undermined the defense was ineffective and prejudicial resulting in grant of habeas); *Combs v. Coyle*, 205 F.3d 269, 288 (6th Cir. 2000) (defense counsel was "surprised" by expert's testimony, and counsel's "failure to

anticipate, suppress, prepare for, object to, or avoid repetition of this damaging testimony rendered his performance constitutionally deficient.").

The judge ruled, and the SJC agreed, that counsel erred in asking the question but that there was no prejudice because of the strong evidence that Johnston used anabolic steroids. (Add.33); *Johnston*, 467 Mass. at 695. The SJC missed the point. Counsel lost the opportunity to impeach Dr. Welner's credibility as a board-certified psychopharmacologist, something the prosecutor emphasized. (Tr.17:71–73, 80); (Tr.21:91–92) (Welner "the only expert who was a designated psychopharmacologist," emphasizing his expertise regarding drug intoxication); *see* (Tr.18:29–30) (Welner injects psychopharmacological experience on cross).

"[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."  *Strickland*, 466 U.S. at 691. Here, once counsel had elicited the damaging testimony from Dr. Welner he had a duty to investigate that testimony. Had he done so, he would have been able to counteract the negative impact of such testimony and impeach a key government witness. *See Lindstadt v. Keane*, 239 F.3d 191, 201–02 (2nd Cir. 2001) (habeas granted in case where defense counsel failed to investigate expert's testimony linking injuries to sexual abuse; had he done so he could have brought to light studies linking such injuries to causes other than abuse thereby impeaching the government witness). Where the Commonwealth's rebuttal case presented Johnston's delusions as psychotic reactions to pharmacological substances, damaging Welner's credibility on this point would have been "a significant boost to th[e defense] theory." *Peoples*, 734 F.3d at 513–514. Instead, due to his lack of preparation and subsequent failure to investigate, counsel not only introduced damaging evidence, but also failed to take advantage of a significant impeachment opportunity. This failure prejudiced Johnston.

## Conclusion

Johnston has raised four claims of ineffective assistance, each of which impacted Johnston's sole defense of insanity. The Court should evaluate the cumulative prejudice from each aspect of counsel's ineffective assistance. See *Dugas v. Coplan*, 428 F.3d 317, 335 (1st Cir. 2005); *see Ainooson v. Gelb*, 973 F. Supp. 2d 105, 120 n.6 (D. Mass. 2013) (citing Ruth A. Moyer, *To Err is Human; To Cumulate, Judicious: The Need for U.S. Supreme Court Guidance on Whether Federal Habeas Courts Reviewing State Convictions May Cumulatively Assess Strickland Errors,* 61 Drake L.Rev. 447, 466–67 (2013) (observing circuit split on whether to cumulate counsel's errors when determining prejudice under *Strickland* )). After doing so, the Court should grant Johnston's petition.

Respectfully Submitted,


/s/ David J. Nathanson
David J. Nathanson
BBO #633772
Wood & Nathanson, LLP
227 Lewis Wharf
Boston, MA 02110
978-744-2695

dated: October 23, 2015

Certificate of Service

I hereby certify that this document, which was filed on this date through the ECF system, will be sent electronically on this date to AAG Jennifer K. Zalnasky, counsel for the Respondent in this matter.

/s/ David J. Nathanson
David J. Nathanson
