UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

**15-cv-12332-WGY**

**Bryan R. Johnston,**
**Petitioner**

**v.**

**Lisa A. Mitchell**
**Superintendent, Old Colony Correctional Center**

**APPENDIX IN SUPPORT OF PETITION FOR HABEAS CORPUS**
**PAGES 180-209**

for the petitioner:

David J. Nathanson
BBO #633772
Wood & Nathanson, LLP
227 Lewis Wharf
Boston, MA 02110
dnathanson@woodnathanson.com
978-744-2695

dated: October 23, 2015

**3.      *Consequence of a Not Guilty by Reason of Insanity Verdict[1]***

I want to explain to you what could happen to the defendant if you find (him/her) not guilty by reason of insanity, and thus, lacking criminal responsibility. A judge may order such a person to be hospitalized for an initial 40-day period, either under strict security at Bridgewater State Hospital or at a facility for the mentally ill. During that period, the district attorney or certain mental health personnel may petition the court to commit the person for six months.

After a hearing, if it is shown beyond a reasonable doubt that the person continues to be mentally ill, and that (his/her) discharge would create a likelihood of serious harm to (himself/herself) or others, the person will be committed for six months. A judge will then review the person's mental condition at least once a year, and there will be additional periods of commitment if the person continues to be mentally ill and dangerous. He would not be released unless a finding is made that his discharge would not create a likelihood of serious harm to himself or others. Otherwise, he could spend the rest of his life in a locked facility.

The district attorney must be notified of any hearing about the person's release, and may be heard at any such hearing. However, the final decision whether to recommit or to release the person is always made by a judge.

I have given you this information so that you are not concerned about the possible consequences of the difficult function you are about to perform. Please put the possible consequences out of your minds when you consider your verdict. You must decide the case solely on the evidence before you, in light of the law as I have explained it to you.

---

[1] This instruction is modeled on *Model Jury Instructions for Use in the District Court* 6.03 (MCLE, Inc. 1988 & Supp. 1989, 1995, 1997). See Commonwealth v. Mutina, 366 Mass. 810, 323 N.E.2d 294 (1975). G.L. c 123, Sec. 16

**3.**     *Consequence of a Not Guilty by Reason of Insanity Verdict*[1]

I want to explain to you what could happen to the defendant if you find (him/her) not guilty by reason of insanity, and thus, lacking criminal responsibility. A judge may order such a person to be hospitalized for an initial 40-day period, either under strict security at Bridgewater State Hospital or at a facility for the mentally ill. During that period, the district attorney or certain mental health personnel may petition the court to commit the person for six months.

After a hearing, if it is shown beyond a reasonable doubt that the person continues to be mentally ill, and that (his/her) discharge would create a likelihood of serious harm to (himself/herself) or others, the person will be committed for six months. A judge will then review the person's mental condition at least once a year, and there will be additional periods of commitment if the person continues to be mentally ill and dangerous. ~~If the person is no longer mentally ill and dangerous, (he/she) will be discharged.~~
He would not be released unless a finding is made that his discharge would not create a likelihood of serious harm to himself or others. Otherwise, he could spend the rest of his life in a locked facility.

The district attorney must be notified of any hearing about the person's release, and may be heard at any such hearing. However, the final decision whether to recommit or to release the person is always made by a judge.

I have given you this information so that you are not concerned about the possible consequences of the difficult function you are about to perform. Please put the possible consequences out of your minds when you consider your verdict. You must decide the case solely on the evidence before you, in light of the law as I have explained it to you.

---

[1] This instruction is modeled on *Model Jury Instructions for Use in the District Court* 6.03 (MCLE, Inc. 1988 & Supp. 1989, 1995, 1997). See Commonwealth v. Mutina, 366 Mass. 810, 323 N.E.2d 294 (1975). G.L. c 123, Sec. 16

5.    *Effect of Alcohol and/or Drugs on Insanity*[1]

Intoxication caused by the voluntary consumption of alcohol or drugs cannot be a basis for concluding the defendant lacked criminal responsibility.[2]  Alcoholism or drug addiction is not a mental disease or defect within the meaning of the test for lack of criminal responsibility.[3]

However, if the defendant suffers from a mental disease or defect that is activated by the consumption of alcohol or drugs and that results in the lack of a substantial capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law, then the defendant is not criminally responsible.  If the Commonwealth proved beyond a reasonable doubt that the defendant knew or subjectively had reason to know the consumption of alcohol or drugs would trigger the underlying mental disease or defect, then the defendant does not lack criminal responsibility due to the alcohol or drugs activation theory.  In determining whether the defendant had knowledge of the effect of (his/her) consumption of alcohol or drugs on his mental disease or defect, you may consider whether the defendant's mental condition might have interfered with (his/her) ability to understand what a normal person in the same situation would have reasonably understood.[4]

---

[1]This instruction may be given when there is evidence that the defendant's mental disease or defect was triggered by the voluntary consumption of alcohol, drugs or both.  See Commonwealth v. Angelone, 413 Mass. 82, 594 N.E.2d 866 (1992)

[2]See Osborne v. Commonwealth, 378 Mass. 104, 111, 389 N.E.2d 981, 986-87 (1979); Commonwealth v. Sheehan, 376 Mass. 765, 772, 383 N.E.2d 1115, 1120 (1978)

[3]See Osborne v. Commonwealth, 378 Mass. 104, 111, 389 N.E.2d 981, 986-87 (1979); Commonwealth v. Sheehan, 376 Mass. 765, 772, 383 N.E.2d 1115, 1120 (1978)

[4]Commonwealth v. Ruddock, 428 Mass. 288, 290-91, 701 N.E.2d 300, 302 (1998)

**5.**      *Effect of Alcohol and/or Drugs on Insanity*[1]

Intoxication caused by the voluntary consumption of alcohol or drugs cannot be a basis for concluding the defendant lacked criminal responsibility.[2]  Alcoholism or drug addiction is not a mental disease or defect within the meaning of the test for lack of criminal responsibility.[3]

However, if the defendant suffers from a mental disease or defect that is activated by the consumption of alcohol or drugs and that results in the lack of a substantial capacity to appreciate the wrongfulness of (his/her)his conduct or to conform (his/her)his conduct to the requirements of the law, then the defendant is not criminally responsible.  If the Commonwealth proved beyond a reasonable doubt that the defendant knew or subjectively had reason to know the consumption of alcohol or drugs would trigger the underlying mental disease or defect, then the defendant does not lack criminal responsibility due to the alcohol or drugs activation theory.  In determining whether the defendant had knowledge of the effect of (his/her) consumption of alcohol or drugs on his mental disease or defect, you may consider whether the defendant's mental condition might have interfered with (his/her) ability to understand what a normal person in the same situation would have reasonably understood.[4]

---

[1]This instruction may be given when there is evidence that the defendant's mental disease or defect was triggered by the voluntary consumption of alcohol, drugs or both.  See Commonwealth v. Angelone, 413 Mass. 82, 594 N.E.2d 866 (1992)

[2]See Osborne v. Commonwealth, 378 Mass. 104, 111, 389 N.E.2d 981, 986-87 (1979); Commonwealth v. Sheehan, 376 Mass. 765, 772, 383 N.E.2d 1115, 1120 (1978)

[3]See Osborne v. Commonwealth, 378 Mass. 104, 111, 389 N.E.2d 981, 986-87 (1979); Commonwealth v. Sheehan, 376 Mass. 765, 772, 383 N.E.2d 1115, 1120 (1978)

[4]Commonwealth v. Ruddock, 428 Mass. 288, 290-91, 701 N.E.2d 300, 302 (1998)

## INSTRUCTION REGARDING CONSEQUENCES OF VERDICT
## OF NOT GUILTY DUE TO LACK OF CRIMINAL RESPONSIBILITY
### (Tr. 21:234-236).

"Your decision, ladies and gentlemen, must be based solely
on the evidence and the law in this case, without regard to
the possible consequences of your verdict. You may not
consider sentencing in reaching your verdict. However, so
that you do not speculate about the consequences of a
verdict of not guilty by reason of insanity, I'm going to
tell you what happens to a defendant in the event of such a
verdict. However, you must not let this information affect
your evaluation of the evidence or your verdict in any way.
And by informing you, I am not suggesting in any way what
your verdict should be. I simply do not want you to
speculate about the matter and allow that speculation to
interfere with your deliberations in any way.

If a defendant is found not guilty by reason of insanity, a
Court may order the Defendant to be hospitalized at a
mental facility for a period of 40 days for observation and
examination. During this observation period, or within 60
days after a verdict of not guilty by reason of insanity,
the district attorney or other appropriate authorities may
petition a Court to commit the Defendant to a mental health
facility or to Bridgewater State Hospital.

If, after hearing, it is proved beyond a reasonable doubt
that the Defendant continues to
be mentally ill and that his discharge would create a
likelihood of serious harm to himself or others, then the
Court may commit the Defendant to a proper mental facility
or to Bridgewater State Hospital for six months.
Thereafter, periodically a court reviews the order of
commitment. If the person is still suffering from a mental
illness or defect and is still dangerous, he is kept in the
facility. If the person is no longer mentally ill and can
resume a normal life, he or she is later discharged.

The district attorney must be notified of any hearing
concerning whether the person may
be released, and may be heard at any such hearing. However,
the final decision on whether to recommit or release a
person is made by a judge. The district attorney must be
notified of any hearing concerning whether the person may
be released, and may be heard at any such hearing. However,
the final decision on whether to recommit or release a
person is made by a judge.

Having told you this, however, I must again caution you:
Please, put the possible consequences out of your minds
when you consider your verdict. You must base your verdict
in this case solely on the evidence and the law, without
regard to the possible consequences, as your oath requires
you to do.

COMMONWEALTH OF MASSACHUSETTS

HAMPSHIRE, ss.                                    SUPREME JUDICIAL COURT
                                                  DOCKET NO. SJC-09919

                                                  SUPERIOR COURT
                                                  NO. HSCR2005-00025-00028

COMMONWEALTH OF MASSACHUSETTS

v.

BRYAN JOHNSTON

AFFIDAVIT OF ATTORNEY ALEXANDER NAPPAN

I, Alexander Nappan, swear and affirm:

1.  I, along with Attorney Edward Berlin, represented Bryan Johnston in the above-captioned case.

2.  I offered a defense that Bryan Johnston lacked criminal responsibility for the shooting of David Sullivan.

3.  Regarding the evidence of Johnston's refusal of field sobriety tests, I knew that this evidence was inadmissible. I was surprised when the prosecutor elicited this evidence because it seemed clearly inadmissible.  If I had known that the prosecutor was going to elicit the refusal evidence, I would have moved in limine to keep it out. I did not want to object in front of the jury, which I felt would highlight Johnston's refusal and also make the defense look like it was hiding something from the jury.

4.  I elicited the fact that Johnston took and failed one of the field sobriety tests (the horizontal gaze nystagmus test) because I wanted to demonstrate that Johnston at the time of his interaction with the police was under the influence of alcohol and still coherent and respectful.

5.  Regarding the evidence of Johnston's refusal to speak to Bridgewater and jail staff (including on the advice of counsel), my views were similar to my view of the refusal evidence described above. That is, I knew that the evidence was inadmissible. Again, I was surprised that the prosecutor elicited what I thought was obviously inadmissible evidence. Based on my previous experience with this prosecutor, I thought she would not elicit evidence that was so clearly inadmissible. Therefore, I did not move in limine to exclude the evidence. I also did not move to strike the evidence because I did not want the jury thinking that the defense was hiding information from them. I did what I thought was the next best option; I sought and obtained a limiting instruction informing the jurors that Johnston had the right not to speak on the advice of

counsel. I argued in my closing that the jurors should not hold Johnston's silence against him. These measures were all what I would call damage control. I never wanted this evidence put before the jury. If I could have excluded the evidence without doing so in front of the jury, I would have tried to exclude it.

6.  I am informed that the defense psychiatrist, Dr. Martin Kelly, was the first witness to mention Johnston's refusal to speak to doctors, jail staff, and hospital staff about his case. I do not remember him being the first witness to mention this topic. However, I can say with assurance that Dr. Kelly's reference to it was unexpected. I certainly had no intention of eliciting that from him.

7.  Regarding the prosecutor's use of the "Lamb" warnings to suggest that Johnston was criminally responsible, my approach was similar to the evidence of Johnston's refusal of the field sobriety tests and his silence with hospital and jail staff.

    (a).  Before Dr. Feldman interviewed Johnston, I explained to him that we wanted to investigate an insanity defense. I explained the legal concepts involved in an insanity defense. I explained that Dr. Feldman was part of the defense team and that we would see what Dr. Feldman's evaluation of the case was. If it was helpful to us, we would use Dr. Feldman as a witness. I approached these explanations with a great amount of care and caution because I was trying to explain complicated legal concepts to a client who I perceived to be mentally ill and paranoid. I did so in order to ensure that the client understood and trusted the actions that I was taking on his behalf.

    (b).  When Dr. Feldman conducted her videotaped examination, I expected that she would be giving Johnston the Lamb warnings including the warning that the interviews were not confidential. That is due in part to the fact that I was present when she previously interviewed Johnston and administered Lamb warnings.

    (c).  I was not expecting the prosecutor to use Johnston's responses to the Lamb warnings against him. If I had thought of a basis for excluding this evidence, I would have raised it.

8.  Regarding Dr. Michael Welner's testimony that he requested and did not receive Johnston's email communications, I considered the issue damaging because it suggested to the jury that the defense was hiding something. I did not think the evidence was admissible. However, I did not anticipate the prosecutor eliciting this evidence and so I did not move in limine to exclude it. If I had been able to articulate a basis for an objection to its admission, I would have objected during trial.

9.  At trial, the Court excluded Dr. Kelly's testimony regarding whether Johnston's descriptions of his hallucinations were consistent with mental illness (as opposed to intoxication). I expected that Dr. Kelly would have testified that Johnston's hallucinations were consistent with mental illness and

not intoxication because they were consistent and part of a larger delusional system. When the prosecutor elicited from Dr. Welner that Johnston's hallucinations were inconsistent with mental illness and were instead consistent with intoxication, I thought the evidence was properly admissible. However, it certainly seemed unfair to me that the prosecution could elicit evidence on this topic and the defense was prevented from doing so.

10.   When I cross-examined Dr. Welner, I asked him whether it would have been proper for a psychiatrist to prescribe Ativan and Lexapro for anxiety caused by delusions. The Court excluded the question. I expected that the answer would have been "yes".

11.   The Court excluded Dr. Kelly's testimony about Johnston's statements to him. I expected Dr. Kelly to testify to statements by Johnston indicating that Johnston still harbored paranoid delusions at the time of the interview and sincerely believed them. This is recounted in Dr. Kelly's report. At the very least, I was offering Johnston's statements for the purpose of demonstrating Johnston's then-existing mental state at the time of the interviews. Obviously, I was not offering the statements to prove the truth of Johnston's paranoid delusions.

12.   Regarding Dr. Welner's testimony on direct examination to hearsay, I would have objected to such statements had I considered the issue. I certainly was aware of the rule articulated in *D.Y.S. v. A Juvenile*, 398 Mass. 516 (1986). In fact, I objected on this basis when Dr. Welner tried to testify to Johnston's interactions with David Sullivan, a snow plow driver, Hadley police, and a taxi driver on the day of the shooting. I thought those objections would have been sufficient to alert the trial judge to the issue and to put a stop to that type of testimony. But Dr. Welner continued on with similarly impermissible testimony that I did not want the jury to hear: (a) his summary of witness statements that Johnston was never delusional unless he was intoxicated, (b) Dr. Welner's testimony that witnesses described Johnston as in a good mood and non-delusional on the night of the shooting, (c) Dr. Welner's testimony that acquaintances warned Johnston about his belligerence and use of guns when he drank alcohol and Johnston continued to drink nonetheless, (d) Dr. Welner's testimony that Johnston continued to associate with people that were the subject of his paranoid ideas and that those paranoid ideas were only expressed when Johnston was intoxicated, (e) Dr. Welner's testimony to Johnston's allegedly normal conversations with Lindsay Tucker and Phil Swift on the day of the shooting. When he testified to these things, I was exasperated. I had already objected several times, I did not persist because I thought it would poison the jury against Johnston.

13.   I cross-examined Dr. Welner regarding his use of the term "moon faced" in his report to describe Johnston. I thought that Dr. Welner was using the term in a personally demeaning way, as when he described Johnston as "impish". I was surprised when he testified that "moon face" is a medical term describing a symptom of steroid abuse.

SIGNED UNDER THE PAINS AN PENALTIES OF PERJURY

Alexander Z. Nappan, Esq.
BBO #366900
278 Main Street, Suite 205
Greenfield, MA 01301
413-774-4900

dated: 1/27/11

R. 189

COMMONWEALTH OF MASSACHUSETTS

HAMPSHIRE, ss.                              SUPREME JUDICIAL COURT
                                            DOCKET NO. SJC-09919

                                            SUPERIOR COURT
                                            NO. HSCR2005-00025-00028

COMMONWEALTH OF MASSACHUSETTS

v.

BRYAN JOHNSTON

AFFIDAVIT OF MARTIN KELLY, M.D.

I, Martin Kelly, swear and affirm:

1.     I am a licensed medical doctor specializing in psychiatry.

2.     My current curriculum vitae is attached to this affidavit. It is true
       and accurate.

3.     I was previously retained to consult with Attorney Alexander
       Nappan regarding the case of Commonwealth v. Bryan Johnston.

4.     I am making this affidavit at the request of Bryan Johnston's
       current attorney, David Nathanson.

5.     Regarding the psychiatric treatment of Bryan Johnston prior to the
       shooting in this case, it is acceptable psychiatric practice to
       prescribe anti-anxiety medications to a patient presenting with
       both anxiety and delusions if the patient refuses anti-psychotic
       medications.

6.  Bryan Johnston's hallucinations and delusions were consistent with mental illness and distinguishable from drug-induced hallucinations because they were part of Johnston's delusional system. Drug-induced hallucinations are unlikely to be organized around a delusional system. Instead, drug-induced hallucinations typically present as more random hallucinations unrelated to a delusional system.

7.  Within the psychiatric community, it is generally accepted that visual hallucinations can occur in both paranoid (persecutory) delusional disorder and paranoid schizophrenia. Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 297-317, 299-300, 307, 312, 314, 323-29 (4th ed. 2000) (DSM-IV-TR)

8.  At trial, the Court excluded my testimony about Johnston's description of his delusions and my testimony about why Johnston targeted David Sullivan. Had I been permitted to answer, I would have testified consistent with my report. (attached).

9.  I have reviewed Dr. Michael Welner's report and portions of his trial testimony. In his report and in his testimony, he described Mr. Johnston as "moon faced" when he examined him some fourteen months after his arrest and incarceration. He went on to state that round moon faces "is specifically associated in people who are heavy steroid users" and that it was "absolutely" a left over remnant of

Johnston's steroid use. In my opinion, these views are in error on several accounts. The type of steroids that Johnston took in the past are referred to as anabolic-androgen steroids which bodybuilders and athletes use to build lean muscular body mass and do not cause moon facies or Cushing-oid effects. These effects are caused by glucocorticoid steroids such as long term treatment with Prednisone (or a disease of the adrenal gland called "Cushing's syndrome"). Further, that a side-effect of glucocorticoids such as moon facies resolves within a period of weeks following cessation of that type of steroid or surgical treatment of Cushing's disease. There is no evidence that Mr. Johnston took this type of steroid medication.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY

Dr. Martin J. Kelly
850 Boylston St, Suite 303
Chestnut Hill, MA 02467

Dated: January 19, 2011

 

*Harvard Medical School*

*Associate Professor
of Psychiatry*

**Martin J. Kelly, M.D.**

BOYLSTON CONSULTATION CENTER
*850 Boylston Street, Suite 303
Chestnut Hill, MA 02467
(617) 731-6750
(617) 731-2047 FAX*

March 14, 2006

Alexander Z. Nappan, Esq.
278 Main Street
Suite 205
Greenfield, MA  01301-3302

**Re:  Bryan Johnston**

Dear Attorney Nappan:

At your request I have conducted a psychiatric evaluation of Bryan Johnston for the purpose of rendering an opinion concerning mental diseases or defects present on December 7, 2004 that may have a bearing on the Court's determination of criminal responsibility.  The psychiatric evaluation has consisted of:

1.  Extended psychiatric interviews on February 18, 2005 and February 3, 2006;

2.  Review of records of the Noble Hospital, December 7-8, 2004;

3.  Review of Police reports and witness statements concerning the homicide;

4.  Review of the records of Richard Berlin, M.D., July 23, 2004 – December 10, 2004;

5.  Review of the records of the Bridgewater State Hospital, December 10, 2004 – January 7, 2005;

6.  Review of the reports of the Hadley Police Department for incident of December 7, 2004;

7.  Review of prior police reports in Westfield, Massachusetts extending back to 1998 and reports of the Honolulu Police Department, 2001;

8.  Review of reports of police interviews with various associates and friends of Bryan Johnston including:

    a.  Evan Donovan

    b.  Phillip Swift

Re:  Bryan Johnston
3/14/2006
Page 2

      c.  Tyler Mauk

      d.  Jeremy Levernoch

      e.  Ryan Williams

      f.  Jeffrey Rose

      g.  Adreana Allaire

      h.  Kim Arasmiovicz

      i.  Lyndsay Tucker

      j.  Edward Arasmiovicz

      k.  Gareth Mello

      l.  Ronald Condino

      m. Jennifer Rollins

      n.  Scott Tucker

      o.  Matt Riley

      p.  Dave Duquette

      q.  Kathryn Dempsey

      r.  Justin Bond

      s.  Chris Ames

      t.  Nicole Coulombe

9.  Interviews by telephone of Dr. Richard Berlin (2), Evan Donovan and Phillip Swift (2) and Jeremy Levernoch;

10. Interview of Bruce and Joan Johnston, Bryan's parents and Kim Johnston his sister on February 21, 2005;

11. Written materials by Bryan Johnston in January – February 2005;

12. Police report, October 19, 2002.

     Bryan Johnston is a 24-year-old young man (DOB 10-3-1981) who is charged with murder in the homicide of his long-time friend and high school classmate, David Sullivan.  The homicide occurred on December 7, 2004 shortly after midnight.  It is charged that Bryan went to the Amherst apartment of David and at close range fired multiple shots from a rifle.  He drove away from the scene but on this snowy evening on the way back apparently to his apartment his car became hung up on an obstacle in a

**Re: Bryan Johnston**
**3/14/2006**
**Page 3**

parking lot, which led to police officers coming on the scene. They observed that he had been drinking. After speaking with him at some length, they allowed a friend of his pick him up and drive him home. Shortly after arrival he called his parents who were on their way back from a function in Boston. They were alarmed and very concerned about his mental state. They eventually arrived at his apartment and fearing suicide requested the local police to bring him to the hospital. Bryan struck out at the police officers who had to forcibly restrain him to take him to the Noble Hospital.

At the hospital he required restrains and was thrashing about and expressing suicidal ideation. He was given some medication including Haldol and Ativan. Gradually he calmed down and the restraints were lessened somewhat. Based on his behavior and the information available from the Crisis Team and other sources a diagnosis of a "Psychotic Disorder" was made. He was held at the Noble Hospital for approximately thirty-six hours before being taken into custody from the hospital by the police.

The following day he was seen at the jail by Michael Sherry, Ph.D., forensic psychologist, who recommended that he be sent to Bridgewater State Hospital. Dr. Sherry noted that Bryan was hearing voices and had suicidal ideation. He recommended Bryan be transferred to Bridgewater State Hospital. At Bridgewater he was observed for approximately thirty days. His attorney had instructed him not to discuss the incident but he was cooperative and gave some history. He alluded to being threatened by members of organized crime and certain gangs. It was noted that he had "extreme paranoia," particularly in the months prior to the incident. He did not receive any antipsychotic medication. He was in seclusion for approximately seven days and then transferred to a close observation unit. He was not a management problem. At one point he denied being currently suicidal.

Though he did not describe the incident to the staff at Bridgewater, he did give a history of auditory hallucinations and that he believed they were being orchestrated by

**Re: Bryan Johnston**
**3/14/2006**
**Page 4**

members of organized crime. He related to the examiners an apparently delusional tale
of his experiences three years earlier in Hawaii including waking up with a needle in his
arm, being drugged and paralyzed. While in this state he claimed he was anally raped by
a person from organized crime. This system stemmed at least in part from his thinking
that the father of a young woman with whom he had a platonic relationship believed he
had raped her. Since he was part of the Mafia, he ordered Bryan killed. Though Mr.
Johnston insisted that these were not delusional beliefs, Dr. J. Leonard Peebles felt he had
a psychotic delusional disorder. The Bridgewater staff felt that he was able to return to a
correctional setting and Mr. Johnston returned to the local facility in Northampton in
early January 2005.

He has been at that facility to the present. Initially he was quite suspicious and
felt that certain other inmates were out to harm him at the direction of CPAC Unit of the
state police. This led to some altercations and Mr. Johnston was disciplined. The notions
of various forces, organized crime, the Mafia, the Bloods gang, federal and local law
enforcement were out to harm persisted. In the summer 2005 he was started on
Risperdal, an antipsychotic medication, at a dose he believes is 1.5 or 2mg at bedtime.
He states that this medication has been helpful and that he is somewhat less "anxious,"
though not completely.

**Interview:**

Bryan Johnston was interviewed on two occasions approximately one year apart,
February 18, 2005 and February 3, 2006. Each of the interviews lasted approximately
two hours. On the first interview I was introduced to Bryan by you, his attorney, who he
had come to have some degree of trust. After the introductions we were left alone and he
was responsive and cooperative. He was deferential and often ended his comments with
"sir." In the beginning I explained the limits of confidentiality and told him that I would
be sharing with you, his attorney, my impressions and matters that we discussed. He
appeared to be comfortable with this. During the first interview he seemed to have a
somewhat constricted understanding of the purposes but he was aware that I was a

**Re:  Bryan Johnston**
**3/14/2006**
**Page 5**

psychiatrist seeing him at your request and that the purpose related to his legal charges.
On the second occasion he was more aware and asked certain kinds of questions,
particularly about possible dispositions of his case.

He appeared his stated age and obviously took some care in his appearance.  His
rate of speech was somewhat slowed and measured but he was able to focus and
concentrate.  His intellectual functions were intact with a good fund of information,
concentration and memory functions.  His insight and judgment was impaired.  He
described a delusional system which extended back most prominently to his attending
college in Hawaii, seemingly coming out of a friendship he had with a local girl prior to
going away to school.  He came to believe that her father thought, incorrectly, that he had
raped her and had delegated his associates in organized crime and the Mafia to
exterminate Bryan.  He described being quite terrorized and terrified in Hawaii and
moving from the dormitories to an off campus apartment but that these forces followed
him including following him to his place of employment and the panicky flight from
Hawaii, he mentioned earlier leaving his possessions and his motorcycle, etc.  He related
this in a completely convinced fashion and a sense of disbelief that anyone would not
agree with what he was telling them.

In the second interview session, a year later and after he had been on anti-
psychotic medication, the intensity behind the system was somewhat lessened but he still
appeared to fundamentally believe in the rough outlines of it, i.e. that he had been and
was the Mafia and people that became associated with them including the FBI and CIA,
as well as the gangs, the Bloods and the Latin Kings.  He felt that because of his
background the IRA might be of some possible, but very modest protection.  In
association with these beliefs he described numerous ideas of reference, signs, special
actions or people having specific connection to the paranoid system but likely innocent
gestures or circumstances.  He also appears to have had at least some auditory and visual
hallucinations including over hearing conversations of the people who were out to get

Re:  Bryan Johnston
3/14/2006
Page 6

him, seeing FBI agents repelling down the outside of his apartment building in Hawaii on ropes and others.  There also was a thought disorder quality to his associations and often it was somewhat difficult to follow his intricate and convoluted descriptions of the paranoid system.  Given the density of the system his affect was by comparison relatively flat during his description of it in the interview.  At present his attitude is that his perceptions are correct, though acknowledging other people might have a little trouble believing that.

In the second interview he mentioned that he had been placed on Resperidal by a psychiatrist at the jail and described that as helping somewhat and he was "less anxious." In the interview it was my perception that he was somewhat less *paranoid*, though the system still was present, if he was pressed a bit to describe it.  During the first interview he described that these forces had followed him into the facility and that he had been in a couple of fights in order to protect himself from these forces.  He also felt a device – "a positioning chip, bug" had been implanted in his mouth illegally.  As time has gone on and likely with the help of medication he feels it is still possible that there was some persons in the facility that might bear him ill will but he no longer specifically identified certain individuals or groups.  He has not had any trouble with others for some time.

**Opinion:**

On the basis of the extended psychiatric interviews and a review of the materials cited above it is my opinion that at the time of the homicide on December 7, 2004 Mr. Bryan Johnston had a mental disease that resulted in his lack of substantial capacity to conform his conduct to the requirements of the law.  His mental disease is best characterized as a Paranoid Psychotic Delusional Disorder and/or Paranoid Schizophrenia.

**Comment and Basis for Opinion:**

It is clear from many sources that Bryan's mental illness first manifested itself in Hawaii in the year 2001-2002.  He was under the delusional belief system that the Mafia

**Re: Bryan Johnston**
**3/14/2006**
**Page 7**

and forces connected with them were after him and that there was an imminent threat on his life. He misinterpreted various events and circumstances as confirming the presence of these forces. These thought extended over weeks and months and was noted by friends with whom he was in telephone contact. Because of this he impulsively left Hawaii in 2002 feeling that these forces were closing in on him. He left his apartment in a panic, taking only his clothing, a credit card and his license. He drove his motorcycle to the airport leaving it in a well-lit area. He then went into the terminal and sat in an open area, brightly lit, under observational cameras to protect himself. He believed that certain people in the terminal would have killed him if he moved from that area.

After he returned to Massachusetts he appears to have initially felt somewhat safer but over the next two and a half years there were many instances in which the delusional system became apparent to others. This was particularly true when he drank and was somewhat disinhibited. He confided some of these thoughts to many close friends including Evan Donovan, Phillip Swift and even the victim, David Sullivan.

The delusional system fluctuated and there were many periods in which he was appropriate in social situations. He functioned reasonably well in his college courses and worked approximately twenty-five to thirty hours a week as a security guard in a local hospital. However, in the weeks prior to the shooting his functioning deteriorated.

By mid 2004 the ideas extended beyond the Mafia, the FBI and the CIA, to local gangs called the Bloods and the Latin Kings. Eventually he seems to have come to believe that the Bloods had been delegated the task of exterminating him. As these ideas intensified he became increasingly involved with guns and weapons. He bought several handguns and also the rifle that was used in the homicide. He came eventually to carry a gun with him much of the time for protection, he would explain to some friends. Initially some associates thought this activity was a kind of bravado but gradually a consensus appeared to develop with many of his friends that he was "crazy" and quite dangerous because of the guns. He occasionally shot the gun inappropriately including at birds,

**Re:  Bryan Johnston**
**3/14/2006**
**Page 8**

Animals, passing trains and in other circumstances.  He also pointed guns at friends and associates which alarmed them.

In the fall 2004 he appears to have become increasingly more preoccupied and inappropriate.  By this time friends were avoiding him if at all possible, with few exceptions.  Even those who continued to socialize with him such as his friend, Evan Donovan, were often very uncomfortable with his behavior and several including the victim talked about his changed mental state among themselves and encouraged him to get help.

Though they were not aware of it, in July 2004 he began seeing a psychiatrist, Dr. Richard Berlin.  To Dr. Berlin he told the tale of "Mafia related " incidents in Hawaii and his panicky escape back to Massachusetts.  He told Dr. Berlin that in his sophomore year "people kept away from me at work and at school.  People I told thought I had schizophrenia."  He related the story of the needle in his arm and the anal rape and that he was being chased because someone said he had raped a girl.  Dr. Berlin, who had known Bryan and his family from pervious therapeutic contact, considered the material likely delusional and entertained the diagnosis of a psychotic delusional disorder and schizophrenia.  However, Bryan did not want to take antipsychotic medications, so Dr. Berlin prescribed Lexapro, an antidepressant and Ativan, an anti-anxiety agent.  In several contacts over the next few months Bryan reported doing better to Dr. Berlin, though this was not the case according to his friends.  His school performance was also deteriorating.  His last visit with Dr. Berlin was a month prior to the homicide and Bryan was reporting feeling "much better" with only a few side effects of the medication.  He did not confide in Dr. Berlin any *ongoing* delusional ideas in the course of therapy.

During the day just prior to the homicide he appears to have had an escalating sense of desperation and fear.  He tried to deal with it by keeping active but also being

Re: Bryan Johnston
3/14/2006
Page 9

very concerned with his self-protection and his weapons. On the night of the homicide,
according to interviews and witness statements, he made telephone calls to no fewer than
six friends, including the victim saying he wanted to get together for drinks and hang out.
Each of these people declined to get together with him, likely because of his mental state
and their discomfort with it. He described calling the victim from whom he had been
mildly estranged since June stemming from some remarks Bryan made at a wedding. He
describes the conversation as not unpleasant and that Dave claimed he was just too busy
with schoolwork to get together. While making these calls Bryan had been alone in his
apartment drinking. Ultimately he got in his car, took the rifle and drove to Amherst.

From time to time in the previous months he had felt that Dave had been
somehow connected with these forces, both the Mafia (the Irish Mafia) and the law
enforcement components of the delusional system. He describes an incident being in
Albany at Evan Donovan's with Dan Sullivan, Dave's brother, and people he describes as
law enforcement people. In an account that was somewhat hard to follow he says he was
given an offer that if he testified against Dave's brother he would be placed in the witness
protection program and given a new identity. That night he abruptly left Albany at
4:00AM to return to Massachusetts. According to some sources Dave did not particularly
care to hear about Bryan's preoccupations with of law enforcement and the Mafia, etc.
and was quite blunt in expressing his opinion about Bryan's preoccupations. Dave also
discussed with friends Bryan's need for treatment and asked them to talk to him about it.
Sometimes Bryan regarded Dave as a protector, for example, when he arrived back in
Massachusetts from Hawaii he believed the Latin Kings were to intercept him but didn't
harm him because he was a friend of Dave's. At other times Bryan would tell friends that
they "really didn't know who Dave was, that he really was connected to or the Godfather
of the (Irish) Mafia."

Bryan had the capacity to move other people in and out of the delusional system
such as his friend Jeremy Levernoch. On one occasion because Jeremy was wearing a
red shirt under his jacket this signaled to Bryan that Jeremy was part of the Bloods and

**Re: Bryan Johnston**
**3/14/2006**
**Page 10**

was setting him up for a hit. He went so far as to go to his friend Evan Donovan's house with a gun when Jeremy was there. The people in the apartment were very fearful that something might happen and made him put the gun outside in his car. Jeremy, however, was puzzled and did not understand at all what it was about. Jeremy had been a friend and in fact on the night he was wearing the red shirt that supposedly signaled the connection to the Bloods, Jeremy came back to Bryan's apartment and slept over. In this and other times he could quickly seal over and within a day or a few days act as if nothing happened.

In summary, it is my opinion that Bryan's psychotic mental disorder controlled his behavior and rendered him unable to conform his conduct to the requirements of the law in the homicide of David Sullivan. It is my view that the shooting directly proceeded from his psychotic state and at the time of the homicide Bryan believed that David Sullivan was in a conspiracy to kill him. I do not feel that there are other likely explanations for his behavior. For example, I do not think that it is likely that it was caused by alcohol or substance abuse. Even at present Bryan's psychotic delusional ideas persist some sixteen months later and despite antipsychotic medicine. He also voiced the delusional ideas at times when he has not been drinking. Though steroid paraphernalia and medication was found in his apartment, this is an unlikely explanation since the paranoid ideas have persisted to the present. He told friends he used steroids in Hawaii and in the year or two after he returned. This was at least in part to build himself up for self-protection against the forces that he felt were against him. According to some he may not have used them for about six months prior to the shooting and at the time of the homicide his weight had dropped some twenty or thirty pounds, which is inconsistent with ongoing steroid use. He apparently had used ecstasy in the past but it does not appear he was using it at the time of the homicide and his toxic screen at the Noble Hospital that day was negative.

**Re: Bryan Johnston**
**3/14/2006**
**Page 11**

Ultimately in my view the only credible explanation for the homicide of his friend is that he shot him in the midst of a paranoid delusional belief that David was part of a conspiracy to kill him.

Thank you for requesting my assistance in this very sad and tragic case.

Sincerely,

Martin J. Kelly, M.D.

MJK/tm

\\Sfa15\boylcon$\Reports\2006\Johnston.doc

First Assistant Prosecutor Renee Steese
Northwestern District Attorney's Office
One Gleason Plaza
Northampton, MA 01060-3032

Re: **Bryan Johnston**

March 29, 2006

Dear Ms. Steese,

Pursuant to your request, I have conducted a forensic psychiatric examination of the above defendant. He is a 24 year old resident of Westfield charged with first degree murder in connection with the December 7, 2004 shooting death of David Sullivan.

Subsequent to his arrest, Mr. Johnston's defense attorney has consulted psychiatric and psychological input. To that end, Carol Feldman, Ph.D., J.D. released a report of her inquiry on March 12, 2006, concluding that Bryan Johnston suffered from a major mental disorder that "significantly influenced Mr. Johnston's ability to appreciate the wrongful nature of his behavior"…and "significantly influenced his ability to conform his behavior to the requirements of the law."

On March 14, 2006, Martin Kelly, M.D. released a report of the conclusions of his psychiatric examination. Dr. Kelly opined that Mr. Johnston suffered from a psychotic mental disorder that rendered him unable to conform his conduct to the requirements of the law in the homicide of David Sullivan.

In the aforementioned report, Dr. Kelly characterized Mr. Johnston as "mildly estranged" from the victim prior to the offense. Assessing the instant offense, the psychiatrist asserted "that the shooting directly proceeded from his psychotic state" and added, "I do not think it was caused by alcohol or substance abuse," and "I do not feel that there are other likely explanations" for Bryan Johnston's homicidal behavior. "Ultimately the only credible explanation for the homicide of his friend is that he shot him in the midst of a paranoid delusional belief that David was part of a conspiracy to kill him," concluded Dr. Kelly.

Because issues of criminal responsibility and psychiatric diagnosis have been raised, Mr. Johnston was referred to me for an independent forensic inquiry of the following questions:

Re: Bryan Johnston
*Michael Welner, M.D.*

March 29, 2006

Page 2 of 39

*1) Does Bryan Johnston meet criteria for any psychiatric diagnosis?*
*2) Do any psychiatric diagnoses relate to his killing David Sullivan?*
*3) Apart from psychiatric diagnosis, what clinically significant history contributed to Bryan Johnston's homicide of David Sullivan?*
*4) At the time he shot David Sullivan, was Bryan Johnston substantially able conform his conduct to the requirements of the law?*
*5) At the time he shot David Sullivan, was Bryan Johnston substantially able to appreciate the wrongfulness of his conduct?*

## SOURCES OF INFORMATION

1) Amherst Police Department Call Log
2) Fire Dept. records for December 7, 2004
3) Death certificate of David Sullivan, December 7, 2004
4) Autopsy of David Sullivan, performed by Loren Mednick, M.D.
5) Report of Sgt. Jerry Millar, first officer, December 13, 2004
6) Report of Sgt. C. Pronovost, December 15, 2004
7) Report of Lt. Ronald Young, January 10, 2005
8) Report of Ptl. Jared Tivnan, December 28, 2004
9) Report of Det. Bonnayer, December 20, 2004
10) Statement of Lindsay Tucker, acquaintance of Bryan Johnston, December 14, 2004
11) Statement of Nicole Coulombe, acquaintance of Mr. Johnson December 9, 2004
12) Statements of Matthew Riley, friend of Mr. Riley, December 7 & 13, 2004
13) Statement of Matthew Monaco, acquaintance, December 7 & 14, 2004
14) Statement of Kelly Finn, visitor to home, December 7 & 14, 2004
15) Statement of Kim Arasmiovicz, friend of victim, December 7 & 14, 2004
16) Second interview of Stephen Kubicki, by Det. Sgt. C. Pronovost, December 23, 2004
17) Statement of Dave Duquette, December 7, 13 & 20, 2004
18) Report of Trooper Jonathan Fleming, Massachusetts State Police
19) Statement of Gareth Mello, co-worker, December 7, 2004
20) Statement of Officer Damien Shanley, Hadley P.D., December 7, 2004
21) Statement of Phillip Swift, friend, December 14, 2004 and April 6, 2005
22) Statement of Randy Baker, witness, December 10, 2004
23) Report of Det. Stephen Walsh, January 18, 2005
24) Statement of Charles Thompson, tow truck operator, January 18, 2005
25) Statement of Richard Baranowski, witness, December 11, 2004
26) Report of Officer John Robitaille

Re: Bryan Johnston
*Michael Welner, M.D.*

March 29, 2006

Page 3 of 39

27) Statement of Ronald Condino, employer, December 15, 2004
28) Statement of Jennifer Rollins, neighbor, December 7, 2004
29) Application for involuntary hospitalization, December 7, 2004, 9:15A.
30) Statement of Sgt. Ray Manos
31) Report of Sgt. Blake Gilmore, Underwater Recovery, December 29, 2004
32) Fingerprint reports
33) Firearm purchase & registration records
34) Report of Det. J. Bonnayer, December 20, 2004
35) Report of Det. Gabriel Ting, December 11, 2004
36) Criminalistics reports - examination of Lincoln Town Car, December 27, 2004, crime scene, by Chemist Kellie Bogosian
37) Statement of Adreana Allaire, December 9, 2004
38) Statement of Evan Donovan, friend, December 9, 2004
39) Statement of Jeremy Levernoch, December 17, 2004
40) Statement of Tyler Mauk, friend, December 13, 2004
41) Statement of Jeffrey Rose, friend, December 13, 2004
42) Statement of Ryan Williams, friend, December 23, 2004
43) Statement of Edward Arasimowicz, friend, December 14, 2004
44) Statement of Justin Bond, friend, December 23, 2004
45) Statement of Kate Dempsey, acquaintance, December 13, 2004
46) Statement of Tyler Mauk, friend, December 13, 2004
47) Statement of Scott Taylor, friend, December 14, 2004
48) Statements of Nicole Costigan, friend, December 8, 2004 & February 23, 2005
49) Statement of Chris Ames, acquaintance, December 13, 2004
50) Report of Det. Bonnayer, Dec 19, 2004
51) Statement of Jackie Giangrande, neighbor, December 7, 2004
52) Statement of Jill Zagami, neighbor, December 7, 2004
53) Statement of Carissa Adams, neighbor, December 7, 2004
54) Statement of Chris Aponte, neighbor, December 7, 2004
55) Statement of Evan Brown, neighbor, December 7, 2004
56) Statement of Richard Bushee, neighbor, December 7, 2004
57) Statement of Marie Deletti, neighbor, December 7, 2004
58) Statement of Patricia Flannery, neighbor, December 7, 2004
59) Statement of Edward Haley, neighbor December 7, 2004
60) Statement of Scott Howard, neighbor, December 7, 2004
61) Statement of Julie Nicotra, neighbor, December 7, 2004
62) Statement of Shafraz Nisthar, neighbor, December 7, 2004
63) Statement of Rebecca Shetler, neighbor, December 7, 2004
64) Statement of Catherine Karnoff, neighbor, December 7, 2004
65) Statement of Alex Husted, neighbor, December 7, 2004
66) Grand Jury Hearing, January 19, 2005

Re: Bryan Johnston
*Michael Welner, M.D.*

March 29, 2006

Page 4 of 39

67) Media articles, Rolling Stone, The Republican, Berkshire Eagle, Daily Collegian, Daily Hampshire Gazette
68) Statement of Catherine Karnoff, neighbor, December 7, 2004
69) Photos, from David Sullivan autopsy, crime scene, Bryan Johnston's apartment, Bryan Johnston's firearm, Aqua Vitae
70) Psychiatric records of Richard Berlin, M.D., July 23 – December 10, 2004
71) Noble Hospital records from December 2004
72) Academic records
73) Collect calls from Bryan Johnston to family members
74) Inventory from trunk of Bryan Johnston's car
75) Records from Honolulu Police Department
76) Adult criminal records of Bryan Johnston
77) University of Massachusetts Police records re: Bryan Johnston
78) Amherst Police records re: Bryan Johnston
79) Westfield Police records re: Bryan Johnston
80) Criminalistics report of Carol Courtwright, December 7, 2005
81) Notes of interview of Stephen Kubicki, by Trooper Jonathan Fleming
82) Statement of Luke Chappuis, neighbor, December 14, 2004
83) Statement of Karen Henning, neighbor, January 11, 2005
84) Statement of Nathan Zerbach, neighbor, January 10, 2005
85) Massachusetts State Police incident report, August 13, 1999
86) Property log from Bryan Johnston's residence
87) Records from Hinsdale Police Department re: Bryan Johnston and David Sullivan, February 18, 1999
88) Report of Sgt. Daniel Wildgrube of investigation of January 29 and March 2, 2005 incidents at Hampshire House of Correction
89) Statement of Robert Arsenault, January 29, 2005
90) Statement of Jonathan Spencer, March 14, 2005
91) Disciplinary reports, Hampshire Sherriff's office
92) Instructions on Insanity Defense and lack of Criminal Responsibility
93) Commonwealth v. Urrea (2005)
94) Records, Hawaii Pacific University, September 5, 2000- May 8, 2002
95) Employment records from Baystate Medical Center August 2003 – December 15, 2004
96) Records from Noble Hospital, December 7-8, 2004
97) Records from Hampshire House of Corrections, January 7, 2005 – February 2006
98) Records from Bridgewater State Hospital, December 10, 2004 – January 6, 2005
99) Report of Carol Feldman, Ph.D., J.D., March 12, 2006
100) Report of Martin Kelly, M.D., March 14, 2006
101) Interview of Tyler Mauk, by Det. Gabriel Ting, March 14 & 19, 2006

Re: Bryan Johnston
*Michael Welner, M.D.*

March 29, 2006

Page 5 of 39

102) Interview of Eddie Arasimowicz, by Det. Gabriel Ting, March 14, 18 & 23, 2006
103) Interview of Ryan Williams, by Det. Gabriel Ting, March 14, 17 & 23, 2006
104) Interview of Jeremy Levernoch, by Det. Gabriel Ting, March 14 & 23, 2006
105) Interview of Lindsay Tucker, by Det. Gabriel Ting, March 14, 2006
106) Interview of Bryan Picard, by Det. Gabriel Ting, March 15, 20 & 23, 2006
107) Interview of Nicole Coulomb, by Det. Christina Knightly, March, 2006
108) Interview of Adreana Allaire, by Det. Christina Knightly, March , 2006
109) Statement of Jessica DiGirolamo, March 15 & 23, 2006
110) Records from Westfield State College
111) Interview of Phil Swift, by Sgt. Christopher Pronovost and Det. Gabriel Ting, March 20 & 23, 2006
112) Interview of Derek Chinworth, Smith & Wesson range, by Lt. Ronald Young, March 20, 2006
113) Interview of Jennifer Melle, by Det. Gabriel Ting, March 18, 2006
114) Selected videotaped portions of interview of Bryan Johnston, by Carol Feldman, J.D., Ph.D., early 2005
115) Interview of Bryan Johnston, March 23, 2006
116) Statement of Gareth Mello, March 23, 2006
117) Interview of Dr. Kim Tobin, Westfield State College, March 23, 2006
118) Interview of Dr. Tom Roscoe, Westfield State College, March 23, 2006
119) Interview of Dr. William Cook, Westfield State College, March 22, 2006
120) Interview of Justin Bond, by Det. Gabriel Ting, March 23, 2006
121) Incident report, Westfield State Police Barracks, October 19, 2002
122) Crime scene diagram, 105 Meadow St.
123) Statement of Bruce Reardon, February 21, 2006
124) Statement of Phillip Swift, February 26, 2006
125) Statement of Evan Donovan, March 2, 2006
126) Letters of Bryan Johnston

## MENTAL STATUS EXAMINATION

Bryan Johnston, when interviewed on March 23, 2006, presented as white male who appeared his stated age, of slight bearing, neatly groomed with thinning hair and a moon facies. He engaged me politely but immediately expressed concern about the videotaped equipment being manned by a law enforcement officer in the room. When that officer left the camera to its own devices, Mr. Johnston and I met alone, and began taping with my instructing him that I had been asked to evaluate his case by the prosecutor's office, and the parameters of confidentiality and what to expect from the interview, before proceeding.

R. 208

COMMONWEALTH OF MASSACHUSETTS

HAMPSHIRE, ss.                                    SUPREME JUDICIAL COURT
                                                  DOCKET NO. SJC-09919

                                                  SUPERIOR COURT
                                                  NO. HSCR2005-00025-00028

COMMONWEALTH OF MASSACHUSETTS

v.

BRYAN JOHNSTON

### AFFIDAVIT OF JEFFREY M. KORFF, M.D.

I, Jeffrey M. Korff, swear and affirm:

1.  I am a licensed medical doctor specializing in endocrinology.

2.  My current curriculum vitae is attached to this affidavit. It is true and accurate.

3.  I am making this affidavit at the request of Bryan Johnston's attorney, David Nathanson.

4.  Endocrinology is the medical and biological study of the endocrine system. The human endocrine system is a system of glands which secrete hormones into the bloodstream to regulate body functions such as growth, development, metabolism and mood.

5.  In my practice, I have specific experience with the condition described as "moon face". "Moon face" refers to an identifiably round face which is caused either by endogenous Cushing's syndrome or by the prolonged use of steroids with glucocorticoid properties.

6.  Anabolic steroids are distinct from glucocorticoids. Anabolic

steroids do not cause moon face and they do not cause Cushing's

syndrome.

7.  I have been informed that Bryan Johnston is alleged to have taken

the following substances: Deca, Proprio, Sustanon, and Stenandiol.

Deca is the anabolic steroid nandrolone. Proprio is the anabolic

steroid testosterone proprionate. Sustanon is a blend of four

different testosterone esters all of which are anabolic steroids.

Stenandiol is the precursor or prohormone androstenediol that can

be converted to testosterone but not to a glucocorticoid. None of

these substances would be capable of causing Cushing's syndrome

or a "moon shaped" facial appearance as that term is used in

endocrinology.

8.  In my practice, I have specific experience with the effect of steroids

on body shape. Specifically, I have treated patients with gender

identity issues who have sought treatment to change their body

shape through the use of steroids. I also have specific experience

with people who have the symptom "moon face".

9.  I have reviewed the following photographs of Bryan Johnston:

Hawaii driver's license dated 11/16/2001, a booking photo dated

11/22/2004, a different booking photo from fall 2004, and the

Department of Correction "Offender Face Sheet" dated 4/28/2006. I