UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                      )
BRYAN R. JOHNSTON,                    )
                                                      )
         Petitioner,                           )
                                                      )
v.                                                  )          Civil Action No. 15-12332-JCB
                                                      )
LISA A. MITCHELL,                        )
         Respondent.                         )
_____ )

## RESPONDENT LISA A. MITCHELL'S MEMORANDUM IN OPPOSITION TO THE PETITION FOR WRIT OF HABEAS CORPUS

The petitioner, Bryan Johnston, was convicted of first degree murder, armed burglary, possession of a large capacity firearm in the commission or attempted commission of a felony, and possession of a large capacity firearm without a license. After an unsuccessful appeal to the Massachusetts Supreme Judicial Court ("SJC"), Johnston filed the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. As grounds for relief, Johnston claims that his trial counsel was constitutionally ineffective for four shortcomings: (1) failing to move to suppress his post-*Miranda* responses to questioning at the jail and at Bridgewater State Hospital, (2) failing to move to exclude references to his invocations of his rights to silence and to counsel; (3) failing to object to the prosecutor's insinuation that Johnston's early consultation with counsel indicated a false "constructed" defense; and (4) failing to understand and in fact eliciting the prosecution expert's erroneous conclusion that Johnston was "moon faced" from anabolic steroid use. The respondent submits this memorandum in opposition to the petition for habeas corpus. As detailed below, this Court should deny the petition because the petitioner cannot demonstrate that he is entitled to the extraordinary remedy of habeas corpus.

1

## PRIOR PROCEEDINGS

Following a twenty-three day trial, a Hampshire County jury found Johnston guilty of:

(1) murder in the first degree on theories of deliberate premeditation, extreme atrocity or cruelty, and felony-murder; (2) armed burglary; (3) possession of a large capacity firearm in the commission or attempted commission of a felony; and (4) possession of a large capacity firearm without a license. *Commonwealth v. Johnston*, 467 Mass. 674, 7 N.E.3d 424 (2014) (S.A.887-914).[1] Johnston's motion for new trial was denied without a hearing. *Id*. (S.A. 505-539). His appeal of the denial of that motion was consolidated with his direct appeal to the Supreme Judicial Court. *Id*. The SJC affirmed the convictions and declined to reduce the degree of guilty or order a new trial pursuant to its power under G.L. c. 278, § 33E. *Id*. On June 15, 2015, Johnston filed a Motion for Reduction of Verdict, or in the Alternative, for a New Trial. (S.A.916-918). The motion which was denied by the Hampshire Superior Court because it "did not allege sufficient grounds to justify the extraordinary relief requested in view of the evidence presented at trial before me and the resolution of related issues on appeal." (S.A.10).

On, June 6, 2105, the petitioner filed this petition for writ of habeas corpus.

## STATEMENT OF FACTS

In federal habeas corpus proceedings, "a determination of a factual issue made by a state court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1); *see also Evans v. Thompson*, 518 F.3d 1, 3 (1st Cir. 2008).   The statutory presumption extends to "findings [that] are made by a state appellate court as well as [those that] are made by a state trial court." *Rashad v. Walsh*, 300 F.3d 27, 35 (1st Cir. 2002); *see also, e.g., Pina v. Maloney*, 565 F.3d 48, 50 (1st Cir. 2009) ("'We take the facts as recounted by the [SJC] decision affirming [the petitioner's] conviction,

---

[1] "S.A.__" refers to the Supplemental Answer filed on September 11, 2015. "R.__" refers to the Record Appendix filed by Johnston with his Memorandum on October 23, 2015.

supplemented with other record facts consistent with the SJC's findings,'" *quoting Yeboah-Sefah*

*v. Ficco*, 556 F.3d 53, 62 (1st Cir. 2009)). "The petitioner bears the burden of overcoming that

presumption by providing 'clear and convincing evidence.'" *Teti v. Bender*, 507 F.3d 50 (1st

Cir. 2007), *quoting* 28 U.S.C. § 2254(e)(1). Here, the SJC summarized the relevant findings by

the trial judge as follows:

The Offenses:

> [Johnston] and the victim were members of a large circle of friends who had
> graduated from the same high school in June 2000, and remained close. Both men
> attended a friend's wedding in June, 2004. The defendant became drunk and told
> the victim's girl friend that her brother was taking drugs. This upset her, and she
> asked the victim if what [Johnston] told her was true. The victim confronted
> [Johnston]. The details of the conversation are not certain.
>
> [Johnston] telephoned the victim at about 10:30 P.M. on December 6, 2004, and
> invited to him to go out drinking. The victim declined and the conversation did
> not end well. Few details of the conversation are known. A few minutes later the
> victim told his girl friend that [Johnston] "[w]as not the same anymore." At about
> the same time a woman who lived in an apartment directly above [Johnston's]
> apartment heard angry shouting and cursing coming from [Johnston's] apartment.
> It sounded as if it were taking place during a telephone call.
>
> Shortly thereafter [Johnston] drove approximately thirty-one miles from his
> apartment in Westfield to the house in Amherst where the victim lived. At about
> 12:30 A.M. on December 7, the defendant entered the house. He had been there
> many times. He walked upstairs to the victim's bedroom with a rifle and fired six
> hollow-point bullets into the victim, killing him. A roommate of the victim, the
> only other person in the house, heard the gunshots but he did not see the shooter.
> He telephones 911 and Amherst police arrived within minutes.
>
> On his way back to Westfield [Johnston] stopped in the vicinity of a restaurant in
> Hadley. He disposed of the rifle in a wooded swampy area. As he was leaving he
> drove over a log, immobilizing his car. A snow plow operator stopped to help.
> [Johnston] said he had been drinking and did not want the police to come. The
> operator applied his own strength while the defendant worked the car's engine,
> but they were unable to free the car. [Johnston] asked the operator to use his
> truck, but the operator declined and drove off.
>
> At about 12:45 A.M. two Hadley police officers driving separate police cars were
> dispatched to the area of the restaurant. They observed [Johnston's] disabled car

and stopped. [Johnston] approached one officer and said that his car was stuck and he needed help to free his car.

He added that he had come from a friend's house and had stopped to urinate. The officers detected a mild odor of alcohol on the defendant's breath. His eyes were glassy and mildly bloodshot. When asked if he had been drinking [Johnston] said that he had consumed some alcohol much earlier that evening, but was fine at that time. [Johnston] said that he was a Springfield police officer, but later clarified that he was a special police officer at Baystate Medical Center (Baystate) in Springfield. One of the officers had worked at Baystate and telephoned a night supervisor there. He learned that [Johnston] was not a Baystate special police officer but a patrol officer. When he confronted [Johnston] with this information, [Johnston] apologized and said he had taken the test to become a Baystate security officer (the next position above patrol officer) and in his mind he thought he had the job.

When asked to perform a series of field sobriety tests [Johnston] said that one of his college professors told him that field sobriety tests were illegal, so he was unwilling to perform them at that time. [Johnston] asked if he was going to be arrested. He was told that he would not be arrested, but that the officers needed to have him take a series of tests to determine if he was capable of driving his car safely. [Johnston] agreed. After administering one field sobriety test and based on their other observations of [Johnston], the officers determined that he was too impaired to drive safely. Arrangements were made to have [Johnston's] car towed away. [Johnston] was allowed to telephone a friend (a security officer at Baystate) who arrived and drove him to Westfield.

At 12:58 A.M. on December 7, 2004, while he was waiting for his friend to arrive and drive him to Westfield, [Johnston] left a voice message for a female friend. He apologized for missing her call and said he was "wondering what you're up to tonight." He spoke in his typical "calm, easygoing, fun-loving ... nonchalant" tone.

As [Johnston's] friend was driving him home from the restaurant [Johnston] said, "It's a good thing the cop didn't search me.... I have my piece on me." [Johnston] produced a handgun and said there were six rounds in it. He also said that his license to carry a gun had been revoked.

As a result of a telephone call [Johnston] made to his parents at about 4:45 A.M. on December 7, they drove from Boston to Westfield and initiated civil commitment proceedings against him. At about 9 A.M. the same day two Westfield police officers went to the defendant's apartment and asked him to accompany them to Noble Hospital in Westfield for a psychiatric evaluation that was ordered by a District Court judge pursuant to G.L. c. 123, § 12, on the application of his parents. The defendant refused to comply and a struggle ensued. [Johnston] was subdued through the use of pepper spray.

4

In the meantime, Amherst and State police investigators were given the name of the defendant by the victim's girl friend. They went to the [Johnston's] apartment in Westfield and were made aware of the [Johnston's] civil commitment. [Johnston's] father consented to a search of his own car, which contained some items he and his wife had removed from [Johnston's] apartment for their son's safety, including a .38 caliber handgun. [Johnston's] father also consented to a search of [Johnston's] apartment. Among the items recovered from the two locations were a .223 caliber magazine having a capacity of ninety rounds, and a loaded .40 caliber Sig Sauer pistol. The next day, December 8, investigators returned to [Johnston's] apartment with a search warrant. They recovered several items, including a "fanny" pack containing hypodermic syringes and bottles of two different anabolic steroids. From a Dumpster at the apartment complex, investigators also recovered a gun case capable of holding a rifle.

During a search of the wooded swampy area near the Aqua Vitae restaurant on December 9, police recovered a .223 caliber Colt model CAR–A3 semiautomatic rifle, one live round of ammunition found near the rifle, and a forty-round magazine. Two latent fingerprints found on the rifle matched those of the defendant. Deoxyribonucleic acid (DNA) testing of blood found on [Johnston's] jeans matched the DNA profile of the victim.

Trial counsel told the jury in his opening statement that the defense was lack of criminal responsibility. The Commonwealth's theory was that [Johnston] did not suffer from a mental illness, and any delusions he ever experienced were the result of substance abuse. The Commonwealth also focused upon the absence of any evidence of delusional thinking on the part of [Johnston] in the hours before and approximately one hour after the killing.

*Johnston,* 467 Mass. at 677-681, 7 N.E.3d at 429-431.

History relevant to criminal responsibility:

A great many of the issues in this appeal involve the subject of criminal responsibility. Rather than recite facts that the jury could have found in returning a verdict of guilty, it is more useful to offer a summary of the evidence relevant to criminal responsibility.

[Johnston] was a regular user of alcohol and drugs in high school, as were many of his friends. After high school [Johnston] attended Hawaii Pacific University. His substance abuse continued, and he began experiencing delusions and hallucinations. In December, 2000, during the holiday break after his first semester, [Johnston] told his father he wanted to move out of the dormitory and get his own apartment. He reported that a roommate's father was involved with the Chicago mafia, and it made him feel uncomfortable.

[Johnston]'s sister visited him at college in the fall of 2001. He told her not to answer his telephone because it was "bugged." He reported that Federal Bureau of Investigation (FBI) agents had rappelled off the roof of his apartment complex and observed him from the window of his twenty-seventh floor apartment. This caused him to keep his curtains closed. In addition, he informed his sister that a next door neighbor had watched him through the walls, and that a pizza shop in the commercial space of his apartment building was run by the mafia.

In January, 2002, a friend (the brother of the victim's girl friend) visited him at college. The two men spent most of their time together drinking alcohol and taking drugs. By April, 2002, [Johnston] left Hawaii in haste and refused to return. When his family suggested they go back to Hawaii to retrieve his belongings, he said they could not do that because their lives would be in danger. He explained that he had to leave because various ethnic mafia groups and gangs (he mentioned the "Bloods") were going to kill him and his family. [Johnston] began taking steroids to help protect himself and his family. He wanted people to fear him because he felt vulnerable. After he left Hawaii his family and friends did not recognize [Johnston] as the same person they once had known. He rejected his father's request that he see a psychiatrist.

In September, 2002, [Johnston] enrolled at Westfield State College (now University) as a criminal justice major. He moved out of his parents' home and took an apartment in Westfield. His professors recalled him as being friendly, highly competent, intelligent, and well respected by his peers. They did not observe any unusual behavior or comments. On October 19, 2002, [Johnston] walked into the State police barracks in Westfield and claimed people were chasing him. A State police officer tried to reassure him that no one was in the parking lot. [Johnston] would not accept the officer's assertions as true, and he dialed 911. [Johnston]'s state of agitation did not abate, so the officer telephoned [Johnston]'s father and then handcuffed [Johnston] to a bench for safety purposes. After his father arrived [Johnston] was released. [Johnston] told his father that he had visited a friend in the Albany, New York, area and was followed by the mafia on his drive back to Westfield.

[Johnston] refused an offer to move into the victim's apartment in Amherst because he believed that the victim was a crime family boss and that a great many of their group of friends were involved with organized crime. He also reported that the victim had told him that his crime family had paid to have [Johnston] anally raped in Hawaii, and that they "bugged" his apartment in Hawaii and his parents' home. [Johnston] claimed to have seen the victim at Westfield State College the day before the murder. The victim walked out of a class (where he was not a student), smiled eerily at [Johnston], and said, "I can get you whenever I want."

In November, 2003, [Johnston] obtained employment as a security officer at Baystate. He was considered polite and very reliable. He was well liked.

6

[Johnston] dealt with gang members there without displaying or expressing any fear of them.

On at least five occasions between November, 2003, and mid-November, 2004, [Johnston] brandished a firearm when he was in the company of his friends. Each occasion involved a different friend. In several of those instances he fired his gun at an inanimate object. In several instances he pointed his gun at the friend. On at least two occasions he alluded to a belief that the friend was involved with organized crime. On at least one occasion he acknowledged that alcohol had brought on his behavior.

[Johnston] experienced paranoid delusions both when he was intoxicated or on drugs, and when he was sober. He was not always delusional when intoxicated or on drugs. His delusional fear of organized crime families and of gangs intensified during the six months preceding the victim's death.

In July, 2004, [Johnston] began psychiatric treatment with Dr. Richard Berlin. Lexapro, an antidepressant, provided modest relief. However, by October, 2004, [Johnston] presented with increasing anxiety. By November, 2004, he was sweaty and tense. He reported weekly panic attacks and "out of body" experiences.

Approximately four hours after the murder, at 4:45 A.M. on December 7, 2004, [Johnston] telephoned his parents. He was making no sense, talking about the mafia and gangs, and threatening to commit suicide. At 6 A.M., his sister, a psychiatric nurse, returned a telephone call she had received from him. He made no sense. When his parents arrived at his apartment at 8 A.M., he was saying bizarre things and his eyes were unfocused. As mentioned earlier, Westfield police officers served a commitment order on him later that morning. He was taken forcibly to Noble Hospital in Westfield, where he was placed in four-point restraints and sedated. A toxicology screen was negative for cocaine and amphetamines.

*Johnston,* 467 Mass. at 680-682, 7 N.E.3d at 431-433.

Expert testimony:

[Johnston] presented the opinion testimony of two experts: Dr. Carol Feldman, a forensic psychologist, and Dr. Martin Kelly, a forensic psychiatrist.

Dr. Feldman opined that, at the time of the killing, [Johnston] suffered from the mental illness paranoid schizophrenia and, although he generally appreciated the wrongfulness of killing, he lacked substantial capacity to appreciate the wrongfulness of killing the victim, and he was unable to conform his conduct to the requirements of the law. She explained that [Johnston] believed he was being persecuted by several organized crime groups, and he believed himself to be the prisoner of the victim. She had interviewed [Johnston] six times, describing one

interview in which [Johnston]'s facial color deepened to purple, his tone was emotionally intense, and he was "floridly psychotic" as he described circumstances that caused him to flee Hawaii, namely, persecution by organized crime. Dr. Feldman determined that [Johnston] had experienced hallucinations in which he heard voices of people intending to kill him, and delusions of being subjected to surveillance.

Dr. Kelly testified that [Johnston] lacked criminal responsibility due to a paranoid delusional disorder. He described [Johnston]'s illness as an "extensive belief system about the world and particularly about certain forces having evil intent ... to harm and to kill him and his parents." Dr. Kelly indicated that the disorder does not go into remission without medication, and that the intensity of [Johnston]'s delusions had abated somewhat because he had been placed on a relatively low dose of Risperdal, an antipsychotic medication. Unlike paranoid schizophrenia, a paranoid delusional disorder is not characterized by a decline in functioning, which explains his capacity to work at Baystate and attend college. Both disorders tend to onset between the late teens and mid-twenties.

Dr. Kelly ruled out cocaine and alcohol intoxication as the cause of [Johnston]'s delusions. He also opined that cocaine could not have played a part in the killing because the toxicology screen done at Noble Hospital approximately twelve hours after the shooting was negative for cocaine and amphetamines, a reliable basis to exclude recent cocaine use.

Dr. Kelly also ruled out "ecstasy," an amphetamine [Johnston] was known to use, as a cause of [Johnston]'s delusions. Amphetamines, he said, do not cause systemized delusions such as [Johnston]'s, and psychosis is a very rare complication of amphetamine use. But even if [Johnston] had experienced the rare psychosis induced by amphetamines, the symptoms typically disappear after a few days, or after weeks or months at most. They do not persist for fifteen months, the duration of [Johnston]'s psychotic symptoms after the shooting.

Dr. Kelly opined that alcohol did not cause [Johnston]'s delusions. He noted that [Johnston] experienced his delusions when he was sober (e.g., during his sessions with Dr. Berlin), as well as when he was drinking.

The Commonwealth's expert in rebuttal, Dr. Michael Welner, a forensic psychiatrist who also was board certified in psychopharmacology (the science of treatment of psychiatric conditions with medication and physical treatment), testified that [Johnston] did not suffer from a major mental illness. He ruled out paranoid delusional disorder because [Johnston] had reported to Dr. Berlin that his symptoms were not worsening or intensifying. He also considered that [Johnston] did not report persecutory or delusional behavior on the job or at school, and that up to the night of the shooting [Johnston] continued to be sociable, even though his friends avoided him.

8

> Dr. Welner opined that [Johnston]'s hallucinations originated from his drug use, and not from mental illness. He explained that psychiatric illness is primarily associated with auditory hallucinations, not visual hallucinations. When a person has visual as well as auditory hallucinations, the indication is that they are drug induced.
>
> Dr. Welner cited [Johnston]'s ability to mislead Hadley police officers about where he had been and his concerns about their presence as evidence of his ability to appreciate the wrongfulness of his conduct.

*Johnston,* 467 Mass. at 683-686, 7 N.E.3d at 433-434.

## ARGUMENT

**I.    Standard of Review:**

   a.   Habeas Corpus Review

A petitioner seeking relief pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) must achieve a steep climb.  *See Cooper v. Bergeron*, 778 F.3d 294, 299 (1st Cir. 2015), *citing* Pub. L. No. 104-132, 110 Stat. 1214 (codified at 28 U.S.C. § 2254); *also citing Johnson v. Williams*, 133 S. Ct. 1088, 1094 (2013); *Harrington v. Richter*, 562 U.S. 86, 98-99 (2011). Under 28 U.S.C. § 2254, this Court's review of the state court's decision is highly deferential. *See King v. MacEachern*, 665 F.3d 247, 251 (1st Cir. 2011).

Pursuant to AEDPA, a federal court cannot grant habeas relief on a claim that was "adjudicated on the merits" in state court unless the state court decision at issue is "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).  Alternatively, "the second scenario justifying habeas relief is if the state court adjudication led to 'a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Hensley v. Rodin*, 755 F.3d 724, 731 (1st Cir. 2014), *quoting* 28 U.S.C. § 2254(d)(2). Only a legal or factual error that is objectively unreasonable warrants relief.  *Cooper,*

778 F.3d at 299, *citing White v. Woodall*, 134 S. Ct. 1697, 1702 (2014); *Burt v. Titlow*, 134 S. Ct. 10, 15 (2013); *see also Hensley*, 755 F.3d at 731.

To satisfy Section 2254(d)(2), a petitioner must show that the state's decision was based on factual determinations that were objectively unreasonable.  *See Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003), *citing Williams*, 529 U.S. at 399.  Objective unreasonableness is not merely an incorrect or erroneous decision.  *See Williams*, 529 U.S. at 410; *see also Ward v. Sternes*, 334 F.3d 696, 703-04 (7th Cir. 2003) ("[P]etitioner's challenge to a decision based on a factual determination will not succeed if petitioner merely evidences that the state court committed error.  Instead, he must further establish that the state court committed unreasonable error.").  A habeas petitioner "must clear a high hurdle before a federal court will set aside any of the state's factual findings."  *Mastracchio v. Vose,* 274 F.3d 590, 598 (1st Cir.2001).

Finally, even if a petitioner clears one or more of the hurdles in § 2254(d), he still is not automatically entitled to relief.  Instead, the federal court must conduct *de novo* review of the claim, requiring the petitioner to demonstrate that he "is in custody in violation of the Constitution or laws or treaties of the United States."  *Aspen v. Bissonnette,* 480 F.3d 571, 576 (1st Cir. 2007) (quotation omitted).  "This means that a petitioner must show that his underlying detention is unlawful and not just that the state court employed faulty reasoning in his case."  *Id.*  Even under a *de novo* standard of review, the petitioner must demonstrate "that Supreme Court precedent requires an outcome contrary to that reached by the relevant state court."  *Id.; accord Kater v. Maloney*, 459 F.3d 56, 63-64 (1st Cir. 2006) ("Whether habeas review is under the deferential standard provided in § 2254(d)(1) or under the de novo standard . . . , state habeas petitioners may not seek release on federal law grounds which have yet to be

clearly established.").  Applying these stringent standards of review Johnston's petition must be denied.

> b.  <u>The Standard of Review for Ineffective Assistance of Counsel Claims in a Habeas Proceeding is Doubly Deferential</u>.

All of the grounds for relief being raised by Johnston involve a claim of ineffective assistance of counsel.  These claims involve mixed questions of law and fact and are generally reviewed under the unreasonable application clause of 28 U.S.C. § 2254(d)(1). *Teti v.*, 507 F.3d. at 57; *Shuman v. Spencer,* 636 F.3d 24, 31 (1st Cir. 2001).

The clearly established federal law governing ineffective assistance of counsel claims is set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *See Williams v. Taylor,* 529 U.S. 362, 390-391 (2000). On direct review under *Strickland*, a criminal defendant must establish two elements to prevail: first, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment; second, the defendant must show that the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687.  Both deficient performance and prejudice must be shown, otherwise "it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Id*. On habeas review, the AEDPA standard is layered over the already-deferential *Strickland* standard, resulting in a standard of review that is "doubly deferential." *See Yeboah-Sefah*, 556 F.3d at 65.

The Supreme Court has repeatedly "reinforced the 'doubly' deferential standard that applies to a state prisoner's claims in a federal habeas petition that a state court has unreasonably applied to the *Strickland* principles." *Jewett v. Brady*, 634 F.3d 67,75 (1st Cir. 2011), *citing Richter*, 131 S. Ct. 770. The Court emphasized that under AEDPA "[t]he pivotal question' in a

federal collateral attack under *Strickland* is not 'whether defense counsel's performance fell

below Strickland's standard,' but whether the state court's application of the *Strickland* standard

was unreasonable.'" *Id.*, *quoting Richter*, 131 S. Ct. at 786. Additionally, the Court reiterated that

the "*Strickland* standard is a very general one, so that state courts have considerable leeway in

applying it to individual cases." *Id.* (citing R*ichter*, 131 S. Ct. at 786). Finally, "when § 2254(d)

applies, the question is not whether counsel's actions were reasonable," but rather "the question

is whether there is any reasonable argument that counsel satisfied Strickland's deferential

standard." *Shuman*, 636 F. 3d at 31, *citing Richter*, 131 S. Ct. at 788.

## II.     The SJC Reasonably Rejected Johnston's Claim That Trial Counsel Was Ineffective for Failing to Move To Suppress Statements Made at the Jail and Bridgewater State Hospital.

### a.     Johnston is Not Entitled to De Novo Review Because the SJC Adjudicated His Ineffective-Assistance-of-Counsel Claim on the Merits.

AEDPA applies to Johnston's claim that his counsel was ineffective for failure to

suppress statements made at the Hampshire County House of Correction ("jail") [2] and

Bridgewater State Hospital ("hospital")[3] because the SJC adjudicated the claim on the merits.

The crux of Johnston's argument to the contrary rests on the assertion that the SJC did not

adjudicate the "substantive Fifth Amendment"  aspects underlying the ineffective-assistance-of-

counsel claim, and therefore, he is entitled *de novo* review. (P.Memo 19). However, as discussed

below, the SJC's opinion indicates that it considered, and rejected, both the Fifth and Sixth

Amendment aspects of this ineffective-assistance-of-counsel claim.  Thus, Johnston fails to rebut

---

[2] It is not clear from the record or Johnston's memorandum, which statements were made at the Hampshire Jail that he claims should have been suppressed. He references R. 172 in his memorandum, (P.Memo 15), which indicates that Johnston said, "my lawyer said 'not to say a word' he will be in tomorrow morning and will take care of everything then." That same record also states that "he was alert and he responded to appropriate questions and directions," but does not describe of any other statement made by Johnston.

[3] Johnston was transferred to Bridgewater State Hospital for an evaluation pursuant to M.G.L. c.123, §18(a), to determine whether he was "in need of hospitalization by reason of mental illness."

the presumption that the claim was adjudicated on the merits, and the AEDPA deferential standard of review applies.

Section 2254(d) demands inquiry into whether a prisoner's "claim" has been 'adjudicated on the merits' in state court; if it has AEDPA's highly deferential standards kick in. *Davis, Acting Warden, v. Ayala*, 135 S. Ct. 2187, 2198 (2015), *citing Richter*, 562 U.S. at 103. The Supreme Court re-affirmed that "a state court need not cite or even be aware of [the United States Supreme Court's] cases" to be entitled to deference under § 2254(d). *Richter*, 562 U.S. at 98, *citing Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam). When a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits. *Johnson v. Williams*, 133 S. Ct. 1088, 1094 (2013). As the Court in *Johnson* explained, there are circumstances where the state precedent may fully incorporate the related federal constitutional right; a state court may regard a fleeting reference to the federal constitution or precedent as insufficient to raise a separate claim; or a state court may regard a claim as too insubstantial to merit discussion. *Id*. Under those circumstances, a state court may not explicitly address a specific claim, but are still deemed to have adjudicated it on its merits. *Id*.

Here, the SJC explicitly addressed, and denied, Johnston's claim that trial counsel was ineffective for failing to suppress the statements at issue.  *Johnston*, 467 Mass. at 686-689, 7 N.E.3d at 435-437. Johnston seeks *de novo* review on grounds that he raised a "substantive Fifth Amendment" argument for suppression that was "explicitly misconceived" by the SJC. (P.Br. 18). To the contrary, the SJC did not omit or ignore Johnston's argument that he should not have been approached after he invoked his right to counsel, even though it did not explicitly mention the Fifth Amendment when it rejected his claim.

The SJC discussed this particular ineffective assistance claim in Section 2.b. of its opinion. *See Johnston*, 467 Mass. at 686-688, 7 N.E.3d at 435-36. The court first specified that Johnston "does not argue that he invoked his right to remain silent," indicating that the court's attention was drawn to potential Fifth Amendment aspects of the claim. *Id.* at 687, 7 N.E.3d at 435-36. The SJC then addressed Johnston's right to counsel.  Although the SJC only explicitly mentioned the Sixth Amendment in this regard, it clearly addressed the Fifth Amendment aspects that Johnston now argues were misconceived by the court, namely, whether "[Johnston's] refusal to answer questions on the advice of counsel … required the hospital staff to refrain from talking to him." *Id.* at 687, 7 N.E.3d at 436. The SJC rejected this argument and also correctly noted that "[a] defendant does not have a Sixth Amendment right to have his lawyer present during the court-ordered psychiatric interview." *Id.* at 687, 7 N.E.3d at 436. In support of these conclusions, the SJC cited *Estelle v. Smith*, 451 U.S. 454 (1981), and *United States v. Byers*, 740 F.2d 1104 (D.C. Cir. 1984), cases that discuss both the Fifth and Sixth Amendment aspects of such a claim at length. *Id.* at 687-88, 7 N.E.3d at 436. *Richter* and its progeny require no more for AEDPA deference to apply. *See Johnson*, 133 S. Ct. at 1097.[4]

b. The SJC Reasonably Rejected the Fifth Amendment Aspects of Johnston's Ineffective-Assistance-of-Counsel Claim.

The SJC reasonably rejected the Fifth Amendment as a basis for Johnston's claim that his counsel was ineffective for failing to move to suppress the statements at issue because Supreme Court precedent does not clearly establish a basis for exclusion of the statements under the Fifth Amendment. The right to counsel under the Fifth Amendment is to protect against compelled self-incrimination during custodial interrogation. *See Miranda v. Arizona*, 384 U.S. 436, 466 (1966); *see also Edwards v. Arizona*, 451 U.S. 477 (1981).

---

[4] Nonetheless, for the reasons discussed below, Johnston's claim would fail under either the AEDPA standard or under a de novo standard of review.

The Supreme Court has addressed the application of the Fifth Amendment to court-ordered psychiatric evaluations in at least three cases.  The defendant in *Estelle*, while in custody, was ordered to undergo a psychiatric evaluation only on the issue of his competency to stand trial. 451 U.S. at 466. The state later used that psychiatrist's testimony to demonstrate future dangerousness at the sentencing phase of that death penalty case. *Id*. Because the defendant's counsel had not been made aware—before the interview—of the prosecution's intent to use the statements for that additional purpose, the Supreme Court held that in these limited circumstances the Fifth Amendment barred the introduction of the statements for the purpose of establishing future dangerousness.  *Id*. at 465-467.

Significantly, the Supreme Court emphasized in *Estelle* that the defendant had not raised an insanity defense at trial and did not submit his own evidence as to his mental status and expressly limited its holding to exclude such circumstances, stating: "A criminal defendant, *who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence*, may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding. *Id*. at 468 (emphasis added).  The SJC reasonably perceived that the limited holding of *Estelle* has little application to the instant case.  *See also United States v. Byers*, 740 F.2d 1104, 1109-1116 (D.C. Cir. 1984) (examining the limitations and applicability of *Estelle*).[5]  The Supreme Court in *Estelle* also concluded that at the time of the defendant's

---

[5] In *Byers*, the District of Columbia Circuit joined the Second, Fourth, Fifth, Seventh, Eighth, Ninth, and Tenth Circuits in holding that "where the defendant has interposed the defense of insanity, the Fifth Amendment's privilege against self-incrimination is not violated by court-ordered psychiatric examination" and that "where the defendant introduces psychiatric testimony at trial, the Fifth Amendment does not prevent testimony by the psychiatrist who conducted the court-ordered examination on the issue of sanity." 740 F.2d at 1111.  The *Byers* court noted that "various justifications for denying the claim have been advanced by these courts," including waiver and the notion that such examinations are "real or physical evidence" not subject to Fifth Amendment protection. *Id*. at 1112.  The *Byers* court, for its part, relied on a policy-based rationale, namely that when a defendant puts his sanity at issue by introducing psychiatric evidence, "the state must be able to follow where he has led."  *Id*. at 1113. Whatever the rationale, the SJC was not objectively unreasonable—and indeed, was correct—in joining this long list of courts in rejecting the Fifth Amendment claim raised here.

psychiatric examination, his Sixth Amendment right to counsel had attached and in a footnote explained that "[b]ecause psychiatric examinations of the type at issue here are conducted after adversary proceedings have been instituted, *we are not concerned* in this case *with the limited right to the appointment and presence of counsel recognized as a Fifth Amendment safeguard in Miranda* []." *Id.* 451 U.S. 469-471, 470 n.14, *citing Edwards*, 451 U.S.477; (emphasis added); see also *Byers*, 740 F.2d at 1120 (explaining that the Supreme Court in *Estelle* explicitly noted "that it was not finding any right to counsel during the psychiatric interview."). The rule of *Edwards* is not extended to the circumstances here and does not provide Johnston with the absolute Fifth Amendment right to counsel that he claims.

Another reason why *Estelle* does not help Johnston is because in that case, the Supreme Court concluded that the defendant's Sixth Amendment rights had been violated on grounds that it was unclear whether counsel had been informed that the examination would inquire into the defendant's future dangerousness. 451 U.S. at 469-471. The same cannot be said for Johnston and his counsel.  As stated above, not only was counsel aware of the evaluation at the hospital, but he was present for at least two interviews and set limitations on the type of questions that could be asked. *Cf. Buchanan v. Kentucky*, 483 U.S. 402, 423-425 (1987) (finding that a defendant's Sixth Amendment right to assistance of counsel was not violated where defendant's trial counsel joined in the motion requesting the psychiatric evaluation and defendant was able to consult with counsel as part of the examination).

In *Buchanan*, the Supreme Court held that the Fifth Amendment allowed the prosecution to present evidence from a psychiatric evaluation to rebut the defendant's affirmative defense of extreme emotional disturbance. 483 U.S. at 408. More recently, in *Kansas v. Cheever*, 134 S. Ct. 596, 601-602 (2013), the Supreme Court affirmed the rule of *Buchanan* and held that "where a

defense expert who has examined the defendant testifies that the defendant lacked the requisite mental state to commit an offense, the prosecution may present psychiatric evidence in rebuttal." 134 S. Ct. at 601, *citing Buchanan*, 483 U.S. at 408. The Court explained that "[a]ny other rule would undermine the adversarial process, allowing a defendant to provide the jury, through an expert operating as a proxy, with a one-sided and potentially inaccurate view of his mental state at the time of the alleged crime. *Id*. This rule "harmonizes with the principle that when a defendant chooses to testify in a criminal case, the Fifth Amendment does not allow him to refuse to answer related questions on cross-examination. A defendant 'has no right to set forth to the jury all the facts which tend in his favor without laying himself open to cross-examination upon those facts.'" *Id*. at 601-602, *quoting Fitzpatrick v. United States*, 178 U.S.304, 315 (1900). Thus, "'[w]hen a defendant presents evidence through a psychological expert who has examined him, the government likewise is permitted to use the only effective means of challenging that evidence: testimony from an expert who has also examined him" *Cheever*, 134 S. Ct. at 601, *citing Byers*, 740 F.2d at 1113.

In light of *Estelle*, *Buchanan*, and *Cheever*, it was not objectively unreasonable for the SJC to conclude that the Fifth Amendment posed no bar to the admission of the challenged statements from Johnston's psychiatric interviews. Moreover, it was defense counsel who submitted the records from the hospital as evidence during defense expert Dr. Martin Kelly's testimony. (S.A.3019; Tr.Vol.14; 62 (Dr. Peebles' report was marked as Exhibit 85) and S.A. 3021, Tr.Vol.14; 64 (Bridgewater State Hospital records were marked as Exhibit 86)). Even though the records were not submitted as "rebuttal" in this case, their admission into evidence was not erroneous, nor did it violate any of Johnston's Fifth Amendment protections. All of the psychological experts that testified in this case reviewed the hospital records as part of their

17

evaluations. (Dr. Feldman: S.A.181; Dr. Kelly: S.A. 3017-3018, Tr.Vol.14 ; 60-61; Dr.

Welner:S.A.141). And, Dr. Peebles testified as a rebuttal witness. (S.A.4579, Tr.Vol.19; 291).

The SJC concluded that "all statements made by [Johnston] to psychotherapists at

Bridgewater State Hospital, including his refusals, are admissible (only) on issues involving his

mental or emotional condition." *Id.* 467 Mass. at 689, 7 N.E.3d at 437, *citing Commonwealth v.*

*Benoit*, 410 Mass. 506, 518-519, 574 N.E.2d 347 (1999), *also citing* M.G.L. c. 233, § 20B(b).[6]

At this point in the decision, the SJC makes reference in a footnote to *Blaisdell v.*

*Commonwealth*, 372 Mass. 753, 364 N.E.2d 191 (1977), a case that explicitly discusses waiver

of a defendant's Fifth Amendment privilege against self-incrimination in cases where insanity is

raised as a defense.  In *Blaisdell*, the SJC held that when "a defendant who seeks to put in issue

his statements as the basis of psychiatric expert opinion in his behalf opens to the State the

opportunity to rebut such testimonial evidence in essentially the same way as if he himself had

testified"  and thus waives his privilege against self-incrimination for that purpose. *Id.* 372 Mass.

at 766, 365 N.E.2d at 200, *citing United States v. Baird*, 414 F.2d 700 (2nd Cir. 1969, *cert.*

*denied* 396 U.S. 1005 (1970).[7]  The SJC's decision that the statements were admissible is

consistent with and therefore, not contrary to or an unreasonable application of, *Estelle*,

*Buchanan*, and *Cheever*, as well as *Byers* and the circuit court cases cited therein. Therefore,

---

[6] M.G.L. c. 233, § 20B confers on a patient "the privilege of refusing to disclose, and of preventing a witness from disclosing, any communication, wherever made, between said patient and a psychotherapist relative to the diagnosis or treatment of the patient's mental or emotional condition."  Subsection (b) of that statute provides that "If a judge finds that the patient, after having been informed that the communications would not be privileged, has made communications to a psychotherapist in the course of a psychiatric examination ordered by the court, provided that such communications shall be admissible only on issues involving the patient's mental or emotional condition but not as a confession or admission of guilt."

[7] The SJC in *Benoit*, also relied on *Blaisdell*, as well as with other cases, when it concluded that when the defendant "himself introduced in evidence the details of [the psychiatrist's] diagnosis and observations, he opened to the State the opportunity to rebut evidence on those narrow topics." 410 Mass. at 519, 574 N.E. 2d at 355.

Johnston cannot establish that he is entitled to relief he seeks under either the AEDPA standard or *de novo* review.

Johnston's reliance on *Edwards v. Arizona,* 451 U.S. 477 (1981) and *Minnick v. Mississippi*, 498 U.S. 146 (1990), is misplaced. (P.Memo 17-22).  *Edwards* and *Minnick* prohibit police-initiated custodial interrogation following a defendant's invocation of the right to counsel. *Edwards*, 451 U.S. at 482; *Minnick*, 498 U.S. at 149. However, as discussed above, contrary to Johnston's suggestion, neither *Estelle* nor any other Supreme Court case has extended the rule of *Edwards* in a blanket fashion to all psychiatric examinations. (P.Memo 20-21).

The rationale for distinguishing psychiatric examinations in circumstances such as those presented here is clear. When Johnston was being interviewed, he had already been arraigned and was not being questioned by police as part of a "custodial interrogation" in the sense used in *Edwards* and *Minnick*. Rather, at the jail, Johnston was being seen for a "medical intake" by a Licensed Practical Nurse (R.171), and at the hospital, he was being evaluated and observed by various mental health providers regarding his mental health status as part of court-order under M.G.L. c. 123, § 18(a). (R.21-31). The purpose of the § 18(a) evaluation was very specific: to determine "whether or not [Johnston] should be committed to a psychiatric facility. . .; if [he] had a mental illness, what kind of treatment [he] may benefit from; if [he] did not meet commitment standards and would return to where [he] was awaiting trial . . .what might be helpful to reduce the risk of harm to [himself] or others due to mental illness, if it was present." (S.A.4265,Tr.Vol.20, 11-12 (Testimony of Dr. Peebles)). It was not the intent or purpose of this evaluation to illicit incriminating responses or a confession regarding the pending charges.  *See Estelle*, 451 U.S. at462*, quoting In re Gault,* 387 U.S.1, 49 (1967) (noting that the Supreme Court has held that "the availability of the Fifth Amendment privilege does not turn upon the

type of proceeding in which its protection is invoked, but upon the nature of the statement or admission and the exposure which it invites.").  In fact, as noted in the exchanges between trial counsel and Dr. J. Leonard Peebles, the doctor who evaluated Johnston at the hospital, any questions about the day of the murder and the pending charges were clearly off limits. (S.A. S.A.4605-4606, Tr. Vol.19, 317-318 and S.A.4626-4627, Tr.Vol.20; 13-14; and quoted below). There is nothing in the records that shows the medical staff failed to heed the defendant's declarations that he would not answer certain questions until he spoke to his attorney.  Moreover, there is nothing to suggest the medical staff asked Johnston any questions about the charges and any questions that were asked appear to have been limited to his current mental status, consistent with M.G.L. c. 123, § 18(a). (R.29-171). If anything, the progress notes from the hospital and Dr. Peebles evaluation report show that the staff recorded and respected his requests. (R.29-171).

This is not to say that Johnston did not have a Fifth Amendment right against self-incrimination while he was being interviewed at the hospital.  However, he had been given his Miranda warnings previously and while at the hospital he had been warned and understood that "the interview would not be confidential and that anything he said might be reported back to the court in a written report and/or through oral testimony." (R.23). Johnston "showed a functional understanding of this warning and *responded to his attorney's request to selectively answer some questions*." (*Id*.) (emphasis added). That he was willing, on the advice of counsel, to answer some questions (and did in fact answer some questions) contradicts his position taken here that all questioning should have stopped pursuant to *Edwards* and *Minnick*. Nor can it be said that he was invoking his right to remain silent under the Fifth Amendment.

He may have stated that he wanted to speak to counsel after he arrived at jail and the hospital, but given the timing of those interviews and that the purpose was determine whether

Johnston was suicidal or in need of hospitalization, (S.A.564-569), the Fifth Amendment did not require termination of the interviews in the manner he suggests.

In addition, it is not clear from the record that Johnston "repeatedly and clearly" invoked his Fifth Amendment right to counsel at any time that he was being questioned at the jail or hospital, especially in the manner that he suggests here.[8] (P.Memo 17, 22). During cross-examination of Dr. Peebles, Johnston's trial counsel asked:

> Q: And I permitted questions to be asked by you regarding the issue of his mental status on the issue of whether or not he was suicidal or not; isn't that true?
>
> A: Yes, absolutely.
>
> Q: And during that, those initial interviews, I made it clear to you, did I not, that I didn't want you speaking to him about the charges or his past history of mental illness; isn't that right?
>
> A: About the charges, it was very clear you didn't. His past history, when we got into some things that were of interest, the two of you decided not to pursue that any further.

(S.A.4605-4606, Tr. Vol.19, 317-318).[9] From the start, trial counsel indicated to Dr. Peebles that some topics were okay for questioning and some were not. Specifically, any questions about the crime itself were off limits. This particular limitation did not seem to have any impact on Dr. Peebles' ability to evaluate Johnston's mental health status. Moreover, agreeing to answer some questions is not the same position that Johnston asserts here when he claims that all questioning should have stopped after he said he wanted to speak to counsel. (P.Memo17-18, 22). There is no suggestion that Johnston's current mental status or observations of his general condition were off limits and that was the purpose of this § 18(a) evaluation.

---

[8] This is not to say that he did not raise his Fifth Amendment claim in his SJC brief.

[9] Dr. Peebles' report indicates that counsel was present for the first two of three interviews with Johnston. (S.A.564-565).

In another exchange between defense counsel and Dr. Peebles, these limitations were

further discussed:

Q: When I appeared for this interview, did you object to my presence?

A: I did not.

Q: During the course of the interview, did you collect sufficient information for you to begin your evaluation?

A: I did.

Q: And did I obstruct you in completing the task of collecting sufficient information that you needed on that day?

A: You limited it.

Q: Is it true, then, that you could have collected additional information?

. . .

Q: You asked some questions about [Johnston's] mental status, isn't that right?

A; Correct.

Q: And you took a history of his mental status; isn't that right?

A: Correct.

Q: And you began to ask questions about what his mental status was on the day of the interview as well; isn't that right?

A: Yes.

Q: Is it fair to say, Doctor, that I interrupted when you began a question that could have led to what happened on December 6th and December 7th?

A: I wasn't that specific for dates. I was trying to get more background information on what was going on with him at an earlier point.

Q: Doctor, do you remember specifically asking the question whether or not Mr. Johnston had had a command hallucination?

A: Yes.

Q: Was that one of the questions I objected to on your initial interview?

A: Yes.

(S.A.4626-4627, Tr.Vol.20; 13-14). When counsel was present during questioning, it was made clear to Dr. Peebles that some questions were acceptable and others were not. This has the appearance of a Sixth Amendment right to assistance of counsel. The statements by trial counsel are consistent with and support the SJC's findings that Johnston did not invoke his right to remain silent and "merely set limits about what he was willing to discuss" and that he "refused to answer some questions on the advice of counsel, but he did not refuse to answer all questions." 467 Mass. at 687, 7 N.E.3d at 436.

Finally, the SJC concluded that the "statements to staff at the hospital were admissible only as to [Johnston's] mental or emotional condition" and later repeated "all statements made by the defendant to psychotherapists at Bridgewater State Hospital, including his refusals,[10] are admissible (only) on issues involving his mental or emotional condition." *Johnston,* 467 Mass. at 687 & 689, & N.E.3d at 436 &437. For all the reasons discussed above, The SJC's decision reasonably and correctly concluded—under AEDPA or under de novo review—that in light of *Estelle* and its progeny, the Fifth Amendment was not violated by admission of the challenged statements and therefore Johnston's counsel was not ineffective for failing to move to suppress the evidence. Simply put, there was no "*Edwards* suppression motion" to be filed in this case and even if trial counsel filed one, it would not have been successful. (P.Memo 30).

---

[10] The issue of whether trial counsel was ineffective for failing to move to exclude evidence that Johnston invoked his right to counsel and refused to answer questions is addressed more specifically, at Section III, below.

c.   <u>The SJC Reasonably Rejected the Sixth Amendment Aspects of Johnston's
Ineffective-Assistance-of-Counsel Claim.</u>

The SJC also acted reasonably in rejecting the Sixth Amendment aspects of Johnston's

claim that his counsel was ineffective for failing to move to suppress Johnston's statements at the

jail and at the hospital.  The right to counsel under the Sixth Amendment applies "in all criminal

prosecutions" and attaches at the first formal adversarial judicial proceeding.  *See, e.g.*, *Texas v.

Cobb*, 532 U.S. 162, 167-168 (2001). Here, because the statements at issue were made after

Johnston was arraigned in the District Court, the SJC reasonably analyzed Johnston's claim that

his right to counsel was violated under the Sixth Amendment. *Johnston*, 467 Mass. at 687, 7

N.E.3d at 436. The SJC's decision on this issue is consistent with *Estelle*. The SJC correctly

concluded that at that time, his Sixth Amendment right to assistance of counsel had attached

because he had already been arraigned. *Johnston*, 467 Mass. at 687, 7N.E.3d at 436, *Cf.*, *Estelle*,

451 U.S. 469-471 & 470 n.14. The SJC also found that while "[t]he decision to order a

psychiatric interview for purposes of criminal responsibility is a critical stage where the right [to

counsel] applies, but the resulting interview is not." *Id.*   The SJC stated "a defendant does not

have a Sixth Amendment right to have his lawyer present during the court-ordered psychiatric

interview." *Id.*, *citing Commonwealth v. Trapp*, 423 Mass. 356, 358, 668 N.E. 2d 327, cert.

denied, 519 U.S. 1045 (1996), *also citing Estelle*, 451 U.S. at 470 & n.14, and *Byers*, 740 F.2d at

1118-1121. Thus, the SJC properly concluded that "[Johnston] had no Sixth Amendment right

that required hospital staff to refrain from interviewing him or terminate interviews with him

until counsel was present." *Id*. at 467 Mass. at 688, 7 N.E.3d at 436.

The SJC further found that in order to succeed on a claim of ineffective assistance of

counsel based on the failure to file a motion to suppress evidence, the defendant must show he

would have prevailed on such a motion." *Johnston*, 467 Mass. at 688, 7 N.E.3d at 436, *citing*

24

*Commonwealth v. Comita*, 441 Mass. 86, 91, 803 N.E.2d 700 (2004).[11] The Court properly held

that "[s]uch a motion based on an alleged violation of the defendant's Sixth Amendment right to

counsel, would not have succeeded." *Id*.  In addition, the SJC held that the statements were

admissible as to issues involving his mental or emotional condition.  Thus, even if trial counsel

had filed a motion to suppress the statements, instead of submitting the evidence himself, he

would not likely have been successful. *Johnston*, 467 Mass. at 678 & 689, 7 N.E. 3d at 436 &

437. It was objectively reasonable for the SJC to find no deficiency in counsel's performance for

failing to file a motion to suppress the statements on grounds that his right to counsel was

violated.

> d.  The SJC Reasonably Concluded that Trial Counsel's Decision to Admit the Evidence Fell Within the Range of Reasonable Trial Strategies.

Under the first prong of *Strickland,* there is a "strong presumption" that counsel's

strategy and tactics fall "within the range of reasonable professional assistance," and courts

should avoid second-guessing counsel's performance with the use of hindsight. *Knight v.*

*Spencer*, 447 F.3d 6, 15 (1st Cir. 2006), quoting *Strickland,* 466 U.S. at 689. In this case, it is

helpful to refer to the motion judge's (who was also the trial judge) detailed denial of the motion

for new trial on the issue of ineffective assistance of counsel. (S.A.505-539).   First, the judge

noted there was a "tension between trial counsel's assertion in his affidavit and what the record

and conduct at trial suggest the defense strategy was." (S.A.384; Counsel's Affidavit at S.A.119-

122). The judge then acknowledged that throughout the trial, the Court called counsel sidebar

and counsel "asserted that a strategic decision was made not to challenge objectionable

---

[11] *Comita* applied the standard set out in *Commonwealth v. Sefarian*, 366 Mass. 89, 96-97, 315 N.E.2d 878 (1974), which has been determined by the First Circuit to be "the functional equivalent" to the *Strickland* standard. *See Jewett v. Brady*, 634 F.3d. 67, 75 (1st Cir. 2011) quoting *Lynch v. Ficco,* 438 F.3d 35, 48 (1st Cir. 2006).

evidence." (S.A.379-380).[12]  The judge stated "[i]t was reasonable to conclude, as the trial judge who observed the conduct of counsel throughout the trial, that strategic defense decisions were made at trial, in part, to present to the jury a defense image of frankness and openness in an effort to establish trust that the defense was not trying to keep anything from the jury." (S.A. 380). It thus seems contradictory that Johnston claims here "there can be little dispute that if jurors perceive that a defendant is withholding evidence, that evidence triggers a negative response—and often, assumptions of guilt—in jurors" when being frank and open with the evidence before the jury was trial counsel's strategy.  (P.Memo 34, *citing United States v. Hale,* 422 U.S. 171 (1975).  (S.A.511). It appears that it was a strategic decision by trial counsel to submit the hospital records and Dr. Peebles' report into evidence during defense expert, Dr. Kelly's testimony and Johnston is now second-guessing that decision. It was not an unreasonable strategy in light of the fact that the records would have been admissible in rebuttal because he raised lack of criminal responsibility as a defense.  It is reasonable that trial counsel was attempting to be open and frank with the jury regarding Johnston's mental status at all relevant times. *Cf. Coble v. Quarterman*, 496 F.3d 430, 440 (5th Cir. 2007) (rejecting habeas petitioner's claim that his trial counsel was ineffective where counsel made strategic decision to admit evidence of psychiatric evaluation in order  "to soften the blow in the minds of the jury").

Because Johnston cannot establish trial counsel's performance was deficient, this Court need not address the prejudice prong of the *Strickland* test.  (P.Memo 31-32). Nonetheless, contrary to Johnston's position, the so-called "prejudicial" statements regarding his denial of mental illness, head trauma, suicidal behavior, and hallucinations are the type of statements that are admissible as rebuttal evidence in a case where an insanity defense is raised. He also complains that "this evidence went to the heart of Johnston's only defense at trial" and that these

---

[12] The judge did not specify what the "objectionable evidence" was. (S.A.511).

types of statements "undercut the basis of Dr. Feldman's testimony" and "bolstered the Commonwealth's position."  (P.Memo 33, 34). He may be correct, but that is also the reason why this type of evidence is admissible as rebuttal evidence under *Buchanan, Cheever, Byers* as well as, *Blaisdell*.  A defendant raising an insanity defense is not entitled to only have evidence that favors his position in front of the jury. *Cheever*, 134 S. Ct. at 601-602. The Commonwealth is permitted to challenge that evidence with its own favorable evidence regarding his mental status. *Id. see also Byers,* 740 F.2d at 1113*; and Blaisdell*, 372 Mass. at 764-771, 364 N.E.2d at 199-203. Thus, any attempt by trial counsel to have these statements suppressed, especially on these grounds, would not likely have been successful because he claimed he lacked criminal responsibility.  So, whether they came in through the defense, as they did here, or through the prosecution as rebuttal, the records were admissible. Johnston cannot establish that his trial counsel was constitutionally ineffective, much less that the SJC was objectively unreasonable in reaching a contrary conclusion.

III.    **The SJC Reasonably Rejected Johnston's Claim that Trial Counsel Was Ineffective For Failing to Move to Exclude Evidence that Johnston Invoked his Right to Counsel and Refused to Answer Questions from Staff at the Jail and the Hospital.**

There is no dispute that the SJC adjudicated this claim on the merits, and therefore the AEDPA "doubly deferential" standard of review for ineffective assistance claims applies here. (P.Memo 37).

Johnston claims that "the jury received a substantial amount of evidence and testimony that [he] refused to answer questions and invoked his right to counsel" and that trial counsel "failed to employ [*Doyle v. Ohio,* 426 U.S. 610 (1976) *and Wainwright v. Greenfield*, 474 U.S. 284 (1986), which are] clearly established precedents of the United States Supreme Court which bar this insolubly ambiguous but particularly poisonous evidence from the jury's consideration."

(P.Memo 37).  He further claims that trial counsel "failed to object to the admission of at least five testimonial and fifteen documentary references to Johnston's invocation of his right to counsel and silence." (P.Memo).

In *Doyle*, the Supreme Court recognized that a defendant's due process rights may be violated when the prosecution uses the defendant's post-*Miranda* silence against him. 426 U.S. 610 (1976). In *Wainwright*, the Supreme Court reaffirmed its reasoning in *Doyle* stating, "it is fundamentally unfair to promise an arrested person that his silence will not be used against him and thereafter to breach that promise by using the silence to impeach his trial testimony." 474 U.S. at 292. In that case, the prosecution sought to show that the defendant's decision to remain silent after his arrest demonstrated his mental competence. *Id*. "However, mere reference to a defendant's post-Miranda silence does not necessarily amount to a due process violation." *Ellen v. Brady*, 475 F.3d 5 (1st Cir. 2007), *citing Greer v. Miller*, 483 U.S. 756 (1987). "The hallmark of a *Doyle* violation is 'the use' of the defendant's post-*Miranda* silence against him, especially where the prosecution is allowed 'to call attention to [the defendant's] silence.'" *Id*. at 12, *quoting Greer*, 483 U.S. at 763, (*quoting Doyle* 426 U.S. at 619). There is no dispute that the records contain references to Johnston refusing to answer some questions on the advice of counsel and requesting to speak to counsel, but there is nothing in the record to suggest that the statements were *used* in any manner that would amount to a *Doyle* violation.

To be clear, Johnston did <u>not</u> invoke his right to remain silent. *Johnston*, 467 Mass. at 687 & 688, 7 N.E.3d at 435-436 & 437.  Any claim he makes to the contrary here is in error and not supported by the record. At both the jail and the hospital, Johnston chose not to answer some questions on the advice of counsel, but he did not refuse to answer all questions. *Id*.  (See also, S.A. 517 (trial court's denial of the motion for new trial) and S.A. 564-568). This is consistent

with trial counsel's questions to Dr. Peebles, referring to the fact that he allowed Johnston to answer some questions, depending on the topic. As stated, the SJC concluded that because Johnston had not invoked his right to silence and he had been warned by hospital staff that the interviews would not be privileged,[13] "all statements made by [Johnston] to psychotherapists at Bridgewater State Hospital, including his refusals, are admissible (only) on issue involving his mental or emotional condition."  *Id*., 467 Mass. at 689, 7 N.E.3d at 437 (emphasis added). Thus, his claims here are limited to evidence that he refused to answer certain questions on advice of counsel and that he had requested to speak to counsel before answering certain questions. *Johnston*, 467 Mass. at 689, 7 N.E.3d at 437.

The other slight twist in this case is that it was defense counsel who admitted the evidence that he now claims should be suppressed. (S.A. (S.A.3019; Tr.Vol.14; 62; S.A. 3021, Tr.Vol.14; 64). Thus, the prosecution's "use" of these statements were limited to cross-examination of the defense expert "to show that the defendant was not delusional but acting in a reality-based state of mind" and not in the Commonwealth's case in chief. *Johnston*, 467 Mass. at 691, 7 N.E.3d at 438, (*see also* S.A.518; 3197- 3201, Tr.Vol.15, 32-36). The prosecutor did not call attention to or make specific inquiry into his silence in a manner that would amount to a *Doyle* violation. *Cf. Ellen*, 475 F.3d at 12, *citing Greer*, 483 U.S. at 763-764 *and also citing, Doyle*, 426 U.S. at 619.

In addition, Johnston is not claiming that the SJC's decision was contrary to or an unreasonable application of *Doyle* and *Wainwright*.  Rather, he is only claiming that the SJC unreasonably applied the *Strickland* standard and that the SJC's resolution of this claim resulted

---

[13] Johnston was warned that his statements would not be privileged pursuant to *Commonwealth v. Lamb*, 365 Mass. 265, 270, 311 N.E.2d 47 (1974).

from an unreasonable determination of the facts. (P.Memo 40). His claims must fail because trial counsel was not constitutionally ineffective.

In order to succeed on any challenge to factual findings, a petitioner has to rebut the presumption of correctness with clear and convincing evidence. 28 U.S.C. § 2254(e)(1). *Sanna v. Dipaolo*, 265 F.3d1, 10 (1st Cir. 2001). Johnston does not meet that burden.

He points out what may be a minor discrepancy regarding the number of references to counsel in the records. The SJC said "the records indicate references to counsel on fifteen *occasions*" *Id*. at 691 and Johnston claims there were eighteen references in the records. (P. Memo 38). It seems that the SJC may have taken into consideration that some references to his attorney were repeat entries in the records. For example, on December 10 (R.34 and 68), these do not appear to be separate events, but rather the same comment was noted in two different parts of the record by the same doctor; on December 13 there was a single entry that included the term "atty" three times (R.76); and on December 14 there is a reference to "attorney" in the progress notes (R.80) and that entry was later repeated by Dr. Peebles as part of his evaluation summary report of Johnston's stay at the hospital (R.25). This factual finding was not unreasonable. 28 U.S.C. § 2254(e)(1).

The SJC found that "the portion of the refusals that are identified with the advice of counsel is protected, as is the defendant's request to confer with counsel before answering. All references to counsel, but not the refusals themselves (he did not his right to silence), should have been the subject of a motion to redact." *Id*. The SJC further explained that "requests to confer with counsel are not a proper subject for comment," but these statements may "be admissible to explain why a particular interview ended, or explain why certain information that customarily is requested as a matter of sound medical practice is absent." *Id., citing*

*Commonwealth v. Habarek*, 402 Mass. 105, 110, 520 N.E.2d 1303 (1988), S.C. 421 Mass. 1005,

657 N.E.2d 228 (1995). The SJC then noted that the hospital staff were "stymied by [Johnston's]

refusals and desirous of determining if he was a suicide risk" so they "reached out to counsel,

who attended two interviews" that "went well." *Id*. After that, there were "no refusals to answer

or requests to confer with counsel before answering questions thereafter in the hospital records"

and Johnston was later interviewed for seventy minutes without counsel on January 6, 2005. *Id*.

at 690.

      As to whether counsel was ineffective, the SJC considered "whether the admission of the

evidence of his requests to confer with counsel and the portion of his refusals that were identified

as having been on advice of counsel created a substantial likelihood of a miscarriage of justice."

*Id*., *citing Commonwealth v. Wright*, 411 Mass. 678, 681-682 (1992). In *Wright*, the SJC

explained that this prejudice standard, which is used under M.G.L. c. 278, § 33E review, "is

more favorable to a defendant than is the constitutional standard for determining the

ineffectiveness of counsel" in *Strickland*.  411 Mass. at 682, 584 N.E.2d at 624. This Court has

also previously determined that the standard in *Wright* is at least as protective of defendants at

the federal ineffective assistance of counsel standard and therefore, the federal law adjudication

is subsumed within the state law adjudication. *Sleeper v. Spencer,* 510 F.3d 32, 39 (1st Cir.

2007), *citing Horton v. Allen*, 370 F.3d 75, 86 (1st Cir. 2004) and *Teti*, 507 F.3d at 56.

      After a detailed analysis under *Commonwealth v. Mahdi*, 388 Mass. 679, 448 N.E.2d

704 (1983), which applies the rule of *Doyle* and "predicted the rule later announced in

*Wainwright*" (*Ellen*, 475 F.3d at 12), the SJC concluded that "there was no substantial likelihood

of miscarriage of justice" because "trial counsel was able to avoid harmful consequences from

improper use of this evidence by virtue of the judge's limiting instruction, which the jury are

presumed to follow." *Id*,. 467 Mass. at 692, 7 N.E.2d at 692. The SJC explained that "[t]he

limiting instruction also had the salutary effect of eliminating jury speculation that might have

arisen from redactions in the records." *Id*. In addition, "the prosecutor did not focus upon this

evidence, and instead made no reference to it in her closing argument." *Id*.

 As for trial counsel's strategic decision to admit the evidence, the SJC adopted the

decision of the trial judge, that "counsel was able to use the refusal evidence and the defendant's

requests for counsel 'to explain the absence of psychotic statements at [the hospital] while

avoiding the potentially adverse inferences that the evidence could give rise to, e.g. that

[Johnston's] compliance with his attorney's advice was evidence of his sanity." *Id*.[14]

Johnston also claims that SJC's finding that counsel acted reasonably in admitting the statements

"'to explain the absence of psychotic statements at Bridgewater'" is "unreasonable.'" (P.Memo

41). That there was other evidence to establish the same point does not make the SJC's finding

unreasonable. (P.Memo 42, n.24). Moreover, as the trial judge noted from her own observations

and after questioning defense counsel, the "strategic defense decisions were made at trial, in part,

to present to the jury a defense image of frankness and openness in an effort to establish trust that

the defense was not trying to keep anything from the jury." (S.A.511). As will be discussed in

Section IV, it was also the defense's perception that the prosecution was going to argue Johnston

had consulted with an attorney to "concoct" an insanity defense. (*see e.g.* S.A.3209, Tr.Vol.15,

44). With that in mind and given that lack of criminal responsibility was being raised as a

defense, being upfront with the jury and taking on the contents of the hospital records head-on

was not an unreasonable strategy to take in this case. *Cf. Coble*, 496 F.3d at 440 (rejecting

---

[14] Johnston's counsel "doubts that the SJC's determination reflects reality" and "believes that trial counsel simply did not know the law regarding a crucial point of his defense." (P.Memo 41, n.23). It bears noting that the trial judge, who observed trial counsel, made the same finding as the SJC (S.A.520) and also noted that Johnston "was represented by two experienced defense attorneys. The second trial attorney, a senior criminal defense attorney, did not file an affidavit." (S.A.511).

ineffective-assistance-of-counsel claim on habeas review where trial counsel made a strategic

decision to admit psychiatric examination "to soften the blow in the minds of the jury").

In a detailed examination of trial counsel's performance and strategic decisions, the trial

judge explained that "a review of the whole record strongly indicates that defense counsel

introduced the evidence as part of his trial strategy." (S.A.520). The trial judge further explained:

> There was a sound strategic reason to introduce the evidence, namely to provide some
> explanation for the absence of psychotic statements or behavior from Johnston while he
> was detained at Bridgewater during the thirty-day observation period. As Commonwealth
> expert forensic Michael Welner testified, consistent with his written report, the
> Bridgewater records contained nothing indicative of bizarre behavior, irrational ideas,
> hallucinations, emotional instability, disorganized communications, disorientation, or
> cognitive confusion. Dr. Peebles testified that despite not receiving anti-psychotic
> medication at Bridgewater, Johnston did not express active irrational though and did not
> appear to be actively mentally ill. A reasonable conclusion by counsel could be drawn
> that it would be harmful to the defense if the jury were not informed that his influence
> and advice had significant impact on Johnston's conduct at Bridgewater. In the absence
> of such an explanation, the jury would be potentially be far more likely to conclude that
> Johnston did not suffer from any psychotic or delusional disorder. It would also be a
> reasonable tactical decision to avoid harmful jury speculation that could result from
> redacting the Bridgewater records to conceal the numerous references therein to
> Johnston's silence on the advice of counsel.

(S.A. 520, *citing Commonwealth v. McCaster*, 46 Mass. App. Ct. 752, 753 (1999)). Lastly, the

trial judge also noted that "[t]rial counsel may reasonably have concluded that that the limiting

instruction was consistent with his strategy of allowing the jury to hear about Johnston's silence

on advice of counsel to explain of psychotic statements at Bridgewater while avoiding the

potentially adverse inferences that the evidence could also give rise to, e.g. that Johnston's

compliance with his attorney's advice was evidence of his sanity." (S.A. 522).

That Johnston now disagrees with the strategy taken by his trial counsel does not mean

that his counsel was ineffective.  Under the first prong of *Strickland,* there is a "strong

presumption" that counsel's strategy and tactics fall "within the range of reasonable professional

assistance," and courts should avoid second-guessing counsel's performance with the use of

hindsight. *Knight v. Spencer*, 447 F.3d 6, 15 (1st Cir. 2006), *quoting Strickland,* 466 U.S. at 689.

As the First Circuit has observed, "even if reasonable minds could disagree about what defense

strategy would have been best in this case. . . 'the proper standard for [measuring] attorney

performance is that of reasonably effective assistance,' as guided by 'prevailing professional

norms' and consideration of 'all the circumstances' relevant to counsel's performance." *Pina v.

Maloney*, 565 F.3d 48, 56 (1st Cir. 2009), *quoting Strickland*, 466 U.S. at 688. The Supreme

Court has made clear, "[t]here are countless ways to provide effective assistance in any given

case." *Strickland*, 466 U.S. at 689. Since Johnston has failed to show that counsel's ultimate

choice of defense strategy was manifestly unreasonable, the SJC's denial of his ineffective claim

was not an unreasonable application of *Strickland*.

To the extent Johnston claims he was prejudiced, his arguments fail. (P.Memo 44-46). In

order to support his claim, it appears that Johnston has taken counsel's closing out of context in

order to make his point. (P.Memo 44).  Trial counsel reminded the jury that they had been

instructed "that things that he did on my advice cannot be considered by you. And there are very

good reasons for that- -very, very good reasons for that. So his lack of cooperation during parts

of the assessment phase cannot be considered by you for at least any negative inference."

(S.A.4785, Tr.Vol.21, 60).

Then, when discussing the hospital records, trial counsel reminded the jury that the

hospital staff was looking at "different issues" than the jury was being asked to consider.

(S.A.4805, Tr.Vol.21, 80).  The staff was trying to determine whether Johnston was a suicide

risk; the jury was not. (Id.). He then explained to the jury, "When you look at the [hospital]

records and day after day after day that Mr. Johnston doesn't give answer to any of the questions

that he's asked, and <u>Ms. Steese has offered that evidence for the purpose of establishing that he</u>

demonstrated no psychiatric problems during that hospitalization, take a look at, 'Wouldn't talk to me because the lawyers told me not to," over and over and over again."  (S.A.4805-4806, Tr.Vol.21, 80-81). He was not "multiplying the references" in a negative way, as is suggested by Johnston, but rather it seems that trial counsel was trying to directly attack the issue that he thought was being raised by the prosecution rather than have redactions in the records that could have been more confusing to the jury.  (P.Memo 44). At the time of trial, this was a reasonable strategy that was not prejudicial to Johnston.

When defense counsel's strong closing is combined with the fact that the prosecution "never mentioned the refusals of counsel in her closing argument"[15] adding to that the fact that the judge "*forcefully* instructed the jury" "immediately after the prosecutor broached the subject" that Johnston's "refusals to answer questions on advice of counsel were 'appropriate' and that they should 'not draw any adverse inference from the fact that somebody had been advised by their attorney not to answer questions' 'either because of the advice or because actions were taken pursuant to advice,'" Johnston's argument that he was prejudiced falls apart. *Johnston*, 467 Mass. at 692, 7 N.E. 2d 439. (emphasis added). Also, it bears noting that trial counsel gave the trial judge a proposed curative instruction before Dr. Kelly testified and before the records were admitted to "be read to the jury when that becomes an issue." (S.A.2972-2973, Tr. Vol. 14, 15-16). He did not ask for the instruction to be given when Dr. Kelly testified about the records. (S.A.3018, Tr.Vol. 14, 61). But, he did ask that the instruction be given when the prosecutor cross-examined on the same topic. (S.A.3198-3200, Tr.Vol.33-35). This, at the very least, demonstrates trial counsel's careful and reasonable strategy that he was attempting to use the

---

[15] The prosecution instead focused on "the absence of any indications of active mental illness" while Johnston was at the hospital.  *Johnston*, 467 Mass. at 692, 7 N.E.3d at 439.

records to his benefit and have the instruction given only when the Commonwealth tried to use them. There was no *Doyle* violation and Johnston was not prejudiced.

Finally, the SJC reasonably concluded that 'the evidence of the defendant's refusals on advice of counsel and his request to confer with counsel 'played a minor role in the battle of the experts on the question of [criminal responsibility], with an enormous amount of personal history, conduct and [other] material as ammunition for battle." *Johnston*, 467 Mass. at 691, 7 N.E.3d at 439, *citing Commonwealth v. Adams*, 434 Mass. 805, 815 753 N.E.2d 105 (2001). As the trial judge pointed out, there was "substantial independent evidence of his sanity," including testimony from Johnston's work supervisor, friends, college professor, and co-workers that he was polite, reliable, able to handle stressful situations, normal when sober, and did not engage in any unusual behavior. (S.A.521). Even if there was error by trial counsel by admitting the evidence, it hardly "struck at the heart" of his defense as it was only a small part of his case where he called two experts and several witnesses on his behalf. (P.Memo 45). Further, these statements did not likely to have any influence on the jury's verdict.  Johnston has failed to establish that the SJC unreasonably applied *Strickland* or that the court's factual determinations were unreasonable.

**IV.    The SJC Reasonably Rejected Johnston's Claim that Trial Counsel Was Ineffective for Failing to Object to Prosecution's Insinuation the Johnston's Early Consultation with Counsel Indicated a False "Constructed" Defense.**

There is no dispute that the SJC adjudicated this claim on the merits, and therefore the AEDPA "doubly deferential" standard of review for ineffective assistance claims applies here. (P.Memo 48).

The SJC made the following findings as to whether trial counsel was ineffective for failing to object to the prosecutor's suggestion that the defense was concocted.  The SJC broke-

down this argument into three pieces:  prosecution's opening statement; Dr. Welner's testimony; and prosecutor's closing argument.

> Prosecutor's Opening Statement:
>
> We begin our analysis with the complaint about the prosecutor's opening, to which there was no objection. The prosecutor did not suggest in her opening that the defense was concocted by the family and their attorneys. She merely laid out a chronology of the expected testimony. The family attorney in fact testified that he spoke to the defendant on the telephone for about fifteen seconds. During that conversation the defendant was agitated, rude and unresponsive and walked away from the telephone. The lawyer then made telephone calls to a local crisis team and to the Westfield police department.  There was no impropriety that could have been remedied by objecting.

*Johnston*, 467 Mass. at 693, 7 N.E.3d at 440. The entire brief reference the prosecutor made to the family attorney that set the timeline for the morning of December 7 was this: "You'll hear evidence that Mr. Johnston began making telephone calls. And he made telephone calls - - among the calls he made, were calls to his family members; that at some point, at approximately 9:17 a.m., Mr. Johnston was taken into custody by the Westfield Police Department; that his mother first spoke to an attorney and after speaking to an attorney, had contacted the crisis services in Westfield, and the police department was called in to assist in taking him into custody." (S.A.1169, Tr.Vol.5, 62).  It was trial counsel's strategy to have the attorney testify about December 7 phone call, in order to rebut any contention that the "entire insanity defense" had been perhaps created that morning. (S.A.2338, Tr. Vol. 11, 203).  The prosecutor indicated that her plan was to ask Attorney McCarthy about the mother (S.A.--, Tr.Vol.11, 204) and further explained that any contention that an insanity defense had been crafted after the murder would be "based upon the mother." (S.A.2470, Tr.Vol.11, 335). The intent of any inquiry by the prosecution would be to explore conflicting information as to whether Johnston's mother had told the attorney or doctors that morning that her son had "shot somebody," which is something she denied when testifying before the grand jury. (S.A.2463-2466, Tr.Vol.11, 328-331).

From an objective standpoint, there is nothing in the prosecution's opening statement to suggest that she was insinuating that the family had concocted an insanity defense when they spoke to Attorney McCarthy. The SJC's finding that there was no "impropriety" is supported by the record.  There was no basis for trial counsel to object.

Dr. Welner's Testimony:

With respect to prosecutor's redirect examination of Dr. Welner, the nature of the questioning set forth in the transcript is quite different from what the defendant describes. Trial counsel had cross-examined Dr. Welner at length about two separate incidents at the house of correction in which the defendant assaulted two different inmates, without provocation. Dr. Feldman, [Johnston's] expert psychologist, had attached considerable importance to the incidents. [Johnston] reported to Dr. Feldman that he did this because undercover State and Federal law enforcement agents told him it would be his ticket out of the institution if he completed the assault by a specific time of day. Because he was five minutes late he remained confined at the house of correction. The significance to Dr. Feldman was that [Johnston] was sober, yet delusional, at the time of the two incidents with inmates.

During his cross-examination on the subject of the inmate incidents, Dr. Welner allowed for the possibility that the defendant was delusional because there was 'contradictory information' about [Johnston's] state of mind and [Johnston's] account of what happened. Dr. Welner also testified that the available records from the house of correction indicated that [Johnston] 'was demonstrating absolutely no distress or any sign of any other kind of psychiatric symptom or the same anxiety which had in the past . . . driven him to Dr. Berlin's office to seek care for the symptoms that he had associated with those irrational ideas.'

When the prosecutor returned to this subject in her redirect examination of Dr. Welner, she attempted to clarify that the source of the 'contradictory information' was not internal to the house of correction, but rather was Dr. Feldman, whose opinion on the incidents had been provided to the house of correction staff by trial counsel. The prosecutor further elicited information from the report of a psychiatrist at the house of correction, who expressed the same concerns as Dr. Welner about the inconsistent information. [Johnston] never mentioned to house of correction staff that he had assaulted two inmates on the recommendation of undercover agents. The house of correction psychiatric report said, 'It is notable that  . . . there are concerning inconsistencies in his subjective report to [Dr. Feldman] and observed presentation." It bears mention that *at no point in Dr. Welner's summary of his reasons for concluding as he did is there any indication that the defense of lack of criminal responsibility had been concocted.*

*Johnston*, 467 Mass. at 693, 7 N.E.3d at 440. (emphasis added). To clarify, when the prosecutor

re-directed Dr. Welner, it was after Dr. Anfang's (the psychiatrist at the house of correction)

notes had been initially raised on cross-examination in connection with the two assaults at the

jail. (S.A.4148, Tr.Vol.18, 179-193).[16]  In addition, Johnston takes the line "I advised him that

his lawyer was concerned he get treatment for schizophrenia" out of context. (P.Memo 47). The

reference to Dr. Anfang's notes, as a whole, was part of the prosecution's plan to show the jury

that Johnston was sane and that the assaults were not the result of schizophrenia or delusions.

(S.A.4232-4236, Tr.Vol.18, 263-267). This minor reference to Johnston's attorney was not the

focus of the questioning by the prosecutor nor did it form the basis of Dr. Welner's opinion.

>    Prosecutor's Closing Argument:
>
> Finally, the prosecutor's comment in her closing argument about 'a defense that was
> constructed very soon after the event' was directed not at trial counsel, but the
> defendant's family. The argument occupies about two lines of the fifty three transcript
> pages of a closing argument that otherwise was focused on a close and careful analysis of
> the evidence. [See S.A.4858, Tr. Vol. 21, 133-134]. Trial counsel objected to some
> portions of the prosecutor's closing argument, but not to this statement. The absence of
> an objection is some indication that the argument did not land a hard, foul blow, and was
> not unfairly prejudicial.[17] We are satisfied that this minor flaw in a closing argument that
> otherwise was delivered in a way that must have impressed the jury that the case was
> entitled to their full, thorough, and respectful consideration of all the evidence did not
> create a substantial likelihood of a miscarriage of justice.

*Johnston*, 467 Mass. at 693, 7 N.E.3d at 440. This one line in the closing argument is not enough

to be a "unifying theme . . .that Johnston's insanity defense was concocted after he was charged"

and can hardly be described as a "powerful accusation[] by the prosecutor" when viewed in

context of the rest of an "otherwise focused" and lengthy closing argument. (P.Memo 47 & 49).

Johnston states that "consultation with counsel is off limits." (P.Memo 49). The brief

mention in the opening statement does not amount to anything inappropriate; there was no

---

[16] Dr. Anfang's notes had already been submitted as evidence by the defense. (S.A.3030-3031,Tr.Vol.14,73-74).

[17] At this point, the SJC cited to *Commonwealth v. Toro*, 395 Mass. 354, 360, 480 N.E.2d 19 (1985).

mention of consultation with counsel in the closing argument; and Dr. Welner's minimal testimony regarding the notes from the house of correction does not support Johnston's allegations that something prejudicial happened here. After a review of the entire record, it was reasonable for the SJC to conclude that trial counsel was not ineffective for failing to object.

**V.      The SJC Reasonably Rejected Johnston's Claim that Trial Counsel Was Ineffective When He Elicited Specific Testimony from Dr. Welner that Johnston Appeared "Moon Faced" from Anabolic Steroid Use.**

There is no dispute that the SJC adjudicated this claim on the merits, and therefore the AEDPA "doubly deferential" standard of review for ineffective assistance claims applies here. (P.Memo 50).

Johnston's final claim of ineffective assistance took place during trial counsel's cross-examination of Dr. Welner when he asked why the doctor had described Johnston as "moon faced." *Johnston*, 467 Mass. at 695, 7 N.E.3d at 441. Trial counsel was attempting to show that Dr. Welner was demeaning Johnston. *Id.* Dr. Welner testified that it indicated steroid use and would persist for up to one year after cessation of use. *Id.* According to affidavits from Dr. Kelly and Dr. Jeffry Korff, an endocrinologist, that were submitted in support of the motion for new trial, the steroids that Johnston used would not cause 'moon face' and the symptoms would not have persisted for one year. *Johnston*, 467 Mass. at 695-696, 7 N.E.3d at 441. Johnston claims that trial counsel failed to investigate and was not prepared to impeach Dr. Welner and also produced false and damaging evidence. (P.Memo 50-51).

The SJC made the following findings:

The trial judge concluded that although counsel was negligent, there was no prejudice because there was strong evidence that [Johnston] had in fact used anabolic steroids. We agree. Although this was a lost opportunity to impeach Dr. Welner, whose credentials also included board certification in psychopharmacology, that is, expertise in matters that include side effects and consequences of drugs, the record indicates that trial counsel impeached him on multiple fronts during 270 transcript pages of his cross-examination.

[S.A.3919-3950,Tr.Vol.17, 218-249 and S.A.3990-4229,Tr. Vol.18, 21-260]. Failure to use a particular method of impeachment does not constitute ineffective assistance of counsel."

*Johnston*, 467 Mass. at 695-696, 7 N.E.3d at 441, citing Commonwealth v. Hudson, 446 Mass. 709, 715, 846 N.E.2d 1149 (2006), *quoting Commonwealth v. Fisher*, 433 Mass. 340, 357, 742 N.E.2d 61 (2001).

In its SJC brief, the Commonwealth acknowledged that counsel's inquiry regarding Dr. Welner's description of Johnston was ill-prepared. (S.A.841).  However, as noted by the SJC and the trial judge, there was other reliable evidence that Johnston has used anabolic steroids. (S.A.1874, Tr.Vol.9, 95; S.A.1912, Tr.Vol.10, 11; S.A.2266, Tr.Vol.11, 131; S.A.2698, Tr.Vol.12, 223; S.A.3090, Tr.Vol.14, 133; S.A.3429-3430, Tr.Vol.15, 264-265; S.A.3543-3544, Tr.Vol.16, 100-101; S.A.4071. Tr.Vol.18, 102; S.A.4589, Tr.Vol.19, 301-302). Thus, impeaching Dr. Welner on this one issue would hardly be "powerful," (P.Memo 51), especially in light of the fact that trial counsel vigorously impeached Dr. Welner on other grounds, including focusing on "painting him as a charlatan." (S.A.3923, Tr.Vol.17, 222). Even if it was poor performance by trial counsel to not have properly prepared to impeach Dr. Welner on this one issue, it was not enough to find prejudice under the *Strickland* standard. The SJC reasonably concluded trial counsel was not constitutionally ineffective.

## CONCLUSION

The petition for writ of habeas corpus should be denied because the Supreme Judicial Court's conclusion that trial counsel was not constitutionally ineffective was based on a reasonable application of *Strickland*.

Respectfully submitted,

Lisa A. Mitchell
By her attorney,

41

MAURA HEALEY
ATTORNEY GENERAL

*/s/ Jennifer K. Zalnasky*
Jennifer K. Zalnasky
BBO No. 650762
Assistant Attorney General
Criminal Bureau
1350 Main Street, 4th Floor
Springfield, Massachusetts 01103
(413) 784-1240, ext. 7746
Jennifer.zalnasky@state.ma.us

Dated:  February 17, 2016

*/s/Jennifer K. Zalnasky*
Jennifer K. Zalnasky

CERTIFICATE OF SERVICE

I hereby certify that on February 17, 2016 this document was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.  There are no non-registered participants involved in this case.

*/s/ Jennifer K. Zalnasky*
Jennifer K. Zalnasky, BBO No. 650762