UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                              )
BRYAN R. JOHNSTON,            )
          Petitioner,         )
                              )
          v.                  )   CIVIL ACTION
                              )   NO. 15-12332-WGY
LISA A. MITCHELL,             )
Superintendent, Old Colony    )
Correctional Center,          )
                              )
          Respondent.         )
_____)


YOUNG, D.J.                              October 03, 2016

**MEMORANDUM & ORDER**


I.    **INTRODUCTION**

        A jury convicted petitioner Bryan Johnston ("Johnston") in

2006 of first-degree murder, use of a large capacity firearm in

commission of a felony, possession of a large capacity firearm

without a license, and armed burglary.  At trial, Johnston

admitted that he killed the victim, but argued that he lacked

criminal responsibility for his actions under Massachusetts law.[1]

_____
        [1] In Massachusetts, "once a defendant raises the issue of
criminal responsibility, the Commonwealth has the burden to
prove, beyond a reasonable doubt, that the defendant did not
lack the substantial capacity to appreciate the wrongfulness of
her conduct or to conform her conduct to the requirements of the
law, as a result of a mental disease or defect." Commonwealth
v. Berry, 457 Mass. 602, 612 (2010) (internal citations
omitted).  For an overview of some of the thorny issues involved
in considering a defendant's mental illness when determining his

The Supreme Judicial Court ("SJC") affirmed his convictions and the denial of his motion for a new trial. <u>Commonwealth</u> v. <u>Johnston</u>, 467 Mass. 674 (2014).

Johnston now files a petition for habeas corpus relief before this Court on the basis of ineffective assistance of his trial counsel (his "counsel"). Specifically, he claims that counsel was ineffective in his (1) failure to move to have Johnston's statements made in jail and at Bridgewater State Hospital suppressed, Mem. Supp. Pet'r's Habeas Corpus ("Pet'r's Mem.") 14-36, ECF No. 26; (2) failure to move to exclude Johnston's statements in which he invoked his right to counsel and his refusals to answer questions, <u>id.</u> at 36-46; (3) failure to object to the prosecutor's statement that Johnston had "constructed" a defense, <u>id.</u> at 46-50; and (4) eliciting testimony regarding Johnston's being "moon-faced" without impeaching the testifying witness, <u>id.</u> at 50-53.

Johnston raises some troubling issues: for example, the jury ought not have heard about Johnston's repeated requests to speak with his attorney while at Bridgewater State Hospital. Reviewing his petition under the strictures of the current habeas statutory framework, however, the Court cannot grant him relief.

---

criminal responsibility, see generally Michael Pierce, Case Comment, <u>Commonwealth v. Shin</u>, 97 Mass. L. Rev. 15-18 (2015).

**A.    Factual Background**

The Court must "accept the state court findings of fact unless [Johnston] convinces [the Court], by clear and convincing evidence, that they are in error." Lynch v. Ficco, 438 F.3d 35, 39 (1st Cir. 2006) (internal citations omitted).[2] As the issues raised on habeas all relate to Johnston's statements after the crime, or to counsel's decisions at trial,[3] the discussion of the underlying facts will be concise.

Johnston had a phone conversation with the victim in the evening of December 6, 2004, after which Johnston drove to the

---

[2] Johnston argues that the SJC's recitation of the facts "omits [certain] details" from the testimony at trial that are helpful to him, Pet'r's Mem. 5, and includes these snippets in his recitation of the facts, id. at 5-13, but reality he challenges only one particular factual finding as an "unreasonable determination of the facts." Specifically, Johnston claims that the SJC's determination "that Johnston did not invoke his right to silence . . . . was an unreasonable determination of the facts, to the extent that it is relevant to Johnston's right to counsel claim." Id. at 23 n.8. While Johnston "doubts" that another of the SJC's factual determinations "reflects reality[,]" he does not challenge it as unreasonable. Id. at 41 n.23. This issue will be discussed infra, with this section briefly recounting the pertinent background facts of Johnston's case, drawing on the SJC's recitation of them.

[3] Again, this was not a case about whether Johnston actually committed the acts alleged, but rather whether he was responsible for them. See Johnston, 467 Mass. at 680 ("Trial counsel told the jury in his opening statement that the defense was lack of criminal responsibility. The Commonwealth's theory was that the defendant did not suffer from a mental illness, and any delusions he ever experienced were the result of substance abuse.").

victim's house and shot him six times with a rifle.  <u>Johnston</u>,

467 Mass. at 677.  Driving back to his own apartment after the

shooting, Johnston wrecked his car and, after failing a field

sobriety test, "was allowed [by two police officers] to

telephone a friend[,]" who drove him back to his apartment at

about 1:00 AM on December 7, 2004.  <u>Id.</u> at 678-79.

> [W]hile he was waiting for his friend to arrive and
> drive him [home], [Johnston] left a voice message for
> a female friend.  He apologized for missing her call
> and said he was 'wondering what you're up to tonight.'
> He spoke in his typical 'calm, easygoing, fun-loving .
> . . nonchalant' tone.  As [Johnston's] friend was
> driving him home from the restaurant [Johnston] said,
> 'It's a good thing the cop didn't search me. . . . I
> have my piece on me.'  [Johnston] produced a handgun
> and said there were six rounds in it.  He also said
> that his license to carry a gun had been revoked.

<u>Id.</u> at 679 (alterations in original).

> Approximately four hours after the murder, at 4:45
> a.m. on December 7, 2004, [Johnston] telephoned his
> parents.  He was making no sense, talking about the
> mafia and gangs, and threatening to commit suicide.
> At 6 a.m., his sister, a psychiatric nurse, returned a
> telephone call she had received from him.  He made no
> sense.  When his parents arrived at his apartment at 8
> a.m., he was saying bizarre things and his eyes were
> unfocused.

<u>Id.</u> at 682.

> At about 9 a.m. the same day two Westfield police
> officers went to the defendant's apartment and asked
> him to accompany them to Noble Hospital in Westfield
> for a psychiatric evaluation that was ordered by a
> District Court judge pursuant to G.L. c. 123, § 12, on
> the application of his parents.  The defendant refused
> to comply and a struggle ensued.  The defendant was
> subdued through the use of pepper spray.

In the meantime, Amherst and State police investigators were given the name of the defendant by the victim's girlfriend.  They went to the defendant's apartment in Westfield and were made aware of the defendant's civil commitment.  The defendant's father consented to a search of his own car, which contained some items he and his wife had removed from the defendant's apartment for their son's safety, including a .38 caliber handgun.  The defendant's father also consented to a search of the defendant's apartment.  Among the items recovered from the two locations were a .223 caliber magazine having a capacity of ninety rounds, and a loaded .40 caliber Sig Sauer pistol.  The next day, December 8, investigators returned to the defendant's apartment with a search warrant.  They recovered several items, including a "fanny" pack containing hypodermic syringes and bottles of two different anabolic steroids.  From a dumpster at the apartment complex, investigators also recovered a gun case capable of holding a rifle.

Id. at 679.

In the years leading up to the instant crime, Johnston had exhibited signs of extreme paranoia, believing, for example, "that Federal Bureau of Investigation (FBI) agents had rappelled off the roof of his apartment complex and observed him from the window of his twenty-seventh floor apartment."  Id. at 680. These paranoid delusions caused him to flee Hawaii, where he had been attending college, in 2002, and enroll at Westfield State College, in Massachusetts.  See id. at 680-81.  He continued to experience them while in Massachusetts.[4]

---

[4] For example,

On October 19, 2002, the defendant walked into the State police barracks in Westfield and claimed people

Johnston believed "that the victim had told him that his crime family had paid to have the defendant anally raped in Hawaii, and that they 'bugged' his apartment in Hawaii and his parents' home."  Id. at 681.  Johnston also "claimed to have seen the victim at Westfield State College the day before the murder.  The victim walked out of a class (where he was not a student), smiled eerily at the defendant, and said, 'I can get you whenever I want.'"  Id.

Regarding his mental health, Johnston "experienced paranoid delusions both when he was intoxicated or on drugs, and when he was sober.  He was not always delusional when intoxicated or on drugs.  His delusional fear of organized crime families and of gangs intensified during the six months preceding the victim's death."  Id. at 682.  There was expert testimony at trial regarding Johnston's mental illnesses and their effect on his criminal responsibility.  Johnston presented testimony from two

---

were chasing him.  A State police officer tried to reassure him that no one was in the parking lot.  The defendant would not accept the officer's assertions as true, and he dialed 911.  The defendant's state of agitation did not abate, so the officer telephoned the defendant's father and then handcuffed the defendant to a bench for safety purposes.  After his father arrived the defendant was released.  The defendant told his father that he had visited a friend in the Albany, New York, area and was followed by the mafia on his drive back to Westfield.

Johnston, 467 Mass. at 681.

experts: Dr. Carol Feldman ("Dr. Feldman"), "a forensic psychologist," and Dr. Martin Kelly ("Dr. Kelly"), "a forensic psychiatrist." Id. at 682-83. "Dr. Feldman opined that, at the time of the killing, [Johnston] suffered from the mental illness paranoid schizophrenia and, although he generally appreciated the wrongfulness of killing, he lacked substantial capacity to appreciate the wrongfulness of killing the victim, and he was unable to conform his conduct to the requirements of the law." Id. at 683. "Dr. Kelly testified that [Johnston] lacked criminal responsibility due to a paranoid delusional disorder." Id. This disorder can exist alongside normal functioning, and, Dr. Kelly testified, Johnston's delusions were caused by it, and not by drug or alcohol use. Id. at 683-84. The Commonwealth's expert witness, Dr. Michael Welner ("Dr. Welner"), on the other hand, "testified that [Johnston] did not suffer from a major mental illness[,]" and instead that "his drug use" caused the actions. Id. at 684.

A jury returned guilty verdicts as to all of the counts charged, which included "(1) murder in the first degree on theories of deliberate premeditation, extreme atrocity or cruelty, and felony-murder; (2) armed burglary; (3) possession of a large capacity firearm in the commission or attempted commission of a felony; and (4) possession of a large capacity firearm without a license." Id. at 676.

**B.    Procedural History**

Johnston was convicted by a jury after a trial in the Massachusetts Superior Court sitting in and for the County of Hampshire.  See Johnston, 467 Mass. at 674.  His motion for a new trial was denied without an evidentiary hearing.  Id. at 676.  The SJC consolidated his direct appeal and appeal from the denial of the new-trial motion and affirmed.  Id. at 676-77.  He filed a petition for habeas corpus in this Court.   Compl., ECF No. 1.  The matter has been fully briefed, see Pet'r's Mem.; Resp. Lisa A. Mitchell's Mem. Opp. Pet. Writ Habeas Corpus ("Govt.'s Mem."), ECF No. 31; Reply Mem. Supp. Pet. Habeas Corpus ("Pet'r's Reply"), ECF No. 36,[5] and the Court held a hearing on June 29, 2016, Elec. Clerk's Notes, ECF No. 40.

**II.  ANALYSIS**

Johnston argues that his counsel was ineffective for four reasons: (1) failure to move to suppress statements Johnston made after he had been given a Miranda warning, see Pet'r's Mem. 14-36; (2) failure to move to exclude Johnston's statements in which he invoked his right to counsel and his refusals to answer various questions, id. at 36-46; (3) failure to object to the trial prosecutor's statement that Johnston had "constructed" a

---

[5] The record was filed in paper copy with the Court, Notice Manual Filing, ECF No. 19, and thus citations to, for example, the trial transcript, will not include an ECF number.

defense, id. at 46-50; and (4) eliciting testimony regarding Johnston's being "moon-faced" without impeaching the testifying witness, id. at 50-53. The Court first discusses the applicable legal framework, and then addresses these arguments in turn.

### A. Standard of Review

The Antiterrorism and Effective Death Penalty Act ("AEDPA") governs this Court's posture on review. AEDPA provides, in relevant part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --
>     (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>     (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (emphasis supplied).

Johnston does not dispute that AEDPA applies generally to the Court's review of his petition. See Pet'r's Mem. 40, 51. As to his first claim (regarding the admission of his post-Miranda statements made in the absence of counsel), however, Johnston argues that AEDPA, by its terms, does not apply because the claim was not "adjudicated on the merits in State court." See id. at 19-22. This is a weighty determination, because if AEDPA does not apply, then the Court would review the argument

de novo, meaning the Court would analyze one of the grounds
Johnston proffers in support of his ineffective assistance of
counsel claim with no deference to the state court's
determination.  While Johnston is correct that the SJC did not
explicitly discuss the underlying Fifth Amendment violation that
he argues gives rise to a Sixth-Amendment claim -- and, with
respect, that court did appear to misunderstand this argument[6] --
the SJC's opinion nonetheless suffices as an adjudication on the

---

[6] Johnston argues that the SJC's subsequent statements show
that it fundamentally misunderstood his claim, which is that his
counsel's failure to object constituted ineffective assistance
of counsel because it prevented his Fifth Amendment right from
being vindicated at trial.  Pet'r's Mem. 20.  After clarifying
that Johnston "does not argue that he invoked his right to
remain silent[,]" the SJC claimed that he "focuses on [his]
right to counsel under the Sixth Amendment," and since
defendants do "not have a Sixth Amendment right to have [their]
lawyer present during the court-ordered psychiatric
interview[,]" rejected that claim.  Johnston, 467 Mass. at 687.
As the Commonwealth points out, the SJC, in asserting that
Johnston lacked a "Sixth Amendment right to have his lawyer
present during the court-ordered psychiatric interview[,]" id.,
cited to a Massachusetts case that cited to the Supreme Court
case on which Johnston primarily relies, see Pet'r's Mem. 20-21.
The SJC, however, did so not to refute the asserted Fifth-
Amendment violation that resulted from his counsel's
ineffectiveness, but to show that his counsel's ineffectiveness
could not have led to a violation of his Sixth Amendment right
to counsel, because with respect to the psychiatric interviews
at issue, Johnston had no Sixth Amendment right.
    Another part of the SJC's opinion, however, can be read to
contain an implicit ruling that Johnston lacked a Fifth
Amendment right to counsel when answering medical questions at
the hospital and jail: while discussing another of Johnston's
claims, the SJC stated Johnston "was not entitled to have
counsel present during the psychiatric interviews[.]"  Johnston,
467 Mass. at 689.

merits.  See Almonte v. Gelb, No. 14-CV-10538-IT, 2015 WL
1186278, at *5 (D. Mass. Mar. 16, 2015) (Talwani, J.) (internal
citation omitted) ("[T]o treat a claim on the merits, a state
court need not necessarily have expressly addressed and resolved
that claim in its opinion.").  This ruling is consistent with
Supreme Court's "presumption of merits adjudication," Johnson v.
Williams, 133 S. Ct. 1088, 1097 (2013),[7] even if it is in some
tension with the First Circuit's recent decision in Rosario v.
Roden, 809 F.3d 73 (1st Cir. 2015), which called for a more
searching inquiry.[8]

---

[7] The Supreme Court showed the force of the on-the-merits
presumption in Harrington v. Richter, 562 U.S. 86 (2011),
holding that "[w]here a state court's decision is unaccompanied
by an explanation, the habeas petitioner's burden still must be
met by showing there was no reasonable basis for the state court
to deny relief a summary denial of a petition qualified for
AEDPA's deferential review."  Id. at 98.  There, the California
Supreme Court had denied a petition in a single sentence,
without referencing specific claims, see id. at 86, and there
was no lower court opinion that did offer an explanation for the
denial, see Richter v. Hickman, 578 F.3d 944, 951 (9th Cir.
2009), rev'd and remanded sub nom. Harrington v. Richter, 562
U.S. 86 (2011) (explaining that in habeas review a federal court
"look[s] through" to the "last reasoned state court decision"
but that there was none).

[8] In Rosario v. Roden, 809 F.3d 73 (1st Cir. 2015), the
First Circuit reviewed a claim brought on a habeas petition de
novo because the SJC issued a written opinion that "did not
address the precise constitutional due process issue presented
[in Rosario]."  Id. at 74 (emphasis supplied); see also Montanez
v. Mitchell, No. CIV.A. 12-11882-FDS, 2014 WL 949602, *3 (D.
Mass. Mar. 10, 2014) (Saylor, J.), aff'd, 609 F. App'x 5 (1st
Cir. 2015) (applying de novo review where "the state court did
not expressly and individually address petitioner's
constitutional challenge[,] . . . [it neither] acknowledge[d] in

### B.    Ineffective Assistance of Counsel Framework

"To succeed on [an ineffective-assistance-of-counsel] claim, [a petitioner] must establish both [1] that counsel's representation fell below an objective standard of reasonableness and [2] that there exists a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[9]  Turner v. United States, 699 F.3d 578, 584 (1st Cir. 2012).  The Court has discretion to begin its analysis with either the first or second prong; both are needed.  See id. at 584.  The standard for the second prong (i.e., the prejudice prong) is that of "[a] reasonable probability," meaning "one sufficient to undermine confidence in the outcome."  Id. (internal citations omitted). "In weighing the prejudicial effect of counsel's errors, [the Court] must consider the totality of the evidence before the judge or jury."  Id. (internal citations omitted).  This includes at least "three factors: first, the strength of the prosecution's case; second, the effectiveness of the defense that was presented at trial; third, the potential value of the

_____

any other way that it had considered and rejected the claim, . . . . [nor] ma[de] a broad statement that all allegations of error lacked merit.").

   [9] The test is called the Strickland test, after the Supreme Court case that articulated the test, Strickland v. Washington, 466 U.S. 668 (1984).

new evidence and new avenues for cross-examination in undermining the credibility of the government witnesses' testimony." Id. (internal citations omitted).

When reviewing an ineffective assistance of counsel claim on habeas review that has already been denied on the merits by a state court, the Court's inquiry is

> whether the state court's application of the
> Strickland standard was unreasonable.  This is
> different from asking whether defense counsel's
> performance fell below Strickland's standard.  Were
> that the inquiry, the analysis would be no different
> than if, for example, this Court were adjudicating a
> Strickland claim on direct review of a criminal
> conviction in a United States district court.  Under
> AEDPA, though, it is a necessary premise that the two
> questions are different.  For purposes of §
> 2254(d)(1), an unreasonable application of federal law
> is different from an incorrect application of federal
> law.  A state court must be granted a deference and
> latitude that are not in operation when the case
> involves review under the Strickland standard itself.

Harrington, 562 U.S. at 101 (internal citation and quotation marks omitted).

**C.  Merits**

Johnston bases his ineffective assistance of counsel claim on four distinct errors on the part of his counsel.  The Court addresses these in turn.

**1.  Suppression of Johnston's Post-Miranda Statements**

Johnston's first argument is that counsel's failure to move to suppress his statements "to jail and Bridgewater staff" in the absence of counsel from December 8 onwards constituted

ineffective assistance of counsel.  Pet'r's Mem. 22-36.[10]  He claims that his invocations of his right to counsel were sufficiently unambiguous under established Supreme Court caselaw to trigger the Fifth Amendment's protections.  See Pet'r's Mem. 23 (citing Minnick v. Mississippi, 498 U.S. 146, 148-49 (1990)).  Further, Johnston argues that his subsequent statements are irrelevant because they were made "after a clear invocation of the right to counsel."  Id. at 26.

To prevail on this claim, Johnston must show both that such a motion would have succeeded and "that there is a reasonable probability that the verdict would have been different absent the excludable evidence[.]"  Kimmelman v. Morrison, 477 U.S. 365, 375 (1986).  More precisely, he must show that the SJC's contrary conclusion was based on an unreasonable application of federal law.  See supra.  Johnston fails, as his desired motion to suppress would not have been granted, thus counsel's failure to bring it was not ineffective.

---

[10] Johnston focuses on his statements as noted on treatment records prepared by clinical staff at Bridgewater State Hospital and his statements made during his medical intake at Hampshire Jail and House of Corrections.  He allows that "the admission of his statements during his actual court-ordered examinations by Dr. Peebles[]" was proper, and challenges only "the admission of dozens of statements to essentially anonymous persons in the Bridgewater records that were not part of the court-ordered examination."  Pet'r's Reply 2-3.

Johnston's argument hinges on the notion that he could "validly assert [his] <u>Miranda</u> rights when approached for a <u>psychological</u> examination[,]" Pet'r's Reply 4 (citing <u>Estelle</u> v. <u>Smith</u>, 451 U.S. 454, 468-69 (1981)), and that "once invoked," the questioning was required to cease so that counsel could "be actually present for a later state-initiated waiver of [his Fifth-Amendment right against compelled self-incrimination.]" <u>Id.</u> at 4 (citing <u>Minnick</u>, 498 U.S. at 153).  Put differently, Johnston's proffered rule is that "when a Miranda right is asserted at a psychological evaluation directed to issues other than criminal responsibility, later responses are inadmissible at the guilt phase of trial."  <u>Id.</u> (citing <u>Estelle</u>, 451 U.S. at 468-69).  Thus, Johnston's counsel was ineffective, he contends, because instead of "mov[ing to exclude [the entire Bridgewater record] other than the formal interviews of Johnston[,]" counsel instead "moved to admit [it all,]" <u>id.</u> at 6 (citing Tr. 14:64), even though the record contained statements obtained in violation of his rights under the Fifth Amendment.

For Johnston's Fifth Amendment rights to have been implicated, he must have been subject to "custodial interrogation[,]" where "interrogation" refers to "any words or actions . . . that the [government actor] should know are reasonably likely to elicit an incriminating response from the suspect[,]" <u>Rhode Island</u> v. <u>Innis</u>, 446 U.S. 291, 301 (1980)

(internal footnotes omitted).[11]  The Commonwealth argues that the

interviews of Johnston at the jail and Bridgewater State

Hospital did not constitute "custodial interrogation":

> [A]t the jail, Johnston was being seen for a "medical
> intake" by a Licensed Practical Nurse (R.171), and at
> the hospital, he was being evaluated and observed by
> various mental health providers regarding his mental
> health status as part of court-order under M.G.L. c.
> 123, § 18(a).  The purpose of the § 18(a) evaluation
> was very specific: to determine "whether or not
> [Johnston] should be committed to a psychiatric
> facility. . .; if [he] had a mental illness, what kind
> of treatment [he] may benefit from; if [he] did not
> meet commitment standards and would return to where
> [he] was awaiting trial . . . what might be helpful to
> reduce the risk of harm to [himself] or others due to
> mental illness, if it was present."

Govt.'s Mem. 19 (internal citations omitted).

That medical records produced as part of a section 18(a)

evaluation were admitted at trial is unremarkable.  See Mass.

Gen. Laws Ch. 233, § 79; id. § 20B(b) (waiving psychiatrist-

patient privilege when a patient has been subject to a court-

---

[11] Johnston is correct that the Supreme Court has instructed
that Fifth Amendment protections apply even when it is a
psychiatrist, and not a police officer, questioning a suspect.
See Estelle v. Smith, 451 U.S. 454, 464-65 (1981) ("The Fifth
Amendment privilege is directly involved here because the State
used as evidence against respondent the substance of his
disclosures during the pretrial psychiatric examination.  The
fact that respondent's statements were uttered in the context of
a psychiatric examination does not automatically remove them
from the reach of the Fifth Amendment.") (internal footnote
omitted).  It is not correct, however, that every time a
psychiatrist questions a defendant there has been a "custodial
interrogation."

ordered examination to extent that the communications "are
admissible only on issues involving the patient's mental or
emotional condition"); id. § 20B(c) (waiving privilege when a
"patient introduces his mental or emotional condition as . . .
[a] defense").[12]

> The Commonwealth correctly points out that
>
> [t]here is nothing in the records that shows the
> medical staff failed to heed the defendant's
> declarations that he would not answer certain
> questions until he spoke to his attorney.  Moreover,
> there is nothing to suggest the medical staff asked
> Johnston any questions about the charges and any
> questions that were asked appear to have been limited
> to his current mental status, consistent with M.G.L.
> c. 123, § 18(a).

Govt.'s Mem. 20; see Pet'r's Mem. 26 n.10 (citing Tr. 19:316)

(describing how Johnston was "seen every day by clinical staff

[at Bridgewater State Hospital] to monitor his mental status.")

(emphasis supplied).  These medical interviews were not of a

criminal-investigative nature and thus did not constitute

"interrogations" under the Fifth Amendment, therefore their

admission does not violate Johnston's constitutional right

against compelled self-incrimination.  See Coble v. Quarterman,

---

[12] For example, the defendant in Commonwealth v. Brown, 449
Mass. 747 (2007) had also been "sent to Bridgewater for
evaluation pursuant to G.L. c. 123, § 18(a)" moved to admit his
records from Bridgewater, and argued on appeal that the trial
judge's rejection (as cumulative) deprived him of his right to
present a defense based on insanity.  See Brown, 449 Mass. at
749 (rejecting that argument).

496 F.3d 430, 440 (5th Cir. 2007) (holding that a "psychiatric consultation was not a custodial interrogation.").[13] Accordingly, a motion to suppress, at least on the ground articulated by Johnston here, would not have been granted, and thus his counsel's failure to so move is not ineffective assistance of counsel.  See, e.g., Kimmelman, 477 U.S. at 375.

### 2.  Johnston's Invocation of his Right to Counsel

Johnston next argues that counsel's failure to move to suppress Johnston's statements (in the medical records) in which he invoked his right to counsel and his refusal to answer questions also constituted ineffective assistance of counsel. Pet'r's Mem. 36-46.  Johnston's claim here is similar to the one above, except that it "focuses on discrete pieces of evidence that should have been excluded -- Johnston's multiple valid invocations of his right to counsel -- as opposed to all subsequent statements following the first valid invocation of

---

[13] The Court agrees with the Fifth Circuit's analysis of a similar issue: "[u]nlike the defendant in Estelle v. Smith, [the petitioner] was not faced with a phase of the adversary system, but was in the presence of a person acting solely in his interest.  Therefore, the [psychiatric] report did not violate his Fifth Amendment right."  Coble, 496 F.3d at 440 (internal citation omitted); cf. Penry v. Johnson, 532 U.S. 782, 795, (2001) (internal citations omitted) ("[O]ur opinion in Estelle suggested that our holding was limited to the 'distinct circumstances' presented there.  It also indicated that the Fifth Amendment analysis might be different where a defendant 'intends to introduce psychiatric evidence at the penalty phase.'  Indeed, we have never extended Estelle's Fifth Amendment holding beyond its particular facts.").

the right to counsel."  Pet'r's Mem. 36 n.19.  Johnston points

to counsel's closing argument, during which, in attempting to

explain why Johnston's records from the jail and Bridgewater

State Hospital did not describe hallucinatory symptoms, he

implored the jury to "look at the Bridgewater records" where

they would see "day after day after day that Mr. Johnston

doesn't give answers to any of the questions that he's asked, .

. . take a look at 'Wouldn't talk to me because his lawyer told

me not to.'  Over and over and over again." Id. at 30 (citing

Tr. 21:80-81).

    The SJC ruled that "the portion of [Johnston's] refusals

that are identified with the advice of counsel is protected, as

is [Johnston's] request to confer with counsel before answering.

All references to counsel, but not the refusals themselves (he

did not invoke his right to silence), should have been the

subject of a motion to redact."  Johnston, 467 Mass. at 689.

The SJC then analyzed whether "the admission in evidence of the

defendant's requests to confer with counsel and that portion of

his refusals identified as having been on advice of counsel

created a substantial likelihood of a miscarriage of justice."

Id. at 690.  Ultimately, the SJC concluded both "that trial

counsel followed a reasonable strategy" and that "there is no

substantial likelihood of a miscarriage of justice."  Id. at

692-93.  Thus, mapped onto the federal <u>Strickland</u> standard,[14] discussed <u>supra</u>, it appears the SJC effectively held that neither prong of the ineffective assistance of counsel claim is satisfied here.[15]

Johnston argues that the SJC's conclusion that his counsel's strategy was reasonable, and further, that he was not prejudiced, constituted an unreasonable application of federal law.  <u>See</u> Pet'r's Mem. 40-46.  The Court disagrees.

With respect to the permissibility of counsel's strategy, the SJC adopted the trial judge's statement (made when denying Johnston's motion for a new trial) that counsel's decision to admit these records -- references to acting on advice of counsel and asking to speak to counsel included -- was a reasonable one because the references "explain the absence of psychotic

---

[14] The SJC's application of Massachusetts's standard constitutes an adjudication on the merits because it is "at least as favorable" to Johnston as the federal standard.  <u>See, e.g.</u>, <u>Mello</u> v. <u>DiPaulo</u>, 295 F.3d 137, 143 (1st Cir. 2002).

[15] Sometimes, the SJC's analysis focuses on prejudice, while, within the same five-factor framework, honing in on the reasonableness of counsel's strategy at other points.  <u>Compare, e.g.</u>, <u>Johnston</u>, 467 Mass. at 692 (discussing the second factor and concluding "that trial counsel followed a reasonable strategy[]" in moving to admit the inadmissible references), <u>with</u> <u>id.</u> at 691 (discussing the third factor and asserting that the "quantum of evidence of criminal responsibility . . . was significant.").  Although the Court denies Johnston relief, it notes that the SJC here appeared to conflate the two steps of <u>Strickland</u>'s doctrine, and in doing so produced an at times confusing opinion with respect to this claim.

statements at Bridgewater while [per the judge's limiting instruction] avoiding the potentially adverse inferences that the evidence could also give rise to, e.g., that [Johnston's] compliance with his attorney's advice was evidence of his sanity." Johnston, 467 Mass. at 692.

As Johnston's briefing elucidates,[16] counsel's strategy suffers from a serious flaw: given that the jury heard about Johnston's attorney's request that Johnston be treated for schizophrenia, see id. at 47 (citing Tr. 18:266-267), and that the prosecutor argued in closing that the lack-of-criminal responsibility defense "was constructed very soon after the [killing,]" id. (citing Tr. 21:133), this strategy risked highlighting the role of Johnston's lawyer in the immediate aftermath of the crime.  Nevertheless, "[e]ven a strong case for relief does not make the state court's contrary conclusion

---

[16] The explaining-the-absence rationale for allowing the testimony is flawed, Johnston argues, because Johnston made plenty of statements post-killing, see Pet'r's Mem. 41-42 (citing Tr. 5:207-09, 212-13, 220, for example), and made psychotic statements to Dr. Peebles, id. at 42 (citing Tr. 19:301, R. 26-27).  The avoiding-juror-speculation (over the redactions in the psychiatric records submitted to them) rationale is undermined by counsel's failure to object when the Commonwealth referred to such records as "sanitized," id. (citing Tr. 14:64, 74), and the fact of multiple other redacted records given to the jury, id. (citing Exs. 28, 83, 83, 85, 86, for example).  It also undermined the entire defense, Johnston argues, because the Commonwealth was able to argue that "Johnston's ability to follow his attorney's advice demonstrated that he was criminally responsible." Id. at 43 (citing Tr. 15:32-34, 36-39, 42-47, 208, as examples).

unreasonable."  Harrington, 562 U.S. at 88.  Relatedly, the

SJC's finding that Johnston was not prejudiced by counsel's

strategy is supported by the lack of convincing evidence of

Johnston's having psychotic delusions in the time period

immediately surrounding the killing, despite being un-medicated.

As Johnston's counsel was stuck between a rock and a hard place,

the Court is not convinced that the SJC's resolution of the

issue was unreasonable.

### 3.   "Constructed" Defense

Johnston next argues that counsel's failure to object to

the trial prosecutor's statement that Johnston had "constructed"

a defense rendered his counsel's performance constitutionally

deficient.  Pet'r's Mem. 46-50.

Johnston first points to a portion of the Commonwealth's

opening statement in which the jury is told that Johnston's

mother "first had spoken to an attorney and, after speaking to

an attorney, had contacted the crisis services in Westfield, and

the police department was called in to assist in taking him into

custody."  Pet'r's Mem. 47 (citing Tr. 5:62).  The SJC ruled

that the Commonwealth's opening argument was proper, and

therefore Johnston's counsel was not ineffective for failing to

object to it.  Johnston, 467 Mass. at 693.  The statement at

issue is in the middle of a lengthy narrative, and merely

explains how the police ended up taking Johnston into custody.

<u>See</u> Tr. 5:61-63.  The Commonwealth did not suggest anything

nefarious in explaining Johnston's mother's consultation with an

attorney, and Johnston has identified no authority that calls

for a per se ban on references to a third party's consulting

with an attorney.

Next, Johnston claims that "the unifying theme of the

prosecutor's closing argument was that Johnston's insanity

defense was concocted after he was charged, and necessarily

after he had consulted counsel."  Pet'r's Mem. 47.  In reality,

however, the Commonwealth's closing argument focused on

undermining Johnston's expert witnesses' reports, <u>see</u> Tr. 21:84-

88, the improvement of Johnston's mental health and his ability

to function, <u>id.</u> at 100-07, and the deliberate nature of

Johnston's acts, <u>id.</u> at 111-24.[17]  The statement at issue --

referencing to "a defense that was constructed very soon after

he event," <u>id.</u> at 133 -- was, as the SJC ruled, in error, <u>see</u>

<u>Johnston</u>, 467 Mass. at 695, but the Court holds that the SJC's

---

[17] The Commonwealth's closing argument in fact consumed over
fifty pages of trial transcript, which the SJC held up as
evidence that the challenged comment was a minor part of it.
<u>Id.</u> at 84-137; <u>Johnston</u>, 467 Mass. at 694 ("The [challenged]
argument occupies about two lines of fifty-three transcript
pages of a closing argument that otherwise was focused on a
close and careful analysis of the evidence. . . . We are
satisfied that this minor flaw in a closing argument that
otherwise was delivered in a way that must have impressed the
jury that the case was entitled to their full, thorough, and
respectful consideration of all the evidence did not create a
substantial likelihood of a miscarriage of justice.").

conclusion that it was too fleeting to justify habeas relief, see id., was not unreasonable.   See, e.g., Kirwan v. Spencer, 631 F.3d 582, 591 (1st Cir. 2011) (affirming denial of habeas petition because the petitioner did not "demonstrate that there is a 'reasonable probability' that the result of his trial would have been different if his attorney had objected to, or sought curative instructions regarding, the prosecutor's statements") (citing Strickland, 466 U.S. at 694).

Third, Johnston claims his counsel ought have objected to the elicitation of testimony on the re-direct examination of Dr. Welner.   Pet'r's Mem. 47.   Specifically, he argues the admission of the following statement of Dr. Welner statement was in error:

> [Dr. Anfang] advised [Johnston] that his lawyer was concerned he get treatment for schizophrenia.  So the discussion of his taking anti-psychotic medication came up with the doctor saying that this is what your lawyer wants you to do.  And he goes on to say, 'Supposedly longstanding delusions.  It is notable that inmate was able to conduct himself behaviorally without overt problems, discontrol [sic], during [his] entire Bridgewater hospital stay . . . and there are concerning inconsistencies in his subjective report and observed presentation.

Tr. 18:266-67.[18]

_____

[18] Johnston's counsel had emphasized the unprovoked nature of his assaulting another inmate while he was at the house of correction as circumstantial evidence of his lack of criminal responsibility.  See, e.g., Tr. 18:190; Johnston, 467 Mass. at 694 ("The significance to [Johnston's expert witness] was that [Johnston], who had been confined at the house of correction, was sober, yet delusional, at the time of the two incidents with inmates.").  The Commonwealth, on redirect, attempted to suggest

The SJC appeared to rule that counsel did not err in failing to object to and move to strike this statement.  See Johnston, 467 Mass. at 694-95 (noting that there was no "indication that the defense of lack of criminal responsibility had been concocted.").  Given that this was one of Dr. Welner's many long answers, his counsel could have made a strategic decision to decline to move to strike.  Cf., e.g., Neverson v. Bissonnette, 242 F. Supp. 2d 78, 92 (D. Mass. 2003), aff'd on other grounds sub nom. Neverson v. Farquharson, 366 F.3d 32 (1st Cir. 2004) (denying ineffective assistance of counsel claim and noting that a reasonable attorney could have concluded that "a motion to strike would draw undue attention to the [challenged] testimony by the jury").  Accordingly, the SJC was not unreasonable in concluding that this inaction on the part of Johnston's counsel did not constitute ineffective assistance of counsel.

### 4.   "Moon-Faced" Testimony

---

that these assaults were not the product of any psychotic delusions but rather were evidence of Johnston's criminality. See Tr. 18:264-266.  The Commonwealth also wanted specifically to cast doubt on an independent evaluation of Johnston that concluded that these assaults were the result of his paranoid delusions.  See id. at 18:265, and it did so by asking Dr. Welner to read from Dr. Anfang's notes (which had referenced the results of this evaluation), because Dr. Anfang was skeptical of Johnston's truthfulness.  Id. at 265-66.

Finally, Johnston claims that counsel's eliciting of testimony regarding Johnston's being "moon-faced," without impeaching the testifying witness, constituted ineffective assistance of counsel.  Pet'r's Mem. 50-53.[19]

The SJC evaluated this claim and rejected it:

> The trial judge concluded that although counsel was negligent, there was no prejudice because there was strong evidence that the defendant in fact used anabolic steroids.  We agree.  Although this was a lost opportunity to impeach Dr. Welner, whose credentials also included board certification in psychopharmacology, that is, expertise in matters that

---

[19] Johnston points to the following exchange between counsel and the Commonwealth's expert witness:

Q:   . . . you describe Mr. Johnston as moon-faced?
A:   Yes.
Q:   Why did you choose the word "moon-faced"?
A:   That's a medical term
Q:   What does it mean?
A:   It refers to a round face, a particularly round face that is specifically associated in people who are especially heavy steroid users.  That after they have been using steroids for quite some period of time, there are a number of changes in the body habitus, one of which is that the face may become quite round.  And having evaluated, assessed, people with what is known as moon-faces, I believe that [Johnston's] presentation was consistent with a person who had moon-faces.
. . .
Q: He hadn't done steroids for more than a year?
A:   That's correct
Q:   So you believe it was the leftover remnants of his steroid abuse?
A:   Absolutely. . . . The effects of steroid use may continue to manifest themselves long after the person has stopped.

Tr. 18:196-98.

> include side effects and consequences of drugs, the
> record indicates that trial counsel impeached him on
> multiple fronts during 270 transcript pages of his
> cross-examination.  Failure to use a particular method
> of impeachment does not constitute ineffective
> assistance of counsel.

Johnston, 467 Mass. at 695-696.

While counsel's question to the Commonwealth's expert witness concerning Johnston's characterization as "moon-faced" may have hurt Johnston's case insofar as it emphasized that Johnston had been using steroids (which would provide an alternate explanation for his aggression independent of his mental illness), the Court is not convinced that the SJC's determination as to the insufficiency of the resulting prejudice was an unreasonable one, as the point was minor and counsel impeached Dr. Welner in other ways.  See, e.g., Knight v. Spencer, 447 F.3d 6, 17 (1st Cir. 2006) (affirming denial of habeas petition for failure to impeach a witness on a particular point because "[d]efense counsel at trial . . . notably did examine [the witness] on a number of issues").[20]

---

[20] Johnston asks the court to "evaluate the cumulative prejudice from each aspect of counsel's ineffective assistance." Pet'r's Mem. 53 (citing Dugas v. Coplan, 428 F.3d 317, 335 (1st Cir. 2005) and Ainooson v. Gelb, 973 F. Supp. 2d 105, 120 n.6 (D. Mass. 2013) (citing Ruth A. Moyer, To Err is Human; To Cumulate, Judicious: The Need for U.S. Supreme Court Guidance on Whether Federal Habeas Courts Reviewing State Convictions May Cumulatively Assess Strickland Errors, 61 Drake L. Rev. 447, 466-67 (2013)).  Even when evaluated together, the Court cannot grant Johnston relief.

## III. CONCLUSION

For the foregoing reasons, Johnston's petition for habeas corpus, ECF No. 1, is DENIED.

<u>/s/ William G. Young</u>
WILLIAM G. YOUNG
DISTRICT JUDGE